## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| KEYSTONE MOUTAIN LAKES REGIONAL COUNCIL OF CARPENTERS as successor in interest to Northeast Regional Council of Carpenters and the NORTHEAST CARPENTERS FUNDS and THE TRUSTEES THEREOF,<br><br>       Plaintiffs,<br><br>       v.<br><br>LLANOS DRYWALL, LLC and MJO DRY WALL CONSTRUCTION LLC,<br><br>       Defendants. | Civil Action No.: 18-cv-<br><br>CIVIL ACTION<br><br>**COMPLAINT** |

Plaintiffs Keystone Mountain Lakes Regional Council of Carpenters, as successor in interest to Northeast Regional Council of Carpenters ("the Union") and Northeast Carpenters Funds and the Trustees Thereof ("the Funds"), by their undersigned attorneys, allege and say as follows:

### NATURE OF THE ACTION

1.      Plaintiff Union brings this action on behalf of the Union and its members. This is an action under sections 502(a)(3) and 515 of the Employee Retirement Income Security Act ("ERISA"), as amended, 29 U.S.C. §§ 1132(a)(3) and 1145, and section 301 of the Labor Management Relations Act ("LMRA"), as amended, 29 U.S.C. § 185, to collect delinquent contributions to employee benefit plans, payment for lost work opportunities and payment for lost wages.

**PARTIES**

2.      Plaintiff Funds are trust funds established and maintained pursuant to section 302(c)(5) of the LMRA, 29 U.S.C. § 186(c)(5), and include employee benefit plans within the meaning of section 3(3) of ERISA, 29 U.S.C. § 1002(3). The Funds bring and maintain this action pursuant to section 502(d)(1) of ERISA, 29 U.S.C. § 1132(d)(1). The Funds are administered at 91 Fieldcrest Avenue, Edison, NJ 08837.

3.      Plaintiff Trustees of the Funds are fiduciaries of the Funds within the meaning of section 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A). The Trustees bring this action on behalf of themselves, the Funds and its participants and beneficiaries pursuant to section 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3). The Trustees maintain their offices and principal place of business at 91 Fieldcrest Avenue, Edison, NJ 08837.

4.      Plaintiff Union, is a labor organization governed by the Labor-Management Reporting and Disclosure Act of 1959 ("LMRDA"), 29 U.S.C. § 401 *et seq.*, with its principal offices located at being located at 91 Fieldcrest Avenue, Edison, NJ 08837. Plaintiff Union is the sole and exclusive bargaining representative for a group of employees employed by Defendant, Llanos Drywall, LLC ("Llanos"). At all times relevant, the Union was and still is a labor organization within the meaning of Section 2(5) of the LMRA.

5.      Upon information and belief, Defendant LLanos was and still is a business entity duly organized and existing under the laws of the State of New Jersey and an employer within the meaning of section 142 of the LMRA, 29 U.S.C. § 142, with an office and place of business located at 315 Madison Street, Passaic, New Jersey 07055. Llanos is an employer in an industry affecting commerce within the meaning of ERISA, including sections 3(5), (11) and (12) of ERISA, 29 U.S.C. §§ 1002(5), (11), and (12).

6.      Upon information and belief, Defendant MJO Dry Wall Construction LLC ("MJO") was and still is an employer within the meaning of section 142 of the LMRA, 29 U.S.C. § 142, with an office and place of business located at 315 Madison Street, Passaic, New Jersey 07055. MJO is an employer in an industry affecting commerce within the meaning of ERISA, including sections 3(5), (11) and (12) of ERISA, 29 U.S.C. §§ 1002(5), (11), and (12).

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, 29 U.S.C. §§ 185 and 1132(e).

8.      Venue properly lies in this District pursuant to 29 U.S.C. §§ 185(a) and 1132(e)(2) because the Union is administrated in New Jersey and Defendants do business in New Jersey.

## FACTS

9.      Llanos is a construction contractor, which at all times relevant was a signatory to a short form agreement with the Union incorporating by specific reference the Collective Bargaining Agreement ("CBA") with the Union and Associated Construction Contractors of New Jersey.  A copy of the short form Agreement is attached as Exhibit A.  A copy of the CBA is attached as Exhibit B.

10.     Pursuant to the terms of the CBA Llanos is obligated, whenever it performs work covered by the CBA's work jurisdiction (Article X), which work is performed within the CBA's territorial jurisdiction (Article VIII), to apply the CBA's wage rates, fringe benefit rates and working conditions.

11.     Pursuant to the terms of the CBA, any work subcontracted by Llanos, which work was covered by the CBAs trade and work jurisdiction, was required to be subcontracted to contractors who were also signatories to the CBA (Article XIX).

12.     Pursuant to the terms of the CBA, Llanos represented its members, officers and supervisory personnel would not attempt to form or participate in the creation of or operation of new or double-breasted corporations for the purpose of avoiding the obligations of the CBA (Article XIX, para. 4).

13.     In addition to the CBA, at all times relevant, the Union and Llanos have been parties to Project Labor Agreements ("PLAs") governing construction at numerous locations in Jersey City, New Jersey, including, as relevant to this Complaint:  615 Pavonia Avenue; 65 Bay Street; 70 Columbus Drive and 80 Columbus Drive (collectively, the "PLA Projects"). The PLAs expressly references the CBA and other trade agreements, and to the extent that their terms are consistent with those of the PLA, incorporates them.

14.     Llanos breached the CBA and PLAs by failing to apply their terms and conditions to covered work on the PLA Projects. Specifically, Llanos failed to hire Union carpenters to perform bargaining unit work on the Projects and to pay contractual wages and benefits for work performed.

15.     Llanos' violations of the CBA and the respective PLAs were formalized by arbitration awards, entered on March 5, 2017 and on May 30, 2016 by arbitrator J.J. Pierson, Esq., the arbitrator designated by the PLA Projects to hear disputes arising under the CBA.

16.     In the May 30, 2016 Arbitration Award, which was issued pursuant to the authority of the CBA and the 70 Columbus PLA, the arbitrator, after finding that Llanos was duly notified of the hearing and considering the evidence presented, sustained the Union's

grievance and entered an Award finding that Llanos, along with its general contractor, Angelo's Construction Co. ("Angelo's"), had violated the CBA and 70 Columbus PLA by failing to hire Union members for CBA work and for failing to pay CBA-scale wages and benefits for that work. As a remedy, the Award directed Angelo's and/or Llanos to pay the Union $382,899.32 as compensation for Llanos' failure to apply the CBA at the 70 Columbus jobsite. The May 30, 2016 Award is attached as Exhibit C.

17.     On or about September 12, 2018, the United States District Court, District of New Jersey entered judgment, in the amount of $382,899.32 representing lost wages and benefits, per the CBA, and $11,750.00, representing the arbitrator's fee, for a total judgment amount of $394,649.32, in favor of the Union and against Llanos and Angelo's, in *Northeast Regional Council of Carpenters, UBCJA v. Angelo's Construction and Llanos Drywall, LLC*, 16-cv-3467.

18.     On or about September 21, 2018, the Union served Writs of Execution on Angelo's assets, resulting in Angelo's payment of $100,948.42 toward its joint liability with Llanos under the judgment docketed at 16-cv-3467. Pursuant to a Consent Order and accompanying Warrant of Satisfaction, entered on the docket, Angelo's liability was satisfied in full for the damages owed to the Union and Funds, leaving Llanos liable to pay the remaining unpaid CBA wages and benefits and the arbitrator's fee, which when credited to reflect Angelo's payment, sums to $293,700.90.

19.     In the March 5, 2017 Arbitration Award, which was issued pursuant to the authority of the CBA and the PLAs, covering construction at: 615 Pavonia Avenue, Jersey City, New Jersey; 65 Bay Street, Jersey City, New Jersey; 80 Columbus Drive, Jersey City, New Jersey, the arbitrator, after finding that Llanos was duly notified of the hearing and considering the evidence presented, sustained the Union's grievance and entered an Award finding that

Llanos had violated the CBA and the relevant PLAs by failing to hire Union members for CBA work and for failing to pay CBA-scale wages and benefits for that work. As a remedy, the Award directed Llanos to pay the Union $885,226.72 as compensation for Llanos' failure to apply the CBA at the various jobsites. The March 5, 2017 Award is attached as Exhibit D.

20. On or about April 24, 2017, the United States District Court, District of New Jersey entered judgment, in the amount of $885,226.72, representing lost wages and benefits, per the CBA, and $3,500.00, representing the arbitrator's fee, for a total judgment amount of $888,726.72, in favor of the Union and against Llanos, in *Northeast Regional Council of Carpenters, UBCJA v. Llanos Drywall, LLC*, 17-cv-2198.

21. On or about November 16, 2017, the Union served Writs of Execution on Llanos' assets, however no assets were available for levy nor discoverable.

22. On information and belief, Llanos has not operated since the Court's entry of the above-referenced April 24, 2017 judgment in favor of the Union.

### The Relationship Between Llanos and MJO

23. On or about August 9, 2017 MJO was incorporated in New Jersey with Valeriano Martinez ("Mr. Martinez") as a principal. See New Jersey Business Gateway Business Record Report for Llanos and for MJO, attached as Exhibits E & F, respectively.

24. Upon information and belief, at relevant times, Defendants shared common ownership, management, interrelated operations, and centralized control of labor relations:

    a. Llanos and MJO perform carpentry work;

    b. Mr. Martinez is the president of Llanos and a principal of MJO;

    c. MJO maintains a place of business and operations at the same address as Llanos, located at 315 Madison Street, Passaic, NJ 07055; and

6

d.  MJO maintains working relationships with certain general contractors who have previously employed Llanos.

25.  Upon information and belief, at relevant times, Defendants shared resources, assets, and employees who performed work covered by the CBA.

26.  Upon information and belief, at relevant times, Defendants acted as a single integrated enterprise; there were no arm's length relationships between them.

27.  Upon information and belief, at relevant times, Llanos's owners, officers, directors, or partners, exercised either directly or indirectly, a significant degree of ownership, management or control of MJO's operations.

28.  Upon information and belief, MJO was created to evade Llanos's obligations under the CBA in direct violation of the CBA's Article XIX, para. 4.

29.  Upon information and belief, by resort to alter ego, Defendants have continued working while avoiding putting assets within reach of judgments and have thereby deprived the Union of remedy for breach of the CBA and PLAs.

## COUNT I
(Recovery of Unpaid Wages and Contributions)

30.  Plaintiffs repeat the allegations in the preceding paragraphs of this Complaint as if set forth at length herein.

31.  At relevant times, Defendants shared common ownership, management, interrelated operations and centralized control of labor relations.

32.  At relevant times, Defendants were operated as a single integrated enterprise and are a single employer for the purposes of collective bargaining obligations.

33.  Alternatively, Llanos and MJO are alter egos of each other and are jointly and

severally liable for Llanos's delinquent contributions pursuant to sections 502 and 515 of ERISA, 29 U.S.C. §§ 1132 and 1145.

**WHEREFORE**, Plaintiffs pray for the following relief:

(a) judgment jointly and severally against Defendants in favor of the Union in the amount of $1,182,427.62; and

(b) such other legal or equitable relief as the Court deems appropriate.

## COUNT II
(For joint and several liability among Defendants, who are jointly liable as successors, alter egos, single employers and/or double breasted entities)

34.     Plaintiffs repeat the allegations in the preceding paragraphs of this Complaint as if set forth at length herein.

35.     Upon information and belief, at relevant times, individuals paid by Defendants performed work covered by the CBAs for which no contributions were made.

36.     Upon information and belief, Llanos formed and operated MJO in violation of the CBA.

37.     Upon information and belief, at relevant times, Llanos used MJO to evade its contractual and statutory obligations to the Union.

38.     At relevant times, Defendants were operated as a single integrated enterprise and are a single employer for the purposes of collective bargaining obligations.

39.     Upon information and belief, substantially all of Llanos's assets were transferred to MJO.

40.     Upon information and belief, at relevant times, there was continuity of operations between Defendants:

8

    a.  MJO employed substantially all of Llanos's management and supervisory personnel;

    b.  MJO employed a part of Llanos's workforce;

    c.  MJO used Llanos's offices, equipment and machinery;

    d.  MJO worked with certain general contractors who had previously employed Llanos; and

    e.  MJO performed the same carpentry services as Llanos.

41.    Upon information and belief, at relevant times, MJO had notice of Llanos's delinquent ERISA fund contributions. Mr. Martinez, Llanos's president and MJO's principal, had knowledge of Llanos's unfair labor practices and unpaid contributions.

42.    To the extent that Llanos is no longer in business, MJO is a successor employer such that it is liable for their delinquent contributions.

**WHEREFORE**, Plaintiffs pray for the following relief:

    (a) judgment against MJO in favor of the Union in the amount of $1,182,427.62;

    (b) interest on the unpaid contributions;

    (c) liquidated damages;

    (d) reasonable attorney's fees and costs; and

    (e) such other legal or equitable relief as the Court deems appropriate.

 

**KROLL HEINEMAN CARTON, LLC**
*Attorneys for Plaintiffs*

Dated: December 28, 2018        */s/ BRADLEY M. PARSONS*

                                _____

                                BRADLEY M. PARSONS

A

SHORT FORM AGREEMENT



# Northeast Regional Council of Carpenters
### UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA

WHEREAS, the Contractor desires to employ employees represented by the Northeast Regional Council of Carpenters ("NRCC")/the Eastern Millwright Regional Council ("EMRC") and their affiliated Local Unions of the United Brotherhood of Carpenters and Joiners of America ("UBC") hereinafter the "Union" in their respective territorial jurisdictions which employment will require payments to the NJ Carpenters Benefit Funds and/or the Empire State Carpenters Benefit Funds ("Funds") and check-off dues deductions to the NRCC/EMRC; **ALL FRINGE BENEFITS ARE TO BE PAID WEEKLY.**

WITNESSETH, the undersigned agrees to be bound by every applicable current collective bargaining agreement between the NRCC, or other local Unions affiliated with the UBC and the members of the contractor associations, governing wages, working conditions and payments to fringe benefit funds applicable to the construction site location where the work is being performed, which agreements are incorporated herein by reference. The Contractor acknowledges that the Union has demonstrated that the Union has majority support and represents a majority of the Contractor's employees in an appropriate unit for the purposes of collective bargaining. Accordingly, the Union demands and the Contractor recognizes the Union as the exclusive bargaining agent under Section 9 of the NLRA for all of its employees within the contractual bargaining unit. The permanent arbitrator appointed by the Trustees of the Funds shall herein decide all matters concerning wages and benefits and all matters concerning procedural or substantive arbitrability. Notwithstanding any contrary provisions in the above described agreements, the permanent arbitrator is also authorized to hear and decide any and all contractual disputes arising under the grievance and arbitration provisions of those agreements. The Agreements and Declarations of Trust, as amended, governing the above mentioned fringe benefit Funds are agreed to by the parties and incorporated herein by reference. This Agreement shall continue in effect for the duration of the above referenced applicable collective bargaining agreements, whether renewed by renegotiations or otherwise, including any amendments and/or modifications thereto, and shall continue in full force and effect from year to year unless at least 90 days before expiration of the then current collective bargaining agreement either party notifies the other in writing by certified mail, return receipt requested, of cancellation of this Agreement. This agreement shall also govern any corporation, partnership, or sole proprietorship which is deemed to be a controlled entity under the Internal Revenue Code or which is a successor to, joint employer with, or alter ego of the undersigned Contractor. To the extent the undersigned contractor subcontracts any work covered by this Agreement to any subcontractor or other person the Contractor shall be liable for all contributions owing to the above mentioned Funds in the event the subcontractor or person fails to pay contributions to said Funds for employees covered by this or the above referred to Agreement who are employed by the said subcontractor as person.

**Northeast Regional Council of Carpenters**

_____
Michael Capelli, Executive Secretary-Treasurer

8/21/14
Date Agreed Upon

THONY ABRANTES
tNNY ORTEGA
Witnessing NRCC Council Representative
(Sign & Print)

**Signatory Contractor**

LLANOS DRYWALL
Company Name

315 MADISON AVE
Address

PASSAIC       NJ   07055
City          State    ZIP

862-823-6645
Phone                Fax

E-mail

0400561739
Federal Tax Identification Number

Valerion R... - PRINCIPAL
Authorized Signature / Title

VALERIANO REYES - PRINCIPAL
Print Name / Title

*Original and Copies must be returned to NRCC HQ*

-NRCC-03- 142

B

# AGREEMENT

*by and between*



## NORTHEAST REGIONAL COUNCIL OF CARPENTERS
and
## EASTERN MILLWRIGHT REGIONAL COUNCIL
of the
UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA

## ASSOCIATED CONSTRUCTION CONTRACTORS OF NEW JERSEY
and their affiliates

## DRYWALL & INTERIOR SYSTEMS CONTRACTORS ASSOCIATION, INC. OF NEW JERSEY

## CONSTRUCTION CONTRACTORS LABOR EMPLOYERS

**EFFECTIVE**
*May 1, 2016 – April 30, 2019*

## TABLE OF CONTENTS

| Article | Article No. | Page No. |
|---|---|---|
| Accident or Sickness | XXXVIII | 39 |
| Agreement | | 2 |
| Agreement and Termination | XXXXIV | 48 |
| Authority of Employer's Association | II | 3 |
| Call Out Pay | XXXIX | 39 |
| Federal and State Law Conflicts | V | 5 |
| Foreman Carpenters and Millwrights | XXX | 33 |
| Fringe Benefit Funds | XXXII | 34 |
| Furnishing of Tools | XII | 18 |
| General Working Conditions | XXII | 26 |
| Grievances and Arbitration | XVIII | 23 |
| Individual Employee Rights | XXVII | 31 |
| Joint Committee | III | 3 |
| Jurisdictional Settlement Procedure | XI | 17 |
| Label | XXIX | 33 |
| Lay-Off | XXV | 30 |
| Layout Work | XXXV | 36 |
| Market Share Expansion Addendum | XXXI | 34 |
| Miscellaneous | XXXVI | 38 |
| More Favorable Conditions | XIII | 18 |
| No Other Verbal Agreements | XXXXIII | 47 |
| Non-Discrimination | VII | 6 |
| Payment of Wages and Fringes | XXIV | 28 |
| Picket Line | XXXVII | 39 |
| Portability | XVI | 21 |
| Recognition | I | 2 |
| Recognition of Floor Laying and Finishing | XXXXII | 42 |
| Recognition of Heavy and Highway Work: Work Covered | XXXX | 40 |
| Recognition of Interior Systems Work Covered | XXXXI | 41 |
| Referral Procedure | VI | 5 |
| Safety Regulations | XXXIV | 36 |
| Shift Work | XXI | 25 |
| Shop Steward | XIV | 18 |
| Subcontractor Clause | XIX | 24 |
| Territorial Jurisdiction | VIII | 6 |
| Trade Autonomy | IX | 7 |
| Training, Safety and Advancement Fund | XXXIII | 35 |
| Unemployment and Temporary Disability Insurance Coverage | XX | 25 |
| Union Security | IV | 4 |
| Union's Right to Strike Delinquent Employers | XXVI | 30 |
| Visitation by Business Representative | XVII | 23 |
| Wages and Fringe Benefits | XXVIII | 31 |
| Work Jurisdiction | X | 7 |
| Work Rules | XV | 19 |
| Working Hours and Holidays | XXIII | 27 |

## AGREEMENT:

WHEREAS, the Associated Construction Contractors of New Jersey and its affiliated associations, expressly the Building Contractors Association of South Jersey and the Building Contractors Association of Atlantic County, Drywall & Interior Systems Contractors of New Jersey and the Construction Contractors Labor Employers, is acting as the authorized bargaining agent for its employer-members who have assigned their bargaining rights to their respective Association, (hereinafter referred to as the "Association"), and any independent contractor signatory hereto, in the matter of wages, hours of work, and all other working conditions; and

WHEREAS, the Northeast Regional Council of Carpenters and the Millwright Regional Council of the United Brotherhood of Carpenters and Joiners of America (hereinafter referred to as the "Union"), are the authorized bargaining agent for all classes of employees performing work within the work jurisdiction of the United Brotherhood within the territory covered by this Agreement; and

WHEREAS, the Association and the Union have arrived at an Agreement on the issues to be incorporated within this Agreement;

NOW, THEREFORE, in consideration of the mutual covenants herein expressed, BE IT AGREED AS FOLLOWS:

## ARTICLE I
## RECOGNITION:

1. The Association recognizes the Union as the sole collective bargaining agent for all Journeymen Carpenters, Millwrights and Lathers and all of their apprentices, trainees and foremen, hereinafter referred to as employees, who perform work within the trade-line jurisdiction of the United Brotherhood of Carpenters and Joiners of America in the matters of wages, hours of work, and all other working conditions excluding, however, all supervisors as defined by the Labor-Management Relations Act of 1947, as amended.

2. Each Employer bound hereto also agrees to comply with the wage rates, fringes, and working conditions in effect in the territories of all carpenter and millwright regions within the territories of the Union, affiliated with the United Brotherhood of Carpenters & Joiners of America.

3. All contractor/union agreements shall be in accordance with all terms and conditions of the collective bargaining agreement currently in place in any local jurisdiction and for full term of said agreement.

4. The Contractor acknowledges that the Union has demonstrated that the Union has majority support and represents a majority of the Contractor's employees in an appropriate unit

2

for the purpose of collective bargaining.   Accordingly, the Union demands and the Contractor recognizes the Union as the exclusive bargaining agent under Section 9 of the NLRA for all of its employees within the contractual bargaining unit.

## ARTICLE II
## AUTHORITY OF EMPLOYER'S ASSOCIATION:

1. The Association is acting herein as bargaining agent for its present and future employer-members of the Association and all affiliated local Associations in the State. The Association represents that it has the authority to execute this agreement on behalf of its members, who have assigned their bargaining rights to the Association, through the Associations' designated officers. Periodically, the Association shall provide the Union an up-to-date written list of all its employer-members, including affiliated Associations, who have assigned their bargaining rights to the Association, together with any deletions or additions in the roll of members.   The Association represents that it will obtain like authority to bind future members to this Agreement.

2.   In the event any employer-member of the Association, who has assigned their bargaining rights to the Association, resigns from membership in the Association during the existence of this collective bargaining agreement, it shall nevertheless be bound by all the provisions herein for the existence of this agreement.

3.   The Union recognizes the Association as the bargaining representative of all affiliated Associations and general members of the Association, that have assigned their bargaining rights to the Association, that perform work within the trade-line jurisdiction of the United Brotherhood.  This agreement shall be binding upon and enforceable against all such members, including their successors, assigns, and wholly or partly owned subsidiaries.

4.  The Association represents that it is duly authorized by its members and affiliated local Associations, who have assigned their bargaining rights to the Association, to enter into this collective bargaining agreement, that in so doing it is authorized to bind each of such members to the terms and conditions of this Agreement, and represents further, that it will require, as a condition of membership in said Association, that all of its participating members shall continue to be bound by such terms or, shall upon admission to the said Association, after the date of execution of this Agreement, agree to be bound from that date forward by all of the terms and conditions of this Agreement.

## ARTICLE III
## JOINT COMMITTEE:

A   joint   labor/management   committee   "Joint   Committee",   consisting   of   two

representatives appointed by the Associated Construction Contractors of New Jersey and its affiliated Associations and two representatives appointed by the Drywall & Interior Systems Contractors of New Jersey, along with four representatives appointed by the Executive Secretary/ Treasurer of the Northeast Regional Council of Carpenters shall be formed to address contract issues and meet on a quarterly basis and, if necessary, at the call of the Co-Chairs of said committee.   The Co-Chairs will be the Chief Executive Officers of the ACCNJ and the International Vice President of the United Brotherhood of Carpenters and Joiners of America, responsible for the jurisdictional region within the Northeast Regional Council of Carpenters. By unanimous agreement, the Joint Committee shall have the authority to implement contract changes within the term of this agreement.   The Joint Committee shall address jurisdictional issues that arise during the term of this agreement.   By unanimous agreement, the Joint Committee shall have the authority to negotiate terms and conditions of a residential agreement. For any matter involving millwright work, the Joint Committee shall consist of two representatives from millwright contractors appointed by the Associated Construction Contractors of New Jersey and two representatives appointed by the Executive Secretary/Treasurer of the Eastern Millwright Regional Council, and the co-chairs will be appointed by the respective sides.

## ARTICLE IV
## UNION SECURITY:

1.     All employees who are present members of the Union shall maintain their membership in good standing in the Union in order to continue in employment.   All new employees, on the eighth (8th) day following the beginning of their employment or the execution date of this Agreement or the effective date of this agreement, whichever is the later, shall become and remain members in good standing of the Union in order to continue in employment, all to be applied and enforced in accordance with the provisions of the National Labor Relations Act, as amended.   Nothing in this Agreement shall be construed as infringing upon the Union's right as expressed in Section 8(b) of the National Labor Relations Act as amended to prescribe its own rules with respect to the acquisition and retention of membership therein.

2.     Eight (8) days under this Article shall mean employment within the bargaining unit for a period of eight (8) days, either continuously with one employer or accumulative with any employers signatory to this Agreement.

3.   In the event that the present provisions of the National Labor Relations Act are amended so as to permit a greater degree of Union security than that now permitted by Section 8(a) (3) thereof, said amendments shall immediately, upon their effective date, be considered to be an integral part of this Agreement as if fully set forth herein.

4.     In the event an employee fails to tender the initiation fee or fails to maintain membership in good standing, the Union shall notify the Employer, in writing, and such notice

4

shall constitute a request to the Employer to discharge said employee within forty-eight (48) hours (Saturdays, Sundays and Holidays excluded) for failure to maintain continuous good standing in the Union, as set forth herein.  The Employer then shall discharge such employee at the end of such period.  In the event the Union does not accept into membership any employee tendering the initiation fee and regular monthly dues, the foregoing shall not be applicable; provided, however, that the Union may, at any time thereafter, decide to take such employee into membership, and if so, the employee then shall be required to tender the full and uniform initiation fee in effect in the Union not later than thirty (30) days following notification by the Union, and shall be required thereafter to maintain membership in accordance with the provisions of the foregoing.  In the event that such employee fails to comply with these provisions, the Union shall notify the Employer, in writing, and the Employer shall discharge such employee within forty-eight (48) hours.

5.    In consideration of the foregoing, the Union agrees to furnish competent employees to the employer upon his request.

## ARTICLE V
## FEDERAL AND STATE LAW CONFLICTS:

Where any provision of this collective bargaining agreement or the application of such provisions to any person, thing, or circumstances shall be in conflict with any federal or state laws or regulations or where such provision or the applications thereof shall be held invalid or unenforceable by a Court of Law or Equity or by any administrative governmental agency having jurisdiction over the subject matter, such decision as to the invalid provision shall not affect the balance of this Agreement which shall remain in full force and effect.  The parties hereto agree that they will meet within ten (10) days after such provisions have been declared invalid and negotiate a substitute provision to be incorporated herein.

## ARTICLE VI
## REFERRAL PROCEDURE:

Not excluding the provisions provided for in Article XVI-Portability, the Employer agrees to give the territorial Carpenters Local Union hiring hall first opportunity to furnish competent and qualified journeymen and apprentices upon the Employer's request and the Carpenters Local Union agrees to supply such craftworkers.   When the Carpenters Local Union does not furnish qualified employees within 48 hours (Saturdays, Sundays and Holidays excluded), the contractor shall be free to obtain employees from any Northeast Regional Council of Carpenter Local Union. All referrals for millwrights shall be made through Millwright Local 715 in accordance with its referral procedures.

--

## ARTICLE VII
## NON-DISCRIMINATION:

1. The Union and the Employer agree to abide by all Executive Orders and subsequent amendments thereto, regarding the Civil Rights Act of 1964, pertaining to non-discrimination in employment, in every respect, subject however to the rights of the parties to contest the illegality of any such Orders or Amendments in a court of law.

2. Whenever an imposed minority hiring plan or a voluntary hiring plan shall provide for the employment of trainees, they shall be employed subject to the terms and conditions of this Agreement to the extent that such minority hiring plan shall permit.

3. The Association agrees to cooperate with the Northeast Regional Council of Carpenters and the Eastern Millwright Regional Council in the development and implementation of uniform procedures for meeting requirements of minority hiring plans on a statewide or regional basis so as to eliminate the multiplicity of conflicting plans now being developed on a job by job basis. Nothing herein shall preclude either party from participating in a voluntary plan, nor shall anything herein require either party to enter into a voluntary plan.

## ARTICLE VIII
## TERRITORIAL JURISDICTION:

This Agreement shall cover the entire Northeast Regional Council of Carpenters in New Jersey and New York and its member Local Unions comprised of the following Regions:

| | |
|---|---|
| All Locals: | Tapers, Homebuilders and other Specialty Crafts – Council wide |
| Local 251: | Floorlayers – Council wide (excluding the Long Island counties of Nassau, Suffolk, Westchester, Rockland, Putnam, Duchess and part of Orange) |
| Local 252: | Mill Cabinet/Industrial Workers (refer to applicable shop agreements) |
| Local 253: | Commercial – Bergen, Essex, Hudson, Passaic Counties |
| Local 254: | Commercial – Hunterdon, Mercer, Middlesex, Morris, Somerset, Sussex, Union, Warren Counties and Parts of Essex County (Short Hills and Millburn) |
| Local 255: | Commercial – Atlantic, Burlington, Camden, Cape May, Cumberland, Gloucester, Monmouth, Ocean, Salem Counties |

In New York, the local collective bargaining agreements shall supersede all other agreements. The territorial jurisdiction listed above excludes the five boroughs of New York City.

This Agreement shall cover Local 715 Millwrights (New Jersey/Statewide) that is part of the Eastern Millwright Regional Council ("EMRC").  The EMRC covers New Jersey, New York, Maine, New Hampshire, Vermont, Massachusetts, Connecticut, Rhode Island, --

6

Philadelphia, Delaware, Maryland, Washington DC and thirteen (13) counties in Virginia.

## ARTICLE IX
## TRADE AUTONOMY:

1. The trade autonomy of the United Brotherhood of Carpenters and Joiners of America consists of the milling, fashioning, joining, assembling, erecting, fastening or dismantling of all material of wood, plastic, metal, fiber, cork and composition and all other substitute materials. The handling, erecting, installing and dismantling of machinery and equipment and the manufacturing of all materials where the skill, knowledge and training of the employees are required, either through the operation of machine or hand tools, either at the job site or in production shops, mills and factories.

2. Our claim of jurisdiction, therefore, extends over the following divisions and sub-divisions of the trade: Carpenters and Joiners; Lathers; Millwrights; Pile Drivers, Bridge, Dock and Wharf Carpenters; Divers, Underpinners, Timbermen and Core Drillers; Shipwrights, Boat Builders, Ship Carpenters, Joiners and Caulkers; Cabinet Makers, Bench Hands, Stair Builders and Millmen; Wood and Resilient Floor Layers and Finishers; Carpet Layers; Display Workers; Shinglers, Siders and Insulators; Acoustic and Drywall Applicators and Finishers; Shorers and House Movers; Loggers, Lumber and Sawmill Workers; Furniture Workers, Reed and Ratan Workers; Shingle Weavers; Casket and Coffin Makers; Box Makers, Railroad Carpenters and Car Builders and all those engaged in the operating of wood working or other machinery required in the fashioning, milling or manufacturing of products used in the trade, or engaged as helpers or tenders to any of the above divisions or sub-divisions.

3. Burning, welding, rigging and the use of any instruments or tools for layout work, incidental to the trade.

4. When the term "Carpenter and Joiner" is used, it shall mean all sub-divisions of the trade.

## ARTICLE X
## WORK JURISDICTION:

A.   The Association recognizes that the Union claims the following work jurisdiction:

The terms "carpenters" and "joiners" shall be synonymous.

1. The prefabrication, fabrication and construction of forms for footings or foundations of houses, buildings structures of all descriptions, whether made of wood, plastic or any other material, the erecting of structural parts of a house, building or structure made of wood, precast concrete or any substitute such as plastics, or composition materials, putting together roofs,

--

7

partitions, fabricating or erecting forms for decking or other structural parts of houses, buildings, or any structure and stripping and dismantling of all forms. The fabrication, erecting and dismantling of all falsework. Where power is used for the setting or dismantling of forms or any other material erected by Carpenters, the Carpenter will do all handling, tagging and signaling. The fabrication and/or setting of all templates including anchor bolts necessary for structural members or machinery and the placing and/or leveling of these bolts is included. The installation and removal of all safety or weather protection, whether temporary or permanent, also the erection and dismantling of all shanties, including tarps or tents of all materials, and building of platforms, runways, catwalks and elevator shafts, whether temporary or permanent.

2.     The handling, carrying, loading, unloading and conveying of all materials erected or installed by employees represented by the brotherhood.

3.     The shoring of banks, slopes, holes, including the driving of sheeting in areas where Carpenters perform work.

4.     All framing in connection with the setting of metal columns. The setting of all forms, centers, imbedded wood and bulkheads of any type of material including expanding metal; the fabrication and setting of screeds and stakes for concrete and mastic floors where the screed is notched or fitted or moulded or made up of more than one member and the setting of all screed and forms pertaining to slope protection. Setting, assembly and maintenance of screed machines and lining and leveling of the track. The making and setting of all forms used in concrete work. The handling, installing and stripping of adjustable bar or span-all joists.

5.     The installation of all louvres and all moulding, column covers and trim made of wood, metal, plastic or composition, installing of run-strips for plumbers or other trade or cutting for pipes through floors, joists or partitions composed entirely or in part of wood or other material erected by Carpenters. The installation of all framework, partitions and trim, materials for toilets and bathrooms made of wood, metal or plastic or composition materials; bathroom partitions, accessories and their backing made of wood, plastic, metal or any other material; fastening on all wooden, plastic or composition cleats to iron work or any other material; the erecting and installation of stran steel or similar material; cutting and hanging all lumber or other material between girders and joists for fire proofing or concrete centers; setting and hanging of all sash, doors, inside and outside blinds, windows and other frames; erection or application of all shingles, standing seam roofs and all other types of architectural metal building applications including roofs, vertical seam steel siding, aluminum siding, siding wallboard, or sheets composed of wood pulp, plastic, plaster, transite or composition materials or any combination of any of the above with any other material including combined or faced with metal regardless of the manner attached; the erection and assembly of interior and exterior signs or displays of all types; set up and dismantle of all displays, signs, banners, kiosks and tents whether temporary or permanent;   unloading, handling and erection of all wood, metal, plastic and composition partitions; cutting and applying of all furring; making and fastening of wood brackets for metal ceilings and side walls; erecting of all furring regardless of composition, and putting on all grounds for plaster or cement finish.

--

8

6.    The building, erection and dismantling of all staging and scaffolding regardless of height where carpenters shall perform work thereon, whether wooden, tubular, mobile, stationary or otherwise, including "Morgan" type scaffolding and other self-rising scaffolding; the maintenance, repair and jacking of all mechanical scaffolding such as "Morgan" scaffolding including installation, maintenance and dismantling of bridge brackets and catch plank; the building and constructing of all derricks; the erection and dismantling of elevators and towers, such as concrete conveyors and temporary material elevators, scaffolding or other structures to be used as scaffolding inside or outside buildings, the making of mortar boards, boxes and trestles; putting in needle uprights; all shoring of buildings, razing and moving buildings whether commercial or residential, jacking and lifting.   Installation of all work related to boardwalks and all related components.

7.    Fitting, installation and fastening of stops, beads and molding in doors and windows; framing of all false work, derricks and hoists, travelers and all lumber or material used in the building and construction industry; putting on of all hardware; putting up interior and exterior trim or finish of wood or substitute material.  The hanging, setting and installation of wood, metal or plastic doors, including but not limited to fire, formica, overhead and security doors, sash, jambs, bucks, including freestanding bucks, casings, moldings, chair rails, mantels base or mop boards wainscoting furniture, china closets, kitchen cabinets, serving counters, booths, wardrobes, non-electrical bells, mail slots, interviewers, knockers, louvers, kickplates and installation of bowling alleys, and installation of displays; setting of vanities of all types with or without fixtures, all lockers, regardless of their composition.

8.    The manufacturing and erecting of cooling towers, refrigeration buildings and rooms, sauna baths and tanks. The erection and installation of all hospital and laboratory Clean Rooms and associated equipment & accessories and all other work associated with Infectious Control Risk Assessment (ICRA). The installation of wood, plastic or metal awnings, door shelters, marquees, jalousies and plastic roofs.  The laying and finishing of all floors including wood, knitter house floor tile or liquid substances for floor tile, cork, asphalt, linoleum, vinyl, rubber, liquid, Astroturf type covering and other synthetic turf products or any other type of resilient floor covering, the preparation of various floors for receiving any of said types of flooring or covering. Installation of elevated and floating floors. The installation of rugs, carpets, draperies, tracks, cubicles and curtains. The application of acoustic tile whether glued or nailed; acoustical suspended ceilings in their entirety; installation of Armstrong and/or other brands of low voltage ceiling grid systems; and all insulation of all types including bats or blankets, whether rigid or otherwise, whether nailed, glued or blown.

9.    Building, handling, installing, unloading and erecting stairs, store, office, bank and other fixtures, furniture, wrapped, bundled, crated or not, refrigeration cases, whether for display or otherwise and walk-in boxes, shelving, racks whether of wood or other material; making and fitting of screens; putting on weather strips and caulking. The installation of laboratory equipment including cabinets and overhead air handling units, fume hoods, alborene stone tops,

--

sills and work benches, including Alucibon panels and terra cotta rain screen and any component of a total envelope system whether wood or metal, medicine cabinets with or without mirrors, or electrical fixtures, bookcases, including Nesbitt type bookcases, fume cabinets, and cabinets either separately or used in conjunction with heating and / or air conditioning units, blackboards, bulletin boards, billboards, meter boards and boards of all types including all layout, drilling and fastening related to the installation of these products. The receiving, unloading, handling, installation, erection and dismantling for re-use of all seating facilities.

10.   The handling and installation of lumber, fixtures, trim and other material including exterior and interior metal studs, drywall and gypsum wallboard of all types, regardless of finish. Drywall taping and finishing.    The erection of porcelain enameled panels, glass-weld type panels, wood, Masonite, corespan and transite type and metal siding. The assembling and setting of all seats in theaters, halls, churches, schools, banks, stadiums and open-air theaters and other buildings; installing wood, metal, plastic, corner beads, gypsum, tectum or similar planking and any material which receives poured gypsum; erecting mortar and brick hoists and concrete distributors used in erecting buildings or fireproofing floors or for pouring concrete buildings, building and repairing coal pockets, breakers, washers, tripples; setting of forms for sidewalks, sidewalk lights, curbs within property lines and on highway structures, utility vaults within the property lines, gutters; erection and installation of hampers, trash, garbage, laundry or mail chutes regardless of composition of material and all welding and burning incidental to carpentry. Setting and welding of armor joints, expansion joints, or any other imbedded item.    The installation of cork, Styrofoam, urethane, foamglass or any other form of insulation material used in construction of walk-in boxes, refrigerators, freezers, coolers, foundations and all interior and exterior sidewalls, roofs and ceilings, etc. and the installation of doors thereto.

11.   All fitting, mortising or boring of holes for hardware on doors must be done on the job site, except pre-finished doors, metal doors, specially finished doors or when otherwise required by Architects specifications.

12.   The operation of winches and jacks whether operated manually or operated mechanically by portable operating devices, used to handle material to be installed or erected by carpenters and all tagging and signaling incidental to the trade.

13.   The handling and installation of all prefabricated, precut and modular structures, pre-engineered buildings, regardless of composition. The erection, disassembling and repair of metal, wood, or plastic forms for modular units. The handling and installation of all wood, vinyl or composite fencing, pre-manufactured playground equipment, all types of athletic equipment regardless of composition.

14.   The maintenance and operation of small generators, welding equipment, gas operated saws, electric saws, skill saws and other portable equipment used by carpenters in the performance of their work. Maintain shall mean starting, stopping, oiling, greasing, gassing, handling and sharpening, if done on the job site and when requested by the employer, repairs on

--

10

the job site.

15.     All work in relation to the installation of Photovoltaic Energy Systems (Solar Panels) to include the following:  foundations, anchorbolts, supports, brackets, pans, racks, positioning motors, counterweights and supporting structures of any kind regardless of material or design.

All rigging, setting prefabrication, fastening, welding, bolting in relation to these systems, whether built on land, flat roofs, pitched roofs or any other application.

When systems are mounted on motorized frames designed to be directed towards sunlight, the motorized systems will be the work of the millwright.

16.   Any change in technology or materials that replaces an application that falls under carpenter or millwright jurisdiction shall be deemed the work of the carpenter or millwright.

B.     Millwrights

The term "Millwright" and Machinery Erectors shall mean the unloading, hoisting, rigging by any means, transferring, moving, cleaning, disassembling, assembling, welding, burning, erecting, calibrating, aligning, starting-up and testing, adjusting, repairing, and the maintaining of all machinery and equipment, be it powered by, or receiving power from, steam, gas, gasoline, diesel, jet, electric, pneumatic, water, solar, thermal, mineral, atomic, rocket, nuclear, chemical, wind or any other source, regardless whether temporarily or permanently installed or located and shall also include the following work:

Although some components of machinery and/or equipment may be described in one application or location and not in another, it shall not be excluded from our autonomy when, to avoid repetition, it is not described in other applications, any change in technology or materials that replace an application that falls under Millwright jurisdiction shall be deemed the work of the Millwrights.

Some of the locations in which you may find machinery, equipment and their components are: woodworking, canning, food, and computer industries, steel, metal, plastic, and glass manufacturing or recycling plants, foundries, ore reduction plants, stamping facilities, coffee roasting plants, paper, cellophane and film industries, feed and saw mills, rock, gravel, sand washing, stone   crushing, cement and asphalt plants, water, sewage and chemical treatment plants, laundries, kitchens, restaurants, hospitals, bakeries, fertilizing and mixing plants, can, ice, bottle and bag manufacturing plants, textile, flour, and paint mills, breweries, milk, rendering and meat processing plants, locks, dams and bridges, coal yards, sugar refineries, ethanol or similar type facilities, bio-mass facilities, cosmetic facilities, pharmaceutical facilities, post offices, package handling centers, incinerators, co-generation, coal gasification and power plants, automotive, truck and or similar manufacturing type factories, maintenance facilities for cars,

--

trucks, trains, planes, buses, bio-research facilities, the amusement, recreational and entertainment fields, semi-conductor plants, clean rooms and wind farms, all mechanical equipment on submarines and ships either assembled, semi assembled, disassembled or maintenance of is the work of the Millwright.

1. Unloading, hoisting, rigging, dismantling, processing, erecting, assembling, cleaning lining, aligning and adjusting of all machinery used in the transmission of power, in building factories, or elsewhere, shafting, bangers, gears, sprockets and chains, belting and all other drives necessary to the transmission of power, truck bumpers, telescopic seals at truck terminals, load levers and Kelly type docks.

2. Millwrights shall set all engines, motors, dynamos, generators, diesel generators, motor restraints, install, measure and align with optical instruments when necessary the reactors, control, push and shut-down rods, rod pressure housing, drives, guide sleeves and other related equipment in reactors, turbines, castings, combustion chambers and all its related components, the attachment of the inlet manifolds and exhaust ducts, cylinders, diaphragms, rotors, blade rings, blade or bucket assemblies, hydrogen coolers, blower assembles, packing joints on hydrogen coolers, exciter or Alterex and all others, turning gear, extension box, welding of extension box, lagging, stretching of coupling bolts or others, perform oil flush, install turbine lube oil tank, pumps and related component skids, filters, thrust bearings, the sweating on and shrinking of bearings, couplings, shafts and others, sole plates and machine bases, perform precision grouting integral to the setting of machinery, using the following materials, epoxy, wet, non-shrink, dri-packing or other types, demineralizing, hydromation and mechanical dust systems, sensors, air compressors, super chargers, coolers, boiler controls and linkage, Bailey Meters or similar devices and their linkages, fluid drives, embedded guides for traveling screens, traveling screens, roller, slide, knife, lock and sluice gates, limit torques on mechanical valves, gates and others, tainter valves, limit switches, trips, triggers or switches including the brackets that are attached to, stop logs, dam rollers, transfer cars, gear head motors, lifts, guns and gun mounts, the skidding and unskidding and crating and of all machines, shall be the work of the Millwrights.

Setting of all motors and pumps and putting on all pulleys, sheaves and flywheels for same; and setting of all worm or gear drives directly coupled to motors; and the making and setting of all templates and any re-work of the above either on site or the removal of pumps for rework off site.

3. All coal handling machines and drives; crushers, conveyors, and drafts, whether the frames be of steel or wood; and all necessary supports shall be assembled by millwrights except such as are to be fastened by hot rivets. The framing and drilling of all work hoppers as handling machinery either elevated or conveying. All burning and welding of same.

4. Stone crushing and gravel washing plants, crushers, screens, revolving or eccentric, rolls, fan conveyors, all conveyors, belt, chain, screw, whether boxes be of steel, iron or wood. The

--

12

assembling of all train rails, mono rails, overhead cranes or all travelers where no hot rivets are used in assembling same.

Setting all beams or timbers used in the reception of machinery and drilling of holes, necessary for the foundation whether they be of wood or steel, stone, concrete or other materials, whether ratchet or power drills are used.   The erection and dismantling of machinery conveyors except that temporary or portable installations pertaining to Heavy and Highway construction is excluded.

5. All grain handling appliances, cleaners, clippers, needles machines, car pullers and grain shovels. The manufacture and erection of wood leg, spouts and conveyor boxes.

6. The erection of steel and/or cast iron legs, heads or roots and conveyor boxes, framing of all marine legs and ship shovels and the framing of all scale timbers. Setting of all scales, tract hopper or automatic, all boot tanks, receiving hoppers and devices used for elevator legs when not electrical appliances.

7. All bin valves, turnheads and indicators, all necessary shafting bearing and supports, all drives, rope belt, chain or rawhide, all pulleys, cable sprockets or gearing and the cutting of all key seats and valve lapping and fitting all machine surfaces in new or old work in the field.

8. All sewage disposal machinery and coffee roasting plants.

9. All amusement devices of all kinds; all animation and mechanical exhibits that are used in expositions and fairs, all turntables in expositions, fairs, gas stations and garages, all barrel or package devices either elevated or conveying; all presses, hydraulic or otherwise.

10. All direct or connected machinery of any power hog hoist and meat handling machinery, all spice or flour or cereal mills, or cotton, wool, silk, twine, paper, saw, cement, planing, powder and paint mills, machinery and woodworking shops or factories, jewelry and powerhouse machinery, sugar refineries, starch house, bakeries, fertilizer breweries, and shoe factories. All ice plants and equipments, ice cream factories and laundries, knitting mills and power sewing machines. Finally, all work pertaining to machinery used for manufacturing purposes or amusement devices which will come with the evolution of time and this craft will come under this jurisdiction claim, and all burning and welding involved.

11. Sewage and Water Treatment Plants-disassembly, fabricating, rigging, erecting and aligning of skimmers, rake mechanisms, feed wells, baffles, scum troughs, degritting equipment, bar screens, communitors, mixers, pumps, aeration systems, blowers, membrane filtration systems, sequencing batch reaction systems, including any related piping or duct work, filter presses, sand filtration systems (excluding the filtration media and associated earthworks), ultra violet rack systems, mechanical drive assemblies, conveyors, mono rails, gates and setting odor control equipment, (excluding heating, ventilating and air conditioning work or associated

--

13

earthworks).

12. The setting of thru-clean bar, straight line bar, trash, tritor drum, and disc screens, straight line grit, circuline grit, circuline sludge, and circuline mixer collectors, straight line, flash, horizontal slow, vertical slow, and vibra flow feeder machines, pre-aeration and settling tanks, covers for tanks, bowls and basins including stationary or mechanical covers regardless of materials, thickeners, rotoline distributors, sludge bed cleaners, digestion systems, heaters, dyna-grind sewage screening grinders, screw pumps, spiral classifer, agitators, junk remover, hydro pulper, cooling fans, lube systems, selectifier screens, hydrosensors, fuel blowers, grizzly screens, trommels, table feeders, dryers, optical sorters, high tension separators, grip dewatering screens, flash mixer, horizontal slow mixer, vertical slow mixer, vibra-flow feeder machine, circuline grit collectors, pre-aeration and settling tanks, circuline sludge collectors, circuline mixer collectors, grip dewatering screens, filter, cone and rotary presses, comminutors, barminutors, degreasers, rotometers, dehumidifiers, benches, washers for cars, trucks, buses, trains and other types, hydraulic units, shroud boxes, silencers, scales, load cells, eddy current clutches, disintegrators, dehairing machines, grain handling devices, laboratory equipment, machine shop equipment, ladle cars, stunning pens and doors, activation equipment, racks, material handling platforms, transition pieces, the handling and installation, of pulleys, gears, sheaves and fly wheels, air vacuum, worm, belt, friction, rope, chain and gear drives that are directly or indirectly coupled to motors, belts, chains, shafts, or screws, installation of legs, boots, guards and boot tanks, all bin and diverter valves, turn hands and indicators, shafting, bearing cable sprockets, cutting of all key seats in old and new work, troughs, chippers, calendars, rolls, winders, rewinders, slitters, cutters, wrapping machines, blowers, forging machines, pneumatic, electric and hydraulic rams, extractors, expellers and extruders, ball and dust collectors, splicing of ropes and cables.

13. The laying out, fabrication and installation of protecting equipment including:   machinery guards, making and setting of templates for machinery, fabrication of bolts, nuts, pans, drilling of holes in machinery for any equipment which the Millwrights install regardless of materials, all welding and burning regardless of type, fabrication of all lines, hose or tubing used in the lubrication, operation, cooling or heating of machinery including the installation of all fluids used to operate, lubricate, cool or heat equipment installed by Millwrights, cleaning of machinery before turnover to owner, machining, grinding, milling, broaching, boring, threading, lapping and keying that may be necessary for any part of equipment, including the starting up, breaking in, trial running and operational or functional testing of any equipment or machinery installed by the Millwrights.

14. When optical instruments such as automatic levels, builders transits, precision jig transits, tilting levels, theodolites or other precision tools and instruments are used to locate and set machines, these tools are considered a tool of this trade and are to be used by Millwrights to set their equipment.

15. Rock, sand and gravel plants, batch or aggregate plants, recycling equipment, crushers,

--

14

conveyors, chutes from one piece of mechanical equipment into another piece of mechanical equipment, or from a vessel into a conveyor, or into other places or mechanical equipment or other mechanical equipment used (for the purpose of description only) to excavate material from one area to another from highways, roadways or elsewhere.

16. Asbestos removal on equipment in which Millwrights normally remove during maintenance and repair work.  (Removal shall be allowed by the Union whose members have been educated and trained in the safe removal of asbestos materials and have a Connecticut State Certified License for asbestos removal.) Any new equipment or technology designed to replace any of the equipment described above shall remain in the jurisdiction of the Millwrights.

17. All welding and burning connected with Millwright work as defined herein.

18. The setting of variable drives, fans, coal cranes, truck cranes or other types, including servicing and the adjusting and aligning of mechanical equipment within the cranes, crane rails and all other types of rails which would carry mechanically activated equipment, including their alignment, monorail (all sizes), trolleys, pumps and their associated components, packaging equipment, refrigerating equipment, chillers, and related equipment, lantern rings, packing glands, packing for pumps, pollution equipment, carbon absorbers, heat exchangers, grain, ball, hammer, roller mills and other, crushers and beaters, hoppers, bins chutes and spouts, turn tables, shears, casing machines, robots, air conveyors, conveyors of all sizes, types, and styles regardless of the materials they are constructed with, including their supports, people movers, jetways, magnetic separators, hoists, feeding machinery, Z-loaders, S-loaders, palletizes, Triax equipment, mechanical equipment in scrubbers, pack towers, precipitators, cooling towers and air cooled condensers.

19. With respect to the new jurisdictional language added to Article X(B) in the 2013 Agreement and for Association contractors only it shall not be a violation of this Agreement if an Employer assigns work defined in Article X, Section B/Millwrights to another recognized building trades union, where the work in question is within the recognized and traditional jurisdiction of another Union with which the Employer has an Agreement and where the Employer has a history of using another building trade to perform the work in question.

20. On Millwright jobs with twenty (20) or more employees, the employee shall be granted ten (10) minutes wash up time before lunch.

21. Millwright Employers shall furnish all Millwright tools not itemized below. When a tool crib is in use by the Millwright Employer to house Millwrights' tools, if it is staffed, it shall be staffed by a Millwright.

The following list of Millwright tools may be required by the Employer to be furnished by the Millwright Employee: 1 metal tool box - 1 one inch outside micrometer - 1 set of standard feeler gages -1 shaft level - protractor combination square - set 3/8" drive sockets - set 1/2" drive

--

15

sockets to 1 1/4" - set open end and box wrenches 3/8" to 1 1/4" Wescott 6", 8", or 12" - ball peen hammer 16 or 24 oz. - set screw drivers and Phillips - 18" level Torpedo level - complete set of Allen wrenches to 3/8" or 1/2" - flashlight - pair side cutters - pair channelocks - pair vise grips - 6' ruler - flex tape 12' - scraper - center punch - hack saw frame-plumb bob-dividers 6" or 8" - utility knife - cold chisel - magnet - mirror - scriber - tin snips - 6" scale - 2 drift pins 2 tap wrenches - chalk line-pry bar.

Employers requesting Millwrights, shall specify the nature of the work to be performed so only the tools required for the work will be on the job site.

The Employer shall be responsible up to a maximum amount of $1250 for the loss of an employee's tools by fire or theft while stored in such shed after working hours, provided that an inventory of such tools has been pre-filed with the Employer. In case of theft, the Employer shall be liable only upon evidence of forced entry.

22. For millwright work, the Millwright Council and Local 715 recognize the threat of non-union competition and will do all possible to promote union millwright construction, including holding pre-bid and/or pre-job conferences on an individual job basis to mutually agree on ways to enable the Union Employers to be more competitive with non-union Employers. The parties recognize the threat of unfair competition in certain areas and types of work from contractors who do not conform to the standards provided in this collective bargaining agreement. In order to address that problem, the Employer may request relief from certain provisions of this collective bargaining agreement. The Employer shall contact the Executive Secretary-Treasurer of the Millwright Council or his designee to discuss the relief being requested. If an agreement on relief is granted, it will be reduced to writing, and reasonable efforts will be made to advise other signatory contractors who are bidding on the project of the relief and will notify the Associations. It is expressly understood that no modification or deviation may be made from the existing collective bargaining agreement except by mutual agreement of the parties. It is further understood that failure to reach an agreement under this provision shall not be subject to arbitration. It is the intent of the parties that this procedure will be utilized where circumstances warrant and that the Employer will not abuse this procedure. Procedures shall be established by the Executive Secretary Treasurer or his or her designee to notify all contractors of the changes, which have been granted for that particular job.

C. Lathing

1. Lathing shall be assigned to journeymen and apprentices represented by this Regional Council on the following work: erecting, constructing, installing and completing of all light iron construction, furring; making and erecting of brackets, clips and hangers; wood, wire and metal lath; plaster board or other material which takes the place of same to which plastic or acoustical material is adhered; corner beads, all floor construction; arches erected for the purpose of holding plaster, cement, concrete or any other plastic or acoustical material.

--

16

2.   All carrying bars, purlins and furring, regardless of size; light iron and metal furring of all descriptions such as rods, channels, flat iron, nailock, screwlock, pomeroy and other ceiling bars or systems for the receipt of metal lath, rock lath, gypsum board, or any other materials and all light iron and metal studs such as stran studs, penn metal, soule, truscon and other trade names of metal studs and all other types of light iron and metal studs, no matter what the manufacturer including Unistrut, when such studs are to receive a dry wall finish, such as gypsum board, wall board, wooden paneling, etc., or when such studs are to receive metal lath, rock lath or other material for the application of plaster or other sprayed on wet material; and all other light iron furring erected to receive lath, plastic or acoustical materials.

3.   The nailing, tying and fastening of all wire and metallic lath such as wirecloth, wire mesh, expanded metal lath, hyrib lath and all rib and flat expanded metal lath and wire of all descriptions as well as the placing of all hangers and all inserts used for the purpose of supporting suspended ceiling of any of the above types of light iron or metal furring which receive lath, plastic or acoustical materials; the placing of all types of floor lath, such as hyrib lath, paper-back steeltex floor lath, Penn metal rib, and all other appurtenances connected therewith.

4.   The erection of all metal plastering accessories such as metal corner beads, door and window casing beads, metal picture mould, metal chair rail, metal base and base screed and any and all other metal plastering accessories which are covered and/or serve as a ground guard, stop, or screed for plastic material.

5.   Such other work as falls within this article as such other work may now exist or may come into being as a result of the development of new methods and new materials, including, but not limited to the installation and erection of the drivit and other synthetic stuccos and similar systems.

6.   Installation of formwork for reinforced concrete construction where such agreements prevail.

7.   The loading, unloading, carrying, placing and handling of all materials falling within the trade jurisdiction of this Council from the point of delivery on the jobsite to the point where work is to be performed with said materials.

## ARTICLE XI
## JURISDICTIONAL SETTLEMENT PROCEDURE:

1.   It is agreed between the Union and the Association that this agreement is applicable to construction work that is primarily within the recognized and traditional jurisdiction of the Union and shall be performed in accordance with the terms of this agreement. It is further agreed that should any employer be required to perform construction work that is within the recognized

17

and traditional jurisdiction of another Union with which the employer has a similar agreement for the performance of that work, then work assignments shall be made in accordance with Agreements of Record or prevailing area practice. If the Union is still aggrieved over any assignment, the matter shall be referred to the respective General Presidents of both contesting Unions in an effort to seek a resolution. If the matter fails of satisfactory resolution in this manner, the parties may agree to select an impartial third party or pursue the matter through the procedures of the National Labor Relations Board. Pending an orderly resolution of the matter, there shall be no interruption of work by a work stoppage, strike or refusal to refer employees to the project by the Union.

2.   It shall not be a violation of this Agreement if an Employer is signatory to a Collective Bargaining Agreement prior to May 1, 2007 with another trade union claiming drywall taping and finishing jurisdiction and as such uses a workforce from that Union for the performance of that work.

## ARTICLE XII
## FURNISHING OF TOOLS:

The Employer shall furnish all drills, hacksaw blades, all wrenches over one (1) inch, files, taps, reamers or any other special tool that is not normally carried in an employees kit of tools including all power activated tools whether electric, chemical propellant air or gas powered. Any stock room crib that is on the premises of a job where the distribution of tools or materials, etc., are being distributed to employees, shall be operated by an employee depending on the type of work being performed.

## ARTICLE XIII
## MORE FAVORABLE CONDITIONS:

The Union hereby agrees that if it affords any conditions of a more favorable nature to any other employer with whom it has a collective bargaining agreement who performs the same or similar work, that said more favorable condition shall automatically be incorporated in this Agreement and be afforded all members of the Association covered hereunder, upon request.

## ARTICLE XIV
## SHOP STEWARD:

1. The Executive Secretary-Treasurer or his designee having jurisdiction over the job, will select a certified Shop Steward. A Shop Steward shall always be employed whenever covered work is being performed on any job, except at the end of the job when punch list work is being

--

18

performed by one employee which does not exceed three (3) days. The steward's employment may be terminated by the Employer after review of complaint against him between the employer and the Business Representative.   In the event of a disagreement between the Business Representative and the employer, the complaint shall be referred to the Executive Secretary-Treasurer or his designee for whatever internal actions considered appropriate. A Shop Steward can be appointed from an employer's regular complement of employees, with the consent of the Union, providing he has the appropriate training certifications from the Northeast Regional Council of Carpenters' shop steward certification program and/or the Eastern Millwright Regional Council's shop steward certification program, and who otherwise meets all of the Union's requirements for appointment as a shop steward.  Should the Union have due cause to replace the shop steward, they will notify the employer, defining the reasons for said replacement.

   2.    The Shop Steward must 1) report to the Local Union prior to the start of the job to pick up the appropriate paperwork and instructions; 2) fill out the appropriate paperwork; and 3) deliver the appropriate completed reports to the Local Union hall after the end of the workday on Friday of each week.   The Shop Steward shall only take the necessary time to perform his duties to the best interests and safety of the covered employees. There shall be no non-working Shop Stewards and the Shop Steward shall not be permitted to leave the job for the performance of his duties unless by the consent of the Employer.

   3.    The Shop Steward shall have no authority to call any strike or stoppage of work or to make any Agreement which changes, modifies or alters any of the terms and conditions set forth in this Agreement.   The Shop Steward shall be given two hours notification before an employee is laid off. The employee shall be given one hour notice of layoff. In the spirit of cooperation and as a courtesy, the employer will make every reasonable effort to notify the Business Agent twenty-four hours in advance to laying off six or more employees at one time.

   4.    The Shop Steward shall not be discriminated against for attending to his or her duties.

   5.    In the event the Union appoints a shop steward on a small job from a group of key company personnel and that steward fails to fulfill his duties, he will be immediately removed from the position and replaced by the Union.

## ARTICLE XV
## WORK RULES:

<u>Section A:</u>
   1.    The welding torch, burning equipment and chain falls are tools of the trade having jurisdiction over the work being performed. Employees using these tools shall perform any of the work of the trade and shall work under the supervision of the craft foremen. The Employer shall provide the welding and burning protective equipment for this work.  When a Millwright is welding, burning or grinding and the owner mandates a Fire Watch, a Millwright shall be
--

designated as said Fire Watch.

2.    There shall be no limit on production by employees nor restrictions on the full use of tools or equipment.   There shall be no restriction, other than may be required by safety regulations, on the number of employees assigned to any crew or to any service.

3.    All manually operated or power operated equipment required for the performance of millwright work shall be used by carpenters and millwrights.

4.    Slowdowns, standby crews and featherbedding practices will not be tolerated.

5.    A steward shall be a qualified employee performing work of his craft and shall exercise no supervisory functions.   There shall be no non-working stewards. Maximum time allocated to union business shall not be excessive.

6.    There shall be no illegal strikes, work stoppages or lockouts.

7.    Employees shall observe the employers' rules and regulations not inconsistent with this agreement which shall be posted at the project.

8.    A copy of said rules and regulations shall be furnished to the Union at least ten (10) days prior to posting.

9.    The selection of craft foremen and general foremen shall be entirely the responsibility of the employer, it being understood that after selection of the first foreman, the second and subsequent foremen shall be selected by the employer from among qualified employees in the Council. Foremen and general foremen shall take orders from individuals designated by the employer.

10.    Employees shall leave their designated shanty or tool room at the starting time and shall remain at their place of work until the quitting time. In high rise buildings, this shall apply where an elevator is available.

11.    There shall be no limitations or restriction on the employers choice of materials, design, methods or techniques of construction.

12.    The Employer agrees that Carpenters will maintain forms at all times when pours are being made, except ordinary footings and grade slabs one board in height ( 12").

13.    It shall be the responsibility of the employer to notify the Union via telephone, facsimile or email twenty-four (24) hours before job start to give the Union the ability to select a certified shop steward/journeyman.

--

20

14.    It shall be the responsibility of Union members to notify Centralized Dispatch (MIX 20/20) before the start of a job.

Section B – Portability Requirements:

1.    To obtain portability, all Northeast Regional Council of Carpenters members are required to report all changes of location or there will be revocation of portability.

2.    All new jobs are to be reported by contractors to the Centralized Dispatch (MIX 20/20) and be assigned a job number for each project.  Failure to do so will result in denial of portability for that job.

3.    All employees shall be in good standing with the Northeast Regional Council of Carpenters

4.    All contractors must be current with their benefits contributions to the Northeast Carpenters Funds and any other Fund within the Northeast Regional Council of Carpenters in order to obtain portability.

5.    Denial of portability to Association Members for any of the above reasons shall result in the Association Member reverting to the portability provisions outlined in Section B under Article XVI, Portability.

6.    Solicitation of work by members will be permitted.

7.    Portability applies only to employees whose employment originated in the Northeast Regional Council of Carpenters' geographic jurisdiction.  Any employee whose employment originated outside of the Northeast Regional Council of Carpenters must be matched at a one-to-one ratio from the Council's referral system.

## ARTICLE XVI
## PORTABILITY:

Section A – Association Members

1.    Employers who are members in good standing of the management bargaining Associations signatory hereto who have accordingly assigned their bargaining rights for this Agreement to said management Association(s), shall be permitted portability of manpower as follows:

As of May 1, 2016 – up to twenty-five (25) bargaining unit employees; thereafter 1 union Council referral/1 key employee

--

21

There shall be 100% portability for Millwrights, Local 715.

All new jobs are to be reported to the Council's Local Union where the work is performed.   Failure to report will result in a denial of portability for that job.

Key employees shall be defined as employees who 1) have worked a total of at least 1,000 hours as a journeyperson carpenter under the terms of this Agreement during the prior three years for the employer; or 2) were on the Employer's active payroll working under the terms of this Agreement for at least 90 out of the last 180 calendar days; and 3) have demonstrated the ability to safely perform the functions of a journeyman carpenter.

It is agreed upon between the Union and the Association and the contractors that in order to keep harmony on job sites with large amounts of manpower, all parties shall work together to insure adequate representation of members from the local area.   In the event a dispute arises due to lack of harmony, such dispute shall be referred to the joint committee to be resolved.

It is agreed that on large crews of 25 or more carpenters, employers will employ a minimum of 15% of carpenters with 25 years of service or more under the terms of collective bargaining agreements within the Council's geographic jurisdiction.

Section B – Non-Association Members

1.      Fifty (50%) percent of the first eight employees on the job shall be designated by the employer from the employer's contingent of key employees and fifty (50%) percent shall be referred by the Local Union.   First employee shall be determined by the employer; second employee shall be referred by the Local Union and the remainder shall be in accordance with the aforementioned.   One of each of the four subsequent employees shall be designated by the employer.   The eighth and ninth employee shall be referred by the Local Union.   The tenth employee shall be designated by the employer from the employer's contingent of key employees and the remainder shall be in accordance with the one to four ratio.   Layoffs shall occur in reverse order.

All new jobs are to be reported to the Local Union where the work is performed.   Failure to report will result in a denial of portability for that job.

All employees shall be members in good standing of the Northeast Regional Council of Carpenters.

Key employees shall be defined as employees who 1) have worked a total of at least 1,000 hours as a journeyman carpenter under the terms of this Agreement during the prior three years for the employer; or 2) were on the Contractor's active payroll for at least 90 out of the last 180 calendar days; and 3) have demonstrated the ability to safely perform

22

the functions of a journeyman carpenter.

Section C – Specialty Crafts

    1.   There shall be 100% portability for Tapers/Homebuilders.

    2.   There shall be 100% portability for Floorlayers, Local 251.

    3.   The Joint Committee shall meet quarterly to discuss portability issues.   By unanimous agreement, the Committee shall have the authority to implement contract changes within the term of this agreement.

## ARTICLE XVII
## VISITATION BY BUSINESS REPRESENTATIVE:

The Business Representative shall be permitted to visit any job site of any Employer-member of the Association or any Employer who performs work under the terms of this Agreement. If security questions are involved, the Business Representative will abide by the rules and regulations.

## ARTICLE XVIII
## GRIEVANCES AND ARBITRATION:

    1.   In the interest of uninterrupted progress on any and all work covered by this Agreement, the parties hereby agree that there shall be no lockout on the part of any employer and there shall be no strikes, work stoppages, picketing or slow-downs of any kind including any threats thereof engaged in by the Union.

    2.   All questions or grievances involving the interpretation and application of this Agreement, other than trade jurisdictional disputes arising under Articles IX and X and the establishment of wage rates shall be handled under the following procedures:

    Step I:      Between the company representatives and the business representative at the job site as soon as practical but in no event later than three (3) working days after the occurrence of the dispute. Failure to raise any dispute within three (3) working days of its notification, renders the dispute null and void.

    Step II:      If not resolved pursuant to Step I, then between the Manager of the Region where the job is located, or a designee, and a company officer at the job site.  This meeting should be arranged as soon as practical but in no event later than three (3) working days after the conclusion of step I.

23

Step III:    If not resolved pursuant to Step II, then between the Executive Secretary/Treasurer of the Regional Council, or a designee, and a company officer at the job site. This meeting should be arranged as soon as practical but in no event later than three (3) working days after the conclusion of Step II.

Step IV:    If the parties are unable to affect an amicable settlement or adjustment of any grievance or controversy, such grievance or controversy shall be submitted to binding arbitration under the Expedited Rules of the American Arbitration Association at the request of either party provided notice in writing of the intent to do so is given through the other party and the American Arbitration Association within thirty-five (35) working days after Step III has been completed. One of the following three Arbitrators (J. J . Pierson, Lou Verrone or Steven M. Wolf) shall be selected who shall hear the matter and his decision will be final and binding on the contract to the Union and all Employers.

3. The Arbitrator shall render his decision in writing on the grievance and solely on the meaning and interpretation of the particular provision of the contract which gave rise to the dispute.

4.   The Arbitrator shall have no power to add to, subtract from, or modify this agreement.

5.   The parties affected shall be afforded a full opportunity to present any evidence, written or oral, which may be pertinent to the matter in dispute.

6.   Except by mutual agreement, all timeliness provisions must be complied with and failure to comply by either party will result in default by that party of its position.

7.   The Arbitrator shall render a decision in writing within ten (10) days after the close of an arbitration proceeding.

8.   No employee, except to the extent that the law permits, shall be allowed to compel the Union to proceed to arbitration in any matter which the Union does not consider justified.

9.   Each party shall share equally the expenses of the arbitrator.

10.   Any grievance filed against an Association contractor will be reported to the respective Association.

## ARTICLE XIX
## SUBCONTRACTOR CLAUSE:

1.   The Employer will not subcontract any work within the jurisdiction of the Union which is to be performed at the job site except to a contractor who holds an agreement with the

--

24

United Brotherhood of Carpenters and Joiners of America or one of its subordinate bodies having jurisdiction at the job site, or who agrees in writing, prior to or at the time of the execution of his subcontract, to be bound by the terms of this Agreement.

2.   It shall not be a violation of this Agreement if an Employer subcontracts drywall taping and finishing work covered by this Agreement to an Employer who is signatory to a Collective Bargaining Agreement with another recognized building trades union, where such subcontracted work is within the recognized and traditional jurisdiction of another Union with which the Employer has maintained an agreement with the union since, on or before May 1, 2007.

3.   Upon request by the Business Agent, the employer will not withhold the names of all subcontractors who are to do any work covered by this agreement.

4.   The Employer represents that its members, officers, and supervisory personnel will not attempt to form or participate in the creation of or operation of new or double-breasted corporations for the purposes of avoiding the obligations of this Agreement.

## ARTICLE XX
## UNEMPLOYMENT AND TEMPORARY DISABILITY INSURANCE COVERAGE:

Each Employer agrees to immediately elect to become a covered Employer under the terms of the Unemployment Compensation Act - Temporary Disability Benefits Act, pursuant to the Revised Statutes of the State of New Jersey, 43:21-1, et seq.   The purpose of this clause is to provide unemployment compensation coverage and temporary disability benefit coverage for one or more employees of each Employer.   Failure to comply with this provision shall be considered a breach of this agreement as to the non-complying individual contractor and the Union reserves the right to cancel the agreement of that particular contractor for such breach.   The Employer will elect to become covered before the commencement of the job and the hiring of employees. He will provide the Union with his qualifying number as issued by the Division of Unemployment Security of the New Jersey Department of Labor and Industry.

## ARTICLE XXI
## SHIFT WORK:

1.   When so elected by the Employer, multiple shifts on a temporary basis of at least five (5) consecutive days duration may be worked.   Any period of time less than five (5) consecutive work days may be considered shift work if mutually agreed to by the Union and the Employer.

2.   When a two shift schedule (including a day shift) is established, the first or day shift

--

shall be established on an eight (8) hour basis.  The second shift shall be established on an eight (8) hour basis and paid the base rate plus 15%.

3.    When a three shift schedule is established, and mutually agreed to by the Employer and the Union, the following conditions shall prevail.  The day shift shall be established on an eight (8) hour basis, the second shift shall be established on a seven and one-half (7 ½) hour basis, and the third shift shall be established on a seven (7) hour basis.  The first shift shall receive the base or regular hourly rate.  The second shift shall receive the base hourly rate plus 15%.  The third shift shall receive the base hourly rate plus 20%.

4. When there is no day shift and a second shift or third shift is established and mutually agreed to by the Employer and the Union, the following conditions shall prevail.  The second shift shall be established on an eight (8) hour basis.  The third shift shall be established on an eight (8) hour basis.  The second shift shall receive the base hourly rate plus 15%.  The third shift shall receive the base hourly rate plus 20%.

5. When an irregular shift must be established, the percentage premium shall be 15% above the base rate.

6.    The percentage premium, when added to the base rate, shall be termed the regular hourly rate.  Shift hours for the second and third shifts shall be such as to conform to the day shift and in no case shall an employee work on more than one shift within a 24 hour period.

7.    Separate safe and suitable rooms or lockers for the security of the employees' tools and clothing shall be provided for the employees of each shift.

8.    When the Department of Labor does not include the shift premium in the prevailing wage rate schedule, the shift work premium will be waived.

9.    All time worked before and after a regularly established shift shall be paid at the applicable overtime rate.  When a portion of a regular established shift works into Saturday, Sunday or a Holiday, that time worked shall be paid at the established shift rate.

## ARTICLE XXII
## GENERAL WORKING CONDITIONS:

1. The Employer shall provide a comfort station on the job to conform with the particular community's health laws, where the job or shop is located; provide sanitary drinking cups and water, which shall be iced between May 1 through October 1, as well as a suitable tool house with a lock. Suitable heating equipment shall be furnished for the shanties during the months of the year when heat is required. Tool sheds shall not be used as a storeroom for any purpose. It shall be kept clean and be of adequate size for the employees to eat their lunches. Where the

--

26

employees' tools are stored on the job, they shall be stored in the premises designated by the Employer. The Employer shall be responsible for the loss of each employee's tools from fire or breaking and entering of any tool shed or shanty.   No claim shall be made unless the aggregate loss of tools from fire or breaking and entering of any tool shed or shanty suffered by all employees on the job exceeds $25.00 overall.   The liability of the Employer shall be limited to $500.00 per employee for carpenter tools and $1,250 per employee for millwright tools.   The employer will issue a hard hat, safety glasses and all safety equipment. Any additional issue of safety equipment will be paid for by the employee, unless stolen or worn out.

2. Where the Employer requires an employee of the Union, to use the employee's car on the Employer's business, the employer will provide public liability coverage for the use of such vehicle while the employee is using that vehicle for the Employer's purposes.   Failure to so provide shall constitute an automatic breach and the Union may exercise its privilege of canceling the agreement on twenty-four (24) hours written notice.

## ARTICLE XXIII
## WORKING HOURS AND HOLIDAYS:

1.    Eight (8) hours shall constitute a day's work. Starting time may be flexible from 6:00 a.m. to 9:00 a.m. as mutually agreed to by the Business Agent and Employer. One half (½) hour for lunch, in the shanty, from 11:00 a.m. to 1:00 p.m.    It is expressly understood, however, that while concrete is being poured employees covered hereunder who are attending forms may be given the thirty minute lunch period anytime from 11:00 a.m. to 1:00 p.m., at the discretion of the Employer.

2.    Five (5) days shall constitute a week's work, Monday through Friday inclusive. Four (4) ten hour days may be worked, when mutually agreed, Monday through Thursday at straight time pay. Friday shall be used as a makeup day at straight time for days lost due to inclement weather or for other mutually agreed reasons. If Friday is not a make-up day, all hours worked on Friday shall be paid at time and one-half providing there was work and the carpenter worked all four of the previous working days.   If a carpenter does not work 40 hours during the work week prior to the Friday premium day and providing there was work for the carpenter, then all time up to 40 hours shall be paid at straight time.   In all other instances, five eight-hour days shall be worked Monday through Friday at straight time pay. At no time shall the above be utilized to circumvent Holiday pay.

3.    Upon mutual agreement by the Employer and the Union, when during the course of a normal work week of eight-hour days from Monday through Friday, 36 hours or less are worked strictly due to weather conditions or an otherwise mutually agreed circumstance, the employing contractor has the option of working Saturday at straight time, not to exceed a forty-hour (40) work week.   Hours over the forty-hour (40) work week worked on a Saturday will be paid at time and one half.   In the event other trades are working on Saturday for time and one half, Carpenters will also be paid at time and one half.

27

4.   Where a four ten-hour day schedule is established on a job, and 36 hours or less are worked due strictly to weather conditions or otherwise mutually agreed circumstances, Friday may be used as a make-up day for such hours lost at straight time up to 40 hours and the applicable overtime rates for all time over 40 hours.

5.   Any work performed outside the aforesaid hours or on Saturday or Sunday and the following Holidays, shall be considered overtime and paid accordingly: New Year's Day, Presidents Day, Memorial Day, Fourth of July, Labor Day, Presidential Election Day, Veterans' Day, Thanksgiving Day, and Christmas Day.   In the event a holiday falls on a Sunday, the following Monday shall be observed as the holiday.   The overtime rate Monday through Saturday shall be time and one-half; Sunday & Holidays shall be double time.

6.   In the event some other craft has a different holiday than those designated herein, the contractor shall endeavor to plan his work so as to minimize its impact to avoid a forced holiday.

7.   New hires shall report at 8:00 a.m., the established starting time,   unless an earlier start is otherwise agreed upon, provided the contractor has called the union hall prior to 8:00 a.m. on the preceding day.   Late arrivals will begin work and be paid from 9:00 a.m., 10:00 a.m. or whatever is appropriate.

8.   Any employer who requests an employee through the referral procedure to work on the same day the request is made by the Employer shall pay that employee from the mutually agreed starting time of that day.

9.   No work shall be performed by employees covered by this agreement on Labor Day except in the case of emergency and by permission of the Union.   It is agreed that overtime is undesirable and not in the best interests of the industry or the employees. Therefore, except in unusual circumstances, overtime will not be worked. Where unusual circumstances demand overtime, such overtime will be kept at a minimum.   Prolonged use of overtime will be permitted only with the agreement of the Union and the Employer.   Whenever any employees are required to work more than two hour's overtime, a half hour eating period shall be provided with pay at the applicable rate.

## ARTICLE XXIV
## PAYMENT OF WAGES AND FRINGES:

1.   Employees shall receive their wages in cash or by check, when allowed as herein set forth, on the job in a closed envelope which shall be plainly marked as to each employee's name, the hourly rate, number of hours, deductions for vacation, dues and the various taxes, such as unemployment, social security and temporary disability. The envelope shall show the gross amount of wages, the employer's name and address.   The Employees shall be paid prior to the

28

end of the established weekly pay day, or an earlier day if the regular pay day falls on a recognized holiday when the banks are closed.  Two (2) days back pay may be withheld by the Employer for each weekly pay.

2.    Permission to pay by check must be requested in writing by the Employer to the particular Council involved. After consideration of such request the Union shall notify the Employer if payment by check is granted.

3.    When payment by check is permitted, the Employer must comply with the requirements of state law, including N.J.S.A. 34:11-4.2 requiring that provisions be made to cash checks locally without reduction in amount.

4.    All members of the Associated Construction Contractors of New Jersey and its affiliated local Associations throughout the State who have assigned their bargaining rights have submitted such a request and each employer member thereof has been approved by the Union. It is also understood that Payroll checks must be bonded and employees paid in cash when terminated, however, this rule does not apply to the Associated Construction Contractors of New Jersey and members of its affiliated local associations.

5.    Fringe benefits must be paid weekly by check to the Shop Steward on the job and delivered to him with the necessary fringe benefit submission forms fully completed, unless permission to submit same by mail directly to the Fund Office is granted by the Trustees of the various funds.  All members of the Associated Construction Contractors of New Jersey and its affiliated organizations have been granted permission to submit payment and forms by mail to the various funds on a monthly basis.

6.    The Business Agent or the Steward shall have the power to examine the pay of any employee.

7.    By mutual agreement between the carpenter and the employer, the employer may pay wages by direct deposit to the carpenters' bank account.

8.    The Union shall not restrict the use of electronic or mobile payroll systems.

9.    Any contractors working in New Jersey from other states must pay unemployment disability and state income tax to the proper New Jersey agencies.  Contractors who were domiciled in a city or municipality that has a wage tax will not be permitted to apply such deduction working on projects within a city or municipality that has no applicable tax.

--

## ARTICLE XXV
### LAY-OFF:

1.   Employees who have been employed on a job four (4) or more days shall receive one (1) hours' notice of discharge at which time they shall receive their pay.

2.   The Shop Steward shall be notified of all layoffs. When employees are required to wait for their wages after lay-off time, they shall be paid for every hour or half hour at time and one-half the hourly rate of pay.   In the event a carpenter is dispatched that does not meet with the employer's required skills/certifications, that carpenter can be laid off after four hours on the first day only and a written notice shall be submitted to the Northeast Regional Council of Carpenters' Union dispatch office outlining the employer's reasons for discharging the employee.   If direct deposit is established and agreed to by the carpenter and the employer, upon layoff, the employer must send for direct deposit within 24 hours of layoff.


## ARTICLE XXVI
### UNION'S RIGHT TO STRIKE DELINQUENT EMPLOYERS:

1.   A Local Union or Regional Council is granted an absolute right to strike the job of any delinquent Contractor and shall be under no compulsion to return any employees to employment with such Contractor until all delinquencies are completely paid up with legal or other costs of the Funds related to said delinquencies. The Union may terminate this Agreement as a result of the delinquencies with said delinquent contractor.  These shall be exceptions to Article XVIII, Grievance and Arbitration Procedure, under this contract.   Where such action is necessitated as a result of the delinquency of any Contractor in the payment of wages, or of any of the fringe benefit payments set forth elsewhere in this Agreement, such delinquent Contractor shall be required to pay the striking employees' wages for each day on strike, for a period not to exceed three (3) days, prior to their return to employment for such Contractor and shall not return until delinquency is satisfied or back payment arrangement agreed upon. The aforesaid payment shall be limited to wages and does not include payments to any fringe benefit fund.

2.   The Trustees of the respective Funds shall maintain appropriate actions in law or in equity, to collect the proper amount of contributions due, for an accounting of, or for any other appropriate relief.  Should legal action be required in order to effect collection of the money owed by the Contractor, or to effect an examination of his books and records, the Contractor shall be responsible, in addition to the money owed, for attorney's fees and disbursements incurred, court costs, plus interest at the rate of twelve percent (12%) per annum on all money, even though actual legal proceedings have not been begun.

3.   The Trustees of the respective Funds may require an Employer with a record of delinquencies or an Employer with no previous record of payments to the fringe benefit funds, to post a surety bond obtained from a carrier licensed to do business in the State of New Jersey or

30

cash escrow with the Trustees prior to the commencement of any work by said Employer.   Such bond shall be in the amount determined by the Trustees but not less than $5,000.00 and must guarantee the payment of Fringe Benefit payments required under this Agreement to all employees within the unit.   A copy of such bond shall be furnished to the Union before the commencement or re-commencement of any work by such employees, or the escrow furnished.

The attorney's fees referred to above agreed upon as follows:

WITH OR WITHOUT SUIT
27 ½% of the first $750.00
22 ½% over $750.00
(Minimum $25.00 each fund)

All disbursements and expenses including arbitration fees are additional.

4.   It is further agreed that the Trustees of any Fringe Benefit Fund or an alleged delinquent employer may request arbitration of any alleged wage or fringe benefit fund delinquencies and arbitration must be heard within thirty (30) days after such request.   The decision of the arbitrator shall be final and binding.   The arbitration shall be heard in offices of the applicable Carpenter Funds or in the office of the counsel for the Funds and shall be in accordance with the rules of the New Jersey State Board of Mediation.   In order to expedite such hearing, a Permanent Arbitrator is herewith designated and approved.   Said Permanent Arbitrator is J. J. Pierson.   The Permanent Arbitrator shall serve for a period of one year and shall be subsequently reappointed yearly thereafter upon affirmative vote of the Fund Trustees.

5.   All provisions with respect to any local fringe benefits funds that are in conflict with the foregoing shall prevail.

## ARTICLE XXVII
## INDIVIDUAL EMPLOYEE RIGHTS:

Each Employee in the bargaining unit individually reserves the right to cancel his services of labor on any job where non-union journeymen or apprentices are employed for a period exceeding the seven (7) days after which they may be required to become members of the Union, pursuant to a valid Union Security Contract.

## ARTICLE XXVIII
## WAGES AND FRINGE BENEFITS:

1.   The schedule of hourly wages and fringe benefit contributions Attached hereto as Appendix "A" shall be applicable during the term of this Agreement:

--

31

2.   FOREMAN: shall receive 15% over the journeyman's rate.

3.   GENERAL FOREMAN: shall receive 30% over the journeyman's rate.

4.   The Union has the option of applying any amount of wages to a vacation fund, check-off or dues. The Employer agrees to make such deductions and to direct payment of same to such offices as may hereafter be requested by the Union or Trustees of any such fund.

5.   It is agreed that the parties may, during the term of this agreement, exercise the option to convert any part of the wage package as payments to any fringe benefit program.

6.   There will be one uniform schedule of wages and fringe benefits, including dues check-off and other employee deductions, for the Union.

7.   Any Vacation monies which may be required to be paid to the New Jersey Carpenters Vacation Fund are subject to the Trust Agreement governing the Fund and to the Vacation Plan adopted by the Trustees, under both of which forfeitures may be used to pay expenses of the Vacation Fund, to guarantee to employees receipt of deductions made from the employees' pay and to pay interest on employees' accounts.

8.   Apprentices shall be paid the following scale of wages:

| | |
|---|---|
| 1st Year | 40% of the journeyman's rate |
| 2nd Year | 55% of the journeyman's rate |
| 3rd Year | 65% of the journeyman's rate |
| 4th Year | 80% of the journeyman's rate |
| 5th Year | 90% of the journeyman's rate |

and after the fifth year and completion of Apprentice School, the full Journeyman's rate. The working hours of an apprentice shall be the same as those of journeymen except that the apprentice shall be guaranteed an eight (8) hour day on any day on which the job works for the first year of apprenticeship.

An apprentice working at rates based on the previous schedule shall continue at those rates until his/her next anniversary date for an increase at which time he/she will be subject to the revised schedule.

The revised wage schedule shall not apply to the Millwrights.  Millwright apprentices shall be bound by the previous wage schedule, as follows:

| | |
|---|---|
| 1st 6 months | 40% of the journeyman's rate |
| 2nd 6 months | 45% of the journeyman's rate |
| 3rd 6 months | 50% of the journeyman's rate |
| 4th 6 months | 55% of the journeyman's rate |

--

| | |
|---|---|
| 5th 6 months | 60% of the journeyman's rate |
| 6th 6 months | 65% of the journeyman's rate |
| 7th 6 months | 70% of the journeyman's rate |
| 8th 6 months | 75% of the journeyman's rate |
| 9th 6 months | 85% of the journeyman's rate |
| 10th 6 months | 95% of the journeyman's rate |

Association members shall have the ability to request apprentices at a 1 to 3 ratio.

In the event a contractor has 3 apprentices, one of those apprentices shall be either a 4th or 5th year.   On larger crews, it is agreed that there will continue to be a contingent of 4th and 5th year apprentices mixed in with the ratio.

It is in the best interests of all parties that apprentices will not be solely dedicated to routine tasks such as loading/unloading material, fire caulking, or insulating for long periods of time that would infringe on their ability to obtain a well-rounded education while working on job sites. Union representatives and the contractors will work together to insure apprentices get proper well-rounded OJT (on the job training).

### ARTICLE XXIX
### LABEL:

All employees as individuals who work under the terms of this Agreement reserves the right to recognize the existence of or non-existence of the label of the United Brotherhood of Carpenters and Joiners of America on all materials, supplies and equipment which they install or erect.

### ARTICLE XXX
### FOREMAN CARPENTERS & MILLWRIGHTS:

All reference to Carpenters in this article will duly apply to Millwrights.

1.      Where there are 2 or more carpenter employees on the job, there shall be a foreman.

2.      Where there are two (2) or more millwright employees on the job, there shall be a foreman. Thereafter, the determination of the number of foremen and general foremen are the sole responsibility of the employer.

3.      The first crew of employees shall not exceed 20 employees exclusive of foremen.

4.      At such time as the 21st employee is employed, there shall be two foremen.

--

33

5.   A third foreman shall be hired at any time but no later than such time as the 36th employee  shall be employed, at which time one of the three foremen shall be designated a general foreman,  and thereafter additional foremen shall be hired with the employment of the 46th employee, 56th employee, etc., in multiples of ten.

6.   All foremen shall be "working foremen" at the discretion of the employer.

7.   On jobs exposed to inclement weather conditions, the duration of which jobs shall be of 10 or less working days exclusive of days lost by reason of inclement weather, and where there are less than 3 carpenters employed thereon, the foreman shall not receive pay for intervening inclement weather days or holidays.  In the event that such jobs exceed 10 actual working days exclusive of holidays and days lost by reason of inclement weather, the foreman's usual pay requirements shall be retroactive to the commencement of the job.

8.   Except as provided for in paragraph six (6) above, all foremen, including the general foremen, shall be paid for the prevailing regular weekly basis for all normal working days between the initial date of employment and the termination date of employment, holidays and inclement weather days included, provided however that all foremen must report to work every day within the work week unless otherwise directed by the Employer.  All overtime worked by foremen shall be compensated for at proper overtime rates.

## ARTICLE XXXI
## MARKET SHARE EXPANSION ADDENDUM

All members of the Associations who are signatory to this Agreement may utilize the Market Share Expansion Addendum for the scope of projects defined therein, subject to the exclusions so noted.   All terms and conditions of this Collective Bargaining Agreement shall apply, except as modified by the Work Rules and Conditions defined in the Market Share Expansion Addendum.

## ARTICLE XXXII
## FRINGE BENEFIT FUNDS:

1.   The Employer acknowledges the fringe benefit funds (collectively known as the "Funds") that have been created by prior collective bargaining agreements and include the New Jersey Carpenters Funds, the New Jersey Carpenters Apprentice Training and Educational Fund, and the New Jersey Carpenters Contractors Trust.

2.   Each of the Funds is managed by an equal number of Employer and Union designated Trustees in accordance with Agreement and Declarations of Trusts which govern the operation of

--

34

the Funds.  Any Employer party to this Agreement and not a member of the Association agrees that the Employer Trustees shall represent it on the Boards of Trustees of the Funds.

3.  The Funds shall be governed by the relevant state and federal laws in a manner consistent with the purpose of remaining tax-exempt employee benefit funds as approved by the Internal Revenue Service.

4.  Any Employer party to this Agreement explicitly and expressly agrees to all of the terms and conditions of the Agreements and Declarations of Trust governing the Funds and the Plans relating to each Fund as if these documents were set forth at length herein.

5.  Notwithstanding the termination of this Agreement at any time in the future and pending negotiations for a new agreement, each Employer agrees to continue to pay to the respective Funds, if any Employees represented by the Union are in their employ, contributions on behalf of such Employees in an amount not less than as stipulated herein.

6.  If any Employer defaults in the payment of his contributions to the Funds as stipulated herein or is in violation of the rules of collection set by the Trustees of the Funds, the Union may consider such defaults as a breach of this Agreement and may terminate this Agreement as to such defaulting Employer.

## ARTICLE XXXIII
## TRAINING, SAFETY & ADVANCEMENT FUND:

1.  The parties to this Agreement agree to continued funding of a Training, Safety and Advancement Fund (TSA) pursuant to the requirement of the Labor-Management Relations Act, the Internal Revenue Code and all applicable laws and the agreement of parties for the purpose, in all lawful ways, of promoting the increase of commercial, institutional, public, industrial building and housing construction throughout the State of New Jersey and the adjoining areas within the territorial jurisdiction of the unions by providing building owners, architects, engineers, builders, contractors, private and public funding institutions and agencies, government agencies and any others, directly or indirectly with the building construction industry, information, data and other information to communicate the advantages of sound, durable and economical construction that will provide a high degree of service, utilization and benefit to the public by the utilization of union affiliated contractors.  The purpose of the Fund shall be to foster and promote the continued utilization and expansion of union construction, particularly utilizing union members of the carpenters union, in prospective projects throughout the State of New Jersey.

2.  Effective May 1, 2016 and continuing thereafter, each Employer bound by this Agreement shall contribute $.28 per hour for each hour of work covered by this Agreement to the Training Safety and Advancement Fund, which shall be allocated to the UBCJA National Safety

35

and Health Programs ($.10) and the Building Contractors Association of New Jersey and Drywall & Interior Systems Contractors Association Industry Advancement Fund ($.18). The Northeast Carpenters Fund office shall collect and distribute such funds.

3. Although the above contribution is designated a "contribution" it is expressly understood and agreed that the said sum payable to said TSA is not intended to be and is not a contribution to employees and no employee of Employer has any proprietary interest in said funds.

4. The parties hereto do hereby establish the Carpenters Contractor Trust NY/NJ (CCT NY/NJ) pursuant to an Agreement and Declaration of Trust. The CCT NY/NJ shall be a labor-management committee established under the Labor Management Cooperation Act of 1978. The terms and conditions of the Trust shall be mutually agreed to by the Union and the Associations. There shall be equal representation of both labor and management on said committee.

## ARTICLE XXXIV
## SAFETY REGULATIONS:

1. All employers and employees shall be required to abide by all Federal, State and Local safety regulations, including but not limited to all OSHA regulations. All covered employees shall abide by the employer's safety regulations. A joint Safety Committee of Labor and Management shall be established to develop the necessary programs to implement the above.

2. Labor and Management agree to OSHA 30-Hour Training as necessary and the union will work toward having all carpenters trained by the end of this contract's duration.

3. On buildings of seven (7) stories or higher, a safety-approved personnel elevator and a qualified elevator operator shall be provided by the employers.

4. The Joint Safety Committee will develop a program for signatory contactors for the goal of maintaining a safe jobsite. At the request of the Employer members on said Committee, an individual from the Committee will be assigned to investigate Workers Compensation claims and to make recommendations if training is warranted to avoid future work place accidents.

## ARTICLE XXXV
## LAYOUT WORK:

1. The carpenter shall drive all stakes, erect all braces and batter boards and do all layout with transit, level or any other means for the purpose of, but not limited to, locating machinery, equipment, bridges, footings, foundations, floors, walls, bolts, columns, partitions, door bucks, curbs, manholes, excavations, etc.

--

2.   On larger jobs such as power plants, dams, bridges, housing, projects, or any other job where it is necessary to have a full time crew for layout, line or grade work, the following will apply:

(a)   A carpenter foreman or company supervisor shall supervise and direct members of the unit on any one job.  He shall be directly responsible for the layout from specifications and plans to the direction and actual performance of the layout.  He shall read plans and specifications, make sketches for performance of layout, develop and maintain survey records, do the necessary computations, control the layout of the job and be able to do the required duties of any member of the unit.   He shall direct employees in the unit.

(b)   Carpenter journeyman under the directions of a carpenter foreman or company supervisor shall perform layout and run the instrument in a party.  They shall set up, operate and make minor adjustments, read plans and sketches, and keep surveying records.

( c)   Carpenter journeyman or apprentices, if available, shall hold the rods and generally assist in doing layout.

3.   The Union agrees to include in its Apprentice and Journeyman Training programs instructions in the use of the transit, level, theodite, piezometer lazer when used as an instrument and other related instruction in the field of layout, line and grade work so that a sufficient number of properly trained employees will be available to the employer at all times.

4.   It is agreed that the aforementioned layout work will be assigned to employees covered by this Agreement and not to any other craft.

5.   The contractor reserves the right to employ a Licensed Professional Engineer or Land Surveyor for establishing basic location of buildings, for making certified surveys, and for protecting the employer from liability for improper layout.

6.   It is understood the Union will allow mobility or freedom of movement within the State of New Jersey for layout personnel or crews.   It is further agreed that the size of the layout crew will be determined by the employer.   The Union does not concede any rights it may have now or in the future to perform layout work on off-site roads or to represent those who do.   It is, however, not the intent of this Agreement to cover road work.   It is understood that bridges or other structures built along the roadway where employees are employed are not to be considered road work.

7.   It is further agreed that said tasks may be performed to the same extent, and under the same circumstances and under the same direction as in the past, by the employer or his management personnel.

--

37

**ARTICLE XXXVI**
**MISCELLANEOUS:**

1.  All employees shall receive a ten-minute coffee break in the morning.

2.  Tools supplied by the Contractor shall be returned by the employees using same or by employees that are assigned to this duty by the Employer.

3.  A five-minute clean-up time to be allowed before the scheduled lunch and quitting time for covered employees.

4.  When employees are requested to work in foul weather, or conditions caused by same, foul weather gear shall be provided by the employer (Jacket, Pants & Boots).

5.  The union shall make every effort to comply with owner or contractor mandated drug testing and/or background screening requirements.

6.  The Union, in cooperation with the Management and Labor Trustees of the Carpenter Benefit Funds, shall implement a program to provide to management and retain for its records the necessary forms required by agencies of the Federal Government in connection with referral of apprentices, journeymen and foremen by the Union.

7.  No project labor agreement (PLA) may supersede this agreement or any of its provisions or articles without the mutual consent of the parties. Further adding that a representative of the Employer Associations may participate in any PLA negotiations.

8.  Carpenters and millwrights will be able to perform duties as assigned by the employer.

9.  In the event of false/positive drug testing resulting in retesting, if the employee's results are found to be negative, the employee will be compensated for lost work.

10.  A committee consisting of Labor and Management representatives shall be established to develop a Drug and Alcohol policy and program which will provide for testing of current employees, pre-employment testing and random testing. The policy and program, once it is adopted, will be part of the Collective Bargaining Agreement.

11.  Any employee working under the terms and conditions of this Agreement is not entitled to paid sick leave established under a state, county, city or local ordinance provided that said ordinance excludes employees working under the terms and conditions of a collective bargaining agreement.

--

38

## ARTICLE XXXVII
## PICKET LINE:

The Employers' employees represented by the Union, reserve the right to refuse to cross any other Union's legal picket line and also reserve the right not to cross any illegal picket line where doing so might result in the infliction to them of bodily harm or where such result is reasonably to be anticipated or where threats of a verbal nature are made, from which they may reasonably infer that they may suffer bodily harm or damage to their property and neither of such refusals shall make the Union or its representatives or the members of the Union responsible in law or in equity or before any Federal or State Administrative Agency having jurisdiction over the subject matter.

## ARTICLE XXXVIII
## ACCIDENT OR SICKNESS:

Should any employee be taken sick or meet with an accident while at work, the employer shall see that he is properly cared for. The shop steward shall take charge of his tools during his absence and notify the Business Representative. This is to be done on the employer's time; however, the steward shall do so at the least possible loss of time. Any employee who is hurt on the job and has to leave shall be paid for the full day.

## ARTICLE XXXIX
## CALL OUT PAY:

1.  Any employees reporting to the job and not being put to work for any reason other than inclement weather or circumstances beyond the control of the employer shall receive one (1) hour pay.  Employees who start work shall be guaranteed pay to the next half hour if work is stopped.  Such guarantees shall be applicable to shift work also. The employee must remain on the job during this time he is being paid.

2.  Any new employee reporting for work at any time in the morning after agreed to starting time shall be guaranteed four (4) hours work, weather permitting work. If a new employee starts or continues to work in the afternoon, he shall be guaranteed eight hours work under all circumstances. In no case shall employees put their tools on the job in advance of being hired. This shall not apply to a temporary layoff when the same employees are later put to work nor if the employees who are regularly employed are absent on the previous day. After making a determination not to work, the employees shall leave the job immediately following the time for which they had been guaranteed work, as per Article XXIII, No. 6.

3.  There shall be no penalty on the employees for any decision not to work because of weather. This shall not apply to emergency work or employees working undercover at said time. Emergency work shall mean that work which would be performed in order to prevent danger to

--

39

life or property.

## ARTICLE XXXX
## RECOGNITION OF HEAVY AND HIGHWAY
## WORK COVERED:

1.  This agreement shall cover all road, railroad, highway and heavy construction. Heavy construction is defined as: construction and alteration of sewage disposal plants, filtering plants, all work performed under compressed air, offshore plants, offshore terminals, foundations, pile driving, pile capping, forms and similar activities, piers, abutments, retaining walls, viaducts, water crossings pertaining to pipeline work, shafts, tunnels, subways, track elevations, elevated highways, reclamation projects, sanitation projects, aqueducts, irrigation projects, water power development, hydroelectric development, transmission lines, locks and dams.

2.  In addition to all aforementioned articles of this agreement, the following conditions shall apply to the work outlined above:

A.  Lying within the jurisdictional boundaries of the Northeast Regional Council of Carpenters, all layout duties for any highway project shall be as follows:

(aa)   The survey crew shall lay out and stake the base line and bench marks of the project involved. They shall further locate horizontally and vertically each structure and its significant parts on such project.

(bb)   The day to day layout necessary to construct forms and locate necessary points for line, elevation and anchor bolts from original points, is the work of the Carpenters.

(cc)  The Employer agrees that the transit and level are tools of the construction trades and will furnish same to the employees when needed for the performance of work normally performed by the employees.

B.  The jurisdiction over the erection of earth walls and sound walls shall be determined by area practices and contractor assignment; the area being the seven southern-most counties in New Jersey, starting with the northern most border of Burlington County.

C.  By mutual agreement, the starting time may be flexible from 6:00 a.m. to 9:00 a.m. with a flexible one-half hour lunch period that will take place in the time frame that begins three hours after the start of the work day and ends two hours prior to the end of the work day.

D.  The employer shall assign work on the basis of traditional work jurisdiction lines. It is, however, recognized that on some jobs effective production will require the use of composite crews. When such circumstances exist and the other basic trade unions have agreed, by mutual

--

40

agreement the employer shall discuss the work involved and the make-up of the crews on the basis of the amount of work involved for each union. In the performance of such work, all employees will perform the work they are assigned.

## ARTICLE XXXXI
## RECOGNITION OF INTERIOR SYSTEMS WORK COVERED:

1. The Employer agrees to recognize that this agreement shall cover the installation of all materials and component parts of all types of ceilings regardless of their materials composition or method or manner of their installation, attachment or connection, including but not limited to the following items: all hangers, support components, cross furring, stiffeners, braces, all bars regardless of material or method of attachment, all integrated gypsum wall board ceiling heat panels, or wall board panels to receive radiant heat fill, all main tees, splines, wall and ceiling angles or moldings, all backing board and all finish ceiling materials regardless of method of installation.

2. All work in connection with the unloading, handling, installation erection and/or application of all materials and component parts of moveable, demountable or stationary, walls and partitions regardless of their material composition or method or manner of their installation, attachment or connection, including but not limited to the following items: all floor and ceiling runners, studs, stiffeners, cross bracings, fire-blocking, resilient channels, furring channels, doors and windows including frames, casing, moulding, base accessory trim items, gypsum drywall materials, laminated gypsum systems, backing board, finish board, gypsum fireproofing of beams and columns, gypsum fireproofing of chases, sound and thermal insulation materials, fixture attachments including all layout work, preparation of all openings for lighting, air vents or other purposes, and all other necessary or related work in connection therewith.

3. In addition to all aforementioned articles of this agreement, the following conditions shall apply only to the work outlined above:

A. Foreman: The selection of the foreman shall be the sole responsibility of the Employer.  The foreman shall be the first and last employee on the job.  The foreman shall give orders directly to the employees.  The determination of the size of work force to be supervised lies exclusively with the Employer.  The foreman shall carry out his duties as a representative of the Employer and may work with his tools so long as he is a member in good standing of the United Brotherhood of Carpenters and Joiners of America.

B. Make-up Day:   In the event conditions on the job, beyond the reasonable control of the Employer, prevent the work from proceeding on any regular workday (Monday through Friday), the Employer and the Union shall have the right due to inclement weather or other mutually agreed upon reasons to a make-up day on Saturday at straight time wages.

--

41

C.    When work to be performed in occupied buildings is of such a nature that it is not appropriate or practical during the regular work days such as renovation, alteration and modernization; such work shall be performed at the time suitable, designated by the owner. Contractors utilizing this provision shall notify the Union prior to commencing work.  Such employees shall receive their regular hourly rate working seven and one-half (7 ½ ) hours and being compensated for eight (8) hours' work.  When any employee works over seven and one-half (7 ½) hours under these conditions in any 24-hour period, the time worked shall be considered overtime and such compensation shall be at one and a half times the regular rate of pay.

D.   In the event that a majority of the other related construction trades on the job have a different or longer workday than the Carpenters' workday under the applicable agreement, the Employer may, by consultation and agreement with the Union, conform the workday to the other trades without payment of premium wages.

E.   When more than one shift is required, the first shift shall be at regular rates of pay. The second shift shall work seven and one-half (7 ½) hours and receive eight (8) hours' pay and the third shift shall work seven (7) hours and receive eight (8) hours' pay.  No employee shall be required to work more than one shift during a 24-hour period at shift rates.

## ARTICLE XXXXII
## RECOGNITION OF FLOOR LAYING AND FINISHING

1.  The Employer agrees to recognize that this agreement shall cover any and all methods for the installation and removal of the following: carpet, carpet tile, wall carpet, linoleum, wall linoleum, cork, matting, protective wall matting, cushioned wall covering, lino-tile, rubber tile, tread-like tile, sheet vinyl, vinyl tile, and all other tiles, all resilient floor coverings, new or old, any related products customarily installed on any vertical, horizontal or any other surface:  tile composed of marble or synthetic chips embedded in  resin, needle punched, tufted grass or synthetic indoor/outdoor coverings, all athletic track and court materials, PVC-rigid type wall and ceiling systems, poured seamless flooring, rubber/vinyl, or similar type wall base, the cleaning of carpets, laying of all hardwood floors, nailed or mastic set, parquet and wood type tiles, and block floors, acrylic impregnated and radiated wood flooring, and all types of epoxy resin installations;  engineered floors and other laminated floors, the sanding and finishing, game lining, striping, lettering, logoing screeing, and recoating of hardwood floors, the staining, dyeing, polishing and waxing of concrete floors, the preparation of all existing floor and wall surfaces whether pumped, poured or troweled or mechanical preparation, as required to prepare for finished floor or wall covering or in any other manner to correct cracks, roughness, indentations, unevenness, leveling, transitions and the like; and the fitting of edge strips on steps and at openings for the protection of all aforementioned floor, wall and ceiling coverings, Channel, stair nosing and carpet edge to receive electric tubing in conjunction with floor products, the cleaning and waxing and all types of temporary protective cover of all flooring

--

42

required at the time of installation, the handling, lifting, stocking,  unloading or moving of any flooring or floor wall, or ceiling covering materials on the job site, and all other work pertaining to installation of carpet, wood, resilient and similar type floor coverings.  Self-leveling engineered cement and any other product for this application, use of shot blast machines to prep slabs, game lines and art work applied on hardwood floors and all sanding and finishing, resilient terrazzo tile, removal of all flooring materials for installing new floors, including operation of all machinery for this purpose. The surfacing and resurfacing of sports floors and game courts (i.e. Basketball, Volleyball, Hockey, Tennis, Running Tracks, Multi-Use and Playground) to include the layout and application of gaming lines for interior and exterior applications.  The use of applicators (associated equipment & accessories) to mix and/or spread the coatings of material. The preparation of the surface to receive these coatings (patching, sanding, washing).

2.  In addition to all aforementioned articles of this agreement, the following conditions shall apply only to the work outlined above:

A.  In order to be recognized as a qualified Employer and eligible to sign the Agreement, said Employer must have an established place of business, financial responsibility and employ at least one mechanic.  The place of business must be investigated by the Business Representative and upon his recommendation that the Employer satisfies the criteria specified in this Agreement and upon approval by the Northeast Regional Council of Carpenters, the Employer shall be considered eligible to sign this Agreement.  Associate companies, partnerships, corporations, persons or other entities shall be considered as one where the purpose is to avoid this provision.

B.  A joint labor/management committee (hereinafter "Joint Committee"), consisting of two representatives appointed by ACCNJ, two representatives appointed by the Floor Covering Institute of New Jersey and four representatives appointed by the Executive Secretary/ Treasurer of the Northeast Regional Council of Carpenters shall be formed to address contract issues and meet on a quarterly basis.  By unanimous agreement, the Joint Committee shall have the authority to implement contract changes within the term of this agreement.

C.  The employees agree that when an installation is unsatisfactory, the Employer may, within a period of ninety (90) days from the time of installation, report same to the Business Representative of the Local Union who shall endeavor to adjust the matter.  If the matter is not satisfactorily resolved, the Employer may provide written notice to the union.  If there are two or more incidents with the same employee, the employee will be required to attend Training School for a hands-on re-evaluation.

D.  All mechanics shall own a complete set of hand tools required for the work as follows:

(aa)  First Year Apprentice: Tool Box, Hammer, #2 Philips Screwdriver, 1/4" Standard Screwdriver, 5 in 1 tool, 100' Chalk Line, Fixed Blade Utility Knife, Carpet Knife, Knife Pouch, 25' Tape Measure, Pliers, Adjustable Wrench, Hand Broom, Patch Trowel 20" x 4", 6" Drywall

--

43

Knife, l' x 8" Framing Square, 4" Razor Scraper, Base Adhesive Spreader, Razor Blade Supply (utility blades, carpet blades, 4" razor scraper blades), Auto Light Torch Head, Propane Tank, Tin Snips or Aviation Snips, Pry Bar.  The employer will supply the employee with Razor Blade Supply (utility blades, carpet blades, 4" razor scraper blades) and Propane Tank.

(bb)   Second Year Apprentice: Carpet Adhesive Trowel, Resilient Adhesive Trowel, Dividers, 2' Framing Square, Underscribes, Carpet Seam Roller, Kicker, (PLUS ALL TOOLS FROM THE FIRST YEAR APPRENTICE);

(cc)   Third Year Apprentice: Top Cutter, Loop Pile Cutter, Stair Tool, Awl, White Rubber Mallet, Carpet Wall Trimmer, Resilient Hand Seam Roller (PLUS ALL TOOLS FROM THE FIRST AND SECOND YEAR APPRENTICE);

(dd)   Fourth and Fifth Year and Journeyworker STATUS: ALL TOOLS REQUIRED FOR FIRST, SECOND AND THIRD YEAR APPRENTICE.

(ee)   Tools may be inspected by the Employer on demand.  The Employee shall return the Employer's tools upon reasonable demand.  If the Employee fails or refuses to return the tools, the Employer may withhold sufficient monies to compensate for the loss of the tools.

(ff) No other mechanic or other Employee shall be required to transport bulky material in his own automobile.

E.   The Union shall appoint a competent journeyman as a Shop Steward.  Employers who are members in good standing of the management bargaining associations signatory hereto shall have a shop steward appointed from their contingent of employees provided those carpenter journeymen are members in good standing of the local union signatory to this Agreement and are regular employees of the Employer.

F.   Employers who are members in good standing of the management bargaining Associations and who have agreed to be bound by this Agreement shall be permitted full portability of workers within all jurisdictions of the Northeast Regional Council of Carpenters for all work covered under this agreement.  The Local Union having territorial jurisdiction shall have the right to supply a steward on each job.

G.   Employers must submit monthly to the Union a list of all jobs awarded which shall include the following: name of project, project location, name of general contractor/owner.   If the contractor does not abide by this provision of the contract, they will void their rights to all Association member provisions under this contract.

H.   When an irregular shift must be established, the percentage premium shall be 15% above the base rate.  Irregular shifts will be permitted if the end user cannot tolerate disruption of its routine business activity.

--

I.  All fringe benefits, except the vacation fund, will be paid at a straight time package rate for Local No. 251, covering the counties of Bergen, Essex, Hudson, Hunterdon, Mercer, Middlesex, Monmouth, Morris, Ocean, Passaic, Somerset, Sussex, Union and Warren.  All fringe benefits shall be paid on a percentage of the gross wages for Local No. 251, covering the counties of Atlantic, Burlington, Camden, Cape May, Cumberland, Gloucester and Salem.

J.  The layoff provisions in Article XXV of this Agreement are not applicable to Employers who are members in good standing of the management bargaining Associations and who have agreed to be bound by this Agreement provided they are current with the payment of their fringe benefit funds.

K.  The Market Recovery provisions are to be utilized by members of the Associated Construction Contractors of New Jersey and the Floor Covering Institute of New Jersey for "retrofit" work.  The Company and the Union agree that with respect to this Article, the following conditions shall prevail:

(aa)  The hourly rate of pay for employees covered by the terms of this Article shall be no less than 75% of the hourly rate established between the Union affiliates and the employees or recognized employer agencies in the locality.  The foreman ratio shall be determined by the employer.

(bb)  The Company may establish a shift starting time different than that provided for in the applicable Local Union or Council Collective Bargaining Agreements.

(cc) The standard workday shall consist of eight (8) consecutive hours of work scheduled between 12:01 a.m. and 11:59 p.m. with one-half hour designated as an unpaid period for lunch. The standard work week shall be five (5) consecutive days of work, Monday through Saturday. Sunday shall be paid at 1½ times the hourly rate.

(dd)  All hours worked in excess of eight (8) hours per day, forty (40) hours per week, or outside of regular shift, Monday through Sunday, shall be paid at the rate of time and one-half (1½) the hourly rate provided for in this Article.  All work performed on holidays shall be paid at the rate of time and one-half (1½) the hourly rate provided for in this Article plus an additional 15% per hour.   There shall be no shift premium.

(ee)  The employer may, at its option, schedule the work for four (4) consecutive ten (10) hour days, with the fifth (5th) day as a make-up day.  On this schedule, all hours worked in excess of ten (10) hours per day and forty (40) hours per week shall be paid at the rate of time and one half (1 ½) the hourly rate provided for in this Article or as per federal or state law and or any applicable Canadian law, and the same shall apply for holiday work, plus an additional 15% per hour.

(ff)  This Article is not intended to be utilized on new construction projects.  However,

--

45

should the company be in a position to bid on a new construction project that is non-union, the Company may request use of this Article. Prior to the Market Recovery provisions being utilized on a new construction project, a written request from the company, provided by the Union, must be submitted to the Union's Office detailing the reasons why this Article should be used. The Union, upon investigating said request, shall notify the Company whether the request has been granted or denied.

(gg)   This Article and the Market Recovery provisions shall not apply to work performed by the Company in New Jersey, if the project is subject to any local, state or federal prevailing wage laws.

(hh)   Failure to comply with all reporting requirements shall void the ability of a Company to utilize the Market Recovery provisions referred to in this Article.

(ii)   The Joint Committee defined in Section 2, Paragraph B of Article XXXXII, shall meet to establish a scope of work and a wage and fringe benefit package for a new material handler designation and a scope of work and a wage and fringe benefit package for a new maintenance designation prior to June 30, 2016.

L.   Apprentices shall be indentured to the Union and shall serve five years in accordance with the Apprentice Standards that are incorporated herein by reference. The promotion of apprentices from year to year and the graduation to a mechanic shall be subject to the approval by the Joint Apprentice Committee.   Apprentices shall be paid the following scale of wages:

| | |
|---|---|
| 1st Year | 40% of the journeyman's rate |
| 2nd Year | 55% of the journeyman's rate |
| 3rd Year | 65% of the journeyman's rate |
| 4th Year | 80% of the journeyman's rate |
| 5th Year | 90% of the journeyman's rate |

and after the fifth year and completion of Apprentice School, the full Journeyman's rate.

An apprentice working at rates based on the previous schedule shall continue at those rates until his/her next anniversary date for an increase at which time he/she will be subject to the revised schedule.

M.   One apprentice shall be allowed to every two mechanics or major fraction thereof, regularly employed. However, there shall be no more than three apprentices subject to the foregoing ratio on any one job or project without the prior consent of the Union.

N.   All new apprentices will be required to enroll in and successfully complete a standardized training program. This program will be the INSTALL program as developed and taught by the Carpenters International Union or a similar program approved by the Joint Committee and the Joint Apprentice Committee. In addition to the indentured term outlined in this agreement, all apprentices must complete the hours of work and corresponding levels in the training program to receive increases in the scale of wages outlined.

O.   All graduating apprentices and existing journeymen must complete a continuing

education regimen in order to receive any wage or benefit changes contemplated by this agreement. This education may come from the INSTALL program or may be a Joint Committee pre-approved program presented by manufacturers, installation and service companies, educational institutions or similar organizations. This continuing education should include product, safety, equipment and installation training. The dates of certification and recertification instruction will be tracked through a "smart card" that will be developed with the oversight of the Joint Committee referenced in this agreement. Each employer will embrace the INSTALL certification program and will be required to employ only employees that are certified INSTALL floor covering installers. The parties shall develop a means by which to provide a financial incentive for journeyworkers to become certified. Labor and Management shall continue to work together to promote and enforce the requirements for INSTALL certification, including limiting the referral of employees who do not possess the appropriate certifications and working to establish ample training opportunities for members to obtain said certifications.

P. Knowing that ongoing programs to promote safety in the workplace and seminars on the latest products and installation techniques are of the utmost importance to maintain a healthy, skilled workforce, the Union strongly endorses and will give all needed support to ensure that its members partake in a minimum of ten hours upgrade training and health and safety programs per year to attain and/or maintain certification.

Q. For Local No. 251, covering the counties of Bergen, Essex, Hudson, Hunterdon, Mercer, Middlesex, Monmouth, Morris, Ocean, Passaic, Somerset, Sussex, Union and Warren, there shall be appointed by the Employer, a foreman for each job on which there are four or more carpenters employed.

For Local No. 251, covering the counties of Atlantic, Burlington, Camden, Cape May, Cumberland, Gloucester and Salem, there shall be appointed by the Employer, a foreman for each job on which there are four or more carpenters employed.

R. All foremen shall be "working foremen" at the discretion of the Employer.

S. The Employer shall pay nine cents ($.09) per hour, for each hour worked per employee to the Industry Development Fund collected through the Northeast Carpenters Fund Office.

## ARTICLE XXXXIII
## NO OTHER VERBAL AGREEMENTS:

It is expressly understood between the parties hereto that all conditions governing the relationship between the parties are set forth herein and that there are no gentlemen's agreements, or understandings, of any kind supplementary hereto. It is agreed that the parties will meet on a regular basis to discuss the mutual problems of the industry and if necessary, and only by mutual consent of Management and Labor, make any adjustments to this Agreement.

**ARTICLE XXXXIV**
**AGREEMENT AND TERMINATION:**

This Agreement shall become effective on the 1st day of May, 2016 and shall terminate on midnight April 30, 2019. At least ninety (90) days prior to the expiration date of this Agreement, either the Union or the Association shall serve upon the other in writing a statement incorporating therein any desired changes in wages, hours of work, working conditions, benefits or any new proposals to be incorporated in a future Collective Bargaining Agreement to become effective subsequent to midnight April 30, 2019.   They shall, within thirty (30) days thereafter, make every effort to commence negotiations prior to the termination of this Agreement.

C

STATE OF NEW JERSEY

| | | |
|---|---|---|
| In the Matter of Arbitration | : | Before: J. J. PIERSON, Esq. |
| | : | Arbitrator |
| Between | : | |
| | : | |
| NORTHEAST REGIONAL COUNCIL | : | |
| OF CARPENTERS, UBCJA ("Union") | : | |
| | : | |
| -and- | : | AWARD and ORDER |
| | : | |
| ANGELO'S CONSTRUCTION | : | |
| ("Angelo's") | : | |
| and | : | "Failure to Hire" |
| LLANOS DRYWALL LLC | : | |
| ("Llanos") | : | |
| | : | |

The undersigned is designated Arbitrator by the parties pursuant to Article 9 (Grievance & Arbitration Procedure") of the "Project Labor Agreement Covering Construction of 70 Columbus Avenue, Jersey City, New Jersey Project" ("PLA") to address the grievance submitted by the Northeast Regional Council of Carpenters ("NRCC", "Carpenters" or "Union"), alleging that Angelo's Construction, as a subcontractor to AJD Construction, and Llanos Drywall LLC, as subcontractor to Angelo's, failed to hire Member-Carpenters to perform bargaining unit work on the Project pursuant to the terms and conditions of the PLA and the NRCC "Schedule A" Agreement of the PLA.[1]   Hearings were conducted on June 22nd, August 5th and October 15th 2015 in Jersey City, New Jersey, after due notice was given to the parties by the Arbitrator, to address the following:

## ISSUES:

1. Whether the grievance was timely filed under the PLA?

2. If so, whether Angelo's Construction and Llanos Drywall violated the PLA and the Schedule "A" NRCC Agreement by failing to hire Carpenters under the PLA procedures and by failing to compensate Carpenters for lost work opportunity? If so, what shall be the remedy?[2]

---

1. For purposes of this matter, the "Schedule A" Agreement relates to the "Agreement between Northeast Regional Council of Carpenters and Building Contractors Association of New Jersey and their affiliates and Associated General Contractors of New Jersey." (See also Footnote x)

2. Angelo's argued that the remedy be limited to no earlier than "60 days prior February 20, 2015"?

Appearing for the Union:
Raymond G. Heineman, Esq.
Robert Satriano, Council Representative
Peter Gowling, Council Representative
Manny Ortega, Council Representative
Anthony Abrantes, Council Representative
George Schreck, Council Representative
Paul Rolden, Business Agent, Laborers Local 3
Joseph Valdez
Gieanderson Soares
Roman Garcia
Rosenda Castallanos

Appearing for Angelo's:
Alan I. Model, Esq.
Angelo Ramos, Owner
Anthony Buttino, former Shop Steward
Jose Paz,
Geida Sanlate (Interpreter)

Appearing for Llanos:
Valeriano Reyes Martinez, Owner

Appearing for the Hudson County Building
and Construction Trades:
Patrick Kelleher, President
Thomas Hoffman, Vice President

## BACKGROUND[3]

The present matter arises on the "70 Columbus Drive Project" ("Project"), a 53-story residential construction project in Jersey City (New Jersey). The Project is subject to a Project Labor Agreement ("PLA") between AJD Construction Co. ("AJD"), as General Contractor ("GC"), reflecting the objectives of "70 Columbus Urban Renewal, LLC" ("Owner"). (See E-2[4]).

The PLA at Article 1 - Preamble, Section 1. Parties to the Agreement, states:

This an Agreement entered into by and between the GC, the Hudson County Building and Construction Trades Council, AFL-CIO, on behalf of itself and its affiliated local union members, and the signatory Local Unions on behalf of themselves and their members, regardless of their affiliation with the County Council or lack thereof, provided that every Local Union must qualify as a Labor Organization as that term is defined in the Ordinance.

_____

3. References to Exhibits are (J- ) for Joint Exhibits,; (E- ) for Employer Exhibits; and (U- ) for Union Exhibits.  References to the hearing transcripts are by date and page: (Tr.1: ) for June 22, 2015; (Tr.2: ) for August 5, 2015; and (Tr.3: ) for October 30, 2015.

4. At the commencement of proceedings, Counsel for Angelo's, expressing a reservation of rights, raised the issue of the validity of both the PLA and the Jersey City Ordinance 07-123 requiring the execution of the PLA. According to Angelo's, the validity of the ordinance was currently on appeal to the U.S. Court of Appeals for the Third Circuit in *Associated Builders and Contractors, Inc. et al. vs. City of Jersey City et al.,* Civil Action No. 14-CV-05445 (2015). (Tr.1:9; see E-1). Counsel argued that, "once (the Ordinance) is invalidated, this PLA has no basis in which to stand, so we're here before you today, Mr. Arbitrator, proceeding while reserving the rights that the PLA is invalid." (Tr.1:10).
   On August 3, 2015, the Honorable Susan D. Wigenton, U.S.D.J., granted the Motion of the City of Jersey City and Hudson County Building and Construction Trades Council to Dismiss the Appeal of the Associated Builders and Contractors, Inc etal. ("ABC").  The Court also denied the Cross-Motion to Amend the Complaint filed by the ABC (See U-25).

Article 2, Section 3 - Entities Bound and Administration of Agreement of the PLA states:

This Agreement shall be binding on all signatory Unions and the GC and all signatory contractors performing on site work, including staging areas related to the Project. The Contractors shall include in any subcontract which they let for performance during the term of this Agreement, a requirement that their subcontractors, of whatever tier, become signatory and bound by this Agreement with respect to subcontracted work performed within the scope of Article 3.

Article 2, Section 4 - Supremacy Clause of the PLA states:

This Agreement, together with the Ordinance[5] and the local Collective Bargaining Agreements appended hereto as Schedule A, represent the complete understanding of all signatories and supersedes any national agreement, local agreement or other collective bargaining agreement of any type which would otherwise apply to this Project, in whole or in part. The sole exception to the preceding sentence is for work performed under the national agreement of the International Union of Elevator Constructors. As to such work, the only provisions of this Agreement which shall be deemed to supersede the Elevator constructor's national agreement shall be Articles 7 (Work Stoppages and Lockouts), 9 Grievance and Arbitration Procedures) and 10 (Jurisdictional Disputes). Where a subject covered by the provisions of this Agreement is also covered by a Schedule A collective bargaining agreement, the provisions of this Agreement shall prevail. It is further understood that no Contractor shall be required to sign any other agreement as a condition of performing work on this Project. Finally, it is understood that: (a) this Agreement shall have no application to any activity of any party hereto except as such activity directly relates to the performance of covered work on the Project; and (b) the execution of this Agreement shall not make any person or entity executing this Agreement a party to any of the Collective Bargaining Agreements and/or addenda attached to this Agreement, except to the extent that they perform work on the Project that is covered by a Schedule A collective bargaining agreement.

Article 4, Section 2 - Union Referral of the PLA states:

A. The Contractors agree to hire Project craft employees covered by this Agrement through the job referral systems and hiring halls and procedures established in the Local Unions' area collective bargaining agreements (Schedule A).

Article 11 - Wages and Benefits, Section 1 - Classification And Base Hourly Rate, states:

All employees covered by this Agreement shall be classified in accordance with the work performed and paid the base hourly wages rates for those classifications as specified in the attached Schedules, as amended during this Agreement. ....

---

5. The "Ordinance" referred to in the present matter is "Jersey City Ordinance 07-123" which requires the execution of a Project Labor Agreement for tax abated projects.

**NRCC -and- ANGELO'S CONSTRUCTION and LLANOS DRYWALL LLC**                    -3-

## POSITIONS OF THE PARTIES

The NRCC contended that Angelo's Construction ("Angelo's", signatory to the Carpenters Agreement (J-2)) and Llanos Drywall ("Llanos", signatory to the Drywall & Interior Systems Contractor Association "DISCA" Agreement (see J-9) and the Carpenters Agreement (J-2)), violated the PLA and the Schedule "A" Carpenters Agreement by operating a "double crew" of workers, one employed under the PLA and a second, non-union crew.

According to the Union, the two companies conducted a "double-breasted operation", failed to hire union-members to perform covered work and, without evidentiary response, paid employees below the wage and benefit rates in the PLA and Schedule "A" Carpenters Agreement and failed to produce payroll records regarding certain employees.   As the NRCC argued, every contractor performing on the Project must be signatory to the PLA and no non-signatory or independent contractors are permitted on the Project to perform covered work.

With respect to the Schedule "A" Carpenters Agreement, the NRCC alleged that Angelo's and Llanos, as signatory to the Carpenters Agreement, violated Article VI (Referral Procedure) by failing to adhere to the hiring hall procedures, violated Article XVI (Portability) and violated Article XXIV (Payment of Wages & Fringes) by failing to pay contractual wages and benefits to employees performing bargaining unit work on the Project.

Finally, the NRCC cited Article XIX (Subcontractor Clause) of the Schedule "A" Carpenters Agreement, provides, in relevant part, which states:

> 1.The Employer will not subcontract any work within the jurisdiction of the Union which is to be performed at the job site except to a contractor who holds an agreement with the United Brotherhood of Carpenters and Joiners of America or one of its subordinate bodies having jurisdiction at the job site, or who agrees in writing, prior to or at the time of the execution of his subcontract, to be bound by the terms of this Agreement.
> ....
>
> 4. The Employer represents that its members, officers, and supervisory personnel will not attempt to form or participate in the creation of or operation of new or double-breasted corporations for the purposes of avoiding the obligations of this Agreement.

The NRCC contended that, by engaging in "double-breasted operations", Angelo's and Llanos avoided the obligations of the Schedule "A" Carpenters Agreement, by failing to subcontract work to signatory contractors on work performed on the Project and by failing to pay contractual wages and benefits to employees performing bargaining unit work on the Project.

NRCC -and- ANGELO'S CONSTRUCTION and LLANOS DRYWALL LLC                                        -4-

According to the NRCC, by continuing a double-breasted operation, Angelo's and Llanos violated the job security for Carpenters intended by Article XIX and deprived eight (8) unidentified carpenters and four (4) identified carpenters from receiving the contractual wages and benefits provided under the PLA and the Schedule "A" NRCC Agreement.[6]

The NRCC requested the Arbitrator to sustain the NRCC grievance and to order a monetary remedy.

Angelo's denied the violation of the PLA and contended that the Union failed to prove that Angelo's or Llanos used non-union workers to perform Carpenters work on the Project in violation of the PLA.[7] According to Angelo's, the Carpenters' claim is limited to the performance of framing and trim (performed by Angelo's) and sheetrock (performed by Llanos).[8] (Tr.2:114).

---

6. According to the NRCC, an investigation revealed that the two companies used a non-union crew of eight between December 20, 2014 and February 9, 2015 when the practice ended, for a total of 2,112 hours ($92,378.88 in lost wages and $52,631.04 in lost benefits). In addition, the NRCC provided names of four (4) individuals who were not paid contractual wages and/or received contractual benefits: Joseph Valdez, who worked for $100 cash per 8 hour shift, without overtime pay and without benefit contributions, between December 20, 2014 and April 22, 2015 ($29,490.56 in lost wages, $46,680.70 in lost overtime and $$56,045.08); Rosendo Castellano, who worked six days a week for $150 per day, without overtime pay and without benefit contributions, between December 20, 2014 and April 22, 2015 ($8,247.36 in lost wages, $4,673.68 in lost overtime wages and $9,868.32 in lost benefits); Ramon Garcia, who worked six days a week but was paid three days wages at the Painters' contractual rate, without overtime pay and without benefit contributions, between December 20, 2014 and June 21, 2015 ($17,865.54 in lost wages, $16,348.08 in lost overtime wages and $34,596.48 in lost benefits); and Gielanderson Soares, who worked overtime four hours per workday and twelve hours on Saturdays, without overtime pay and without benefit contributions, between December 20, 2014 and January 23, 2015 ($6,298.56 in lost overtime wages and $7,775.04 in lost benefits). All claims and calculations were based on $43.74 per hour in wages and $24.92 per hour in benefits.

7. While submitting arguments on behalf of Llanos at the June 22, 2015 hearing, Council for Angelo's (Alan Model, Esq.) placed a statement on the record that he "never formally represented Llanos" and "made it clear to Llanos that I do not represent them ...". (Tr.2:6).

8. Angelo's maintained that the "painting and taping" on the Project was within the jurisdiction of the Painters, not the Carpenters, and noted that Union Counsel stipulated that "The Carpenters' Union is not claiming lost work opportunities for taping, correct." (Tr.2:59 and Tr.2:62) Likewise, the Carpenters stipulated that the taping work on the project is within the jurisdiction of the Painters' Union, District 711. Similarly, Angelo's maintained that the Project's "heat watch" was within the jurisdiction of the Laborers, not the Carpenters, as confirmed by Counsel Representative Manual Ortega (Tr.2:62-63), Laborers Business Agent Paul Rolden (Tr.3: 245-246) and Anthony Buttino (Tr.2:104, 122).

NRCC -and- ANGELO'S CONSTRUCTION and LLANOS DRYWALL LLC                    -5-

Angelo's further contended that the evidence presented by the Carpenters and the testimony presented by non-union workers claiming to have performed framing, trim and sheetrock lacked credibility. It was Angelo's position that the Union's case consisted of self-serving testimony, hearsay statements about fake names, fraudulent procurement of union books, wage-hour violations and, as a result, cast aspersions on Angelo's, Llanos and shop steward Anthony Buttino. According to Angelos, there was little evidence to support the claim that work within the Carpenters' jurisdiction was performed by non-union workers on the Project. As Angelo's alleged, the Union "concocted" the fiction that Angelo's and Llanos employed non-union crews to perform Carpenters work on the Project, without a shred of evidence.

While denying the validity of the Union's arguments, Angelo's asserted that there are limitations on the potential remedy, should the grievance be sustained. Relying on Article 9, Section 2, Angelo's contended that the PLA limits liability to 60 days prior to the February 20, 2015 grievance, which is December 23, 2014.

Likewise, Angelo's contended that any violation of the PLA should be attributable to Llanos, not Angelo's, as all of the alleged incidents of bargaining unit work being performed by non-union workers were the result of assignments by Llanos. As Angelo's maintained, all the individual claims were the result of employees working for Llanos, not Angelo's, when performing work within the scope of Carpenters.

Moreover, Angelo's asserted that there was no evidence to hold Angelo's jointly liable for Llanos' alleged violations, as Angelo's and Llanos were separate businesses and operations, separately signatory to the Carpenters' Agreement and separate employers. Relying on Article 2, Section 5, Angelo's argued that the liability of a contractor "shall be several and not joint" and that "any [c]ontractor shall not be liable for any violations of this Agreement by any other [c]ontractor." As Angelo's argued, there is also no evidence to link Angelo's to Llanos under any legal theory, as both entities are separately owned (Angelo's owned and operated by Angelo Ramos; Llanos owned and operated by Valeriano Reyes-Martinez). Angelo's argued that Angelo Ramos has no ownership or involvement in Llanos and each are different legal entities. (Tr.2:116, 159-160; Tr.3: 215).

It was Angelo's position that the two companies are different legal entities, separate signatories with the Carpenters and Painters, employ different workforces and have different management and supervision. Moreover, in anticipation that the Union would claim that Buttino "supervised" for Angelo's and Llanos, Angelo's characterized the claim as "hollow". According to Angelo's, Buttino was on Angelo's payroll and assigned to Angelo's by the Union and Valeriano Reyes Martinez supervised Llanos' employees. Angelo's further noted that Buttino was not involved in the hiring, disciplining, scheduling, firing, paying, handling grievances, giving raises to, or directing the work of the Llanos workforce. (Tr. 117-119). As Angelo's asserted, Buttino's only involvement with Llanos' workforce occurred when he observed something being done wrong and, "as any quality shop steward or dedicated worker who care about solid construction", he would correct it. (Tr. 153).

With respect to remittance of benefit fund contributions, Angelo's disputed the Union's attempt to link Angelo's to Llanos through Angelo's' remittance of fund contributions on behalf of Llanos for hours worked by Llanos' workers. According to Angelo's, because Llanos was a new signatory, Angelo's assisted in remitting payments to secure timely remittance.

Finally, Angelo's contended that there is no legal basis to impose liability on Angelo's or Llanos for the claimed lost work opportunities and funds contributions claimed by the Carpenters in the February 20, 2015 grievance.

Angelo's requested the Arbitrator to dismiss the claimed violations against Angelo's and Llanos and to dismiss the grievance.

Representatives of Llanos Drywall attended the arbitration hearings, providing testimony and denying the claim, but did not provide a summation of its position.

### Procedural Issue

At the commencement of hearings, Angelo's raised a procedural objection and contended that the Union failed to properly pursue its grievance through Article 9 - Grievance and Arbitration Procedure of the PLA, which states:

SECTION 1. PROCEDURE FOR RESOLUTION OF GRIEVANCES

Any question, dispute or claim arising out of, or involving the interpretation or application of this Agreement, other than jurisdictional disputes or alleged violations of Article 7, Section 1) shall be considered a grievance and shall be resolved pursuant to the exclusive procedure of the steps described below; provided, in all cases, that the question, dispute or claim arose during the term of this Agreement.

STEP 1:

(a) When any employee covered by this Agreement feels aggrieved by a claimed violation of this Agreement, the employee shall, through the Local Union business representative or job steward, give notice of the claimed violation to the work site representatives of the involved Contractor. To be timely, such notice of the grievance must be given within 14 calendar days after the act, occurrence, or event giving rise to the grievance. The business representative of the Local Union or the job steward and the work site representative of the involved Contractor shall meet and endeavor to adjust the matter within 14 calendar days after timely notice has been given. If they fail to resolve the matter within the prescribed period, the grieving party, may, within 14 calendar days thereafter, pursue Step 2 of the grievance procedure by serving the involved Contractor and the GC with written copies of the grievance setting forth a description of the claimed violation, the date of which the grievance occurred, and the provisions of the Agreement alleged to have been violated. Grievances and disputes settled at Step 1 are nonprecedential except as to the specific Local Union, employee and Contractor directly involved unless the settlement is accepted in writing by the GC as creating precedent.

(b) Should any signatory to this Agreement have a dispute (excepting jurisdictional disputes or alleged violations of Article 7, Section 1) with any other signatory to this Agreement and, if after conferring, a settlement is not reached within 14 calendar days, the dispute shall be reduced to writing and proceed to Step 2 in the same manner as outlined in subparagraph (a) for the adjustment of employee grievances.

STEP 2.

The Business Manager or designee of the involved Local Union and, if desired, a representative from the International, together with representatives of the Council (if the Local Union is a member or affiliate), the involved Contractor, and the GC shall meet in Step 2 within 14 calendar days of service of the written grievance to arrive at a satisfactory settlement.

**NRCC -and- ANGELO'S CONSTRUCTION and LLANOS DRYWALL LLC**                    -8-

STEP 3.

(a) If the grievance shall have been submitted but not resolved in Step 2, any of the participating Step 2 entities may, within 21 calendar days after the initial Step 2 meeting, submit the grievance in writing (copies to other participants) to J. J. Pierson, Jr., Esq. who shall act as the Arbitrator under this procedure. The Labor Arbitration Rules of the American Arbitration Association shall govern the conduct of the arbitration hearing, at which all Step 2 participants shall be parties. The decision of the Arbitrator shall be final and binding on the involved Contractor, Local Union and employees and the fees and expenses of such arbitrations shall be borne equally by the involved Contractor and Local Union.

(b) Failure of the grieving party to adhere to the time limits set forth in this Article shall render the grievance null and void. These time limits may be extended only by written consent of the GC, involved Contractor and involved Local Union at the particular step where the extension is agreed upon. The Arbitrator shall have authority to make decisions only on the issues presented to him and shall not have the authority to change, add to, delete or modify any provision of this Agreement.

SECTION 2. LIMITATION AS TO RETROACTIVITY

No arbitration decision or award may provide retroactivity of any kind exceeding 60 calendar days prior to the date of service of the written grievance on the GC and the involved Contractor of the Local union.

According to Angelo's, the Union's grievance was not filed in accordance with Article 9 of the PLA and was "not timely" under the express time limits within the grievance and arbitration procedures of the PLA.[9] Moreover, Angelo's disputed the Union's effort to rely on the grievance and arbitration procedure of the Schedule "A" Carpenters Agreement instead of the applicable procedures of the PLA.

Relying on Article 2, Section 4 (Supremacy Clause) of the PLA, Angelo's argued that the PLA supersedes the underlying Schedule "A" Carpenters Agreement's grievance procedure. As Angelo's further argued, reliance on Schedule "A" is unfounded since the Supremacy Clause of the PLA states that "[w]here a subject covered by the provisions of this Agreement is also covered by a Schedule A collective bargaining agreement, the provisions of this [PLA] Agreement shall prevail."

---

9. Angelo's raised the issue of procedural arbitrability at the onset of the arbitration hearing on June 22, 2015 and sought to bifurcate the proceedings. This Arbitrator denied the request for bifurcation, deciding to accept evidence regarding the procedural and substantive issues, complete the entirety of the record and then ruling on the procedural issue.

As Angelo's contended, the record is clear that the Union failed to properly pursue its grievance through Article 9 of the PLA and that the February 20, 2015 grievance was untimely and should not be considered.

Likewise, Angelo's maintained that the Union failed to invoke a mandatory Step 2 meeting of the parties after the Union's Step 1 meeting letter of February 20th. As Angelo's argued, the Union 'never again' directly communicated with Angelo's, as evidenced by the communication from Local 253 to Patrick Kelleher of the Hudson County Building Trades. Angelo's asserted that the letter admitted that the mandatory Step 2 grievance meeting was never scheduled. Angelo's contended that the Union's failure to schedule a mandatory Step 2 meeting resulted in the grievance being null and void under the PLA and cannot be pursued to arbitration.

Finally, Angelo's contended that, even if the grievance was timely under the PLA, the Union's April 23rd demand for arbitration was untimely, as it was within 21 calendar days after the mandatory Step 2 meeting. As Angelo's argued, failure to move the grievance to arbitration within 21 calendar days rendered the grievance null and void, and not arbitrable.

In response to Angelo's procedural objections, the Carpenters maintained that its grievance was pursued in a timely fashion, following the three step grievance procedure and in filing for arbitration. The NRCC noted that the timeliness issue first arose on June 22nd at the first arbitration hearing. The Union described the following steps taken by Carpenters, Local 253:

> - February 20, 2015, the Step I grievance letters were sent to Llanos Drywall and Angelo's Construction Co., Inc., "requesting a meeting between a Company Representative and a Council Representative at the job site as soon as practical, but in no event later than three (3) days after the receipt of this letter." According to the Union, a meeting between Local 253 Business Manager Peter Gowing (and other Union representatives) and Valeriano Reyes (Llanos) was held February 25th, without resolution. (See U-1 and U-2, sent by regular and certified mail).

> - February 26, 2015, the Step 2 grievance letters were sent to Llanos Drywall and Angelo's Construction Co., Inc., requesting meetings with representatives of both Companies. (See U-3 and U-4, sent by regular and certified mail). As the Union asserted, neither Company responded to the Step 2 letter.

NRCC -and- ANGELO'S CONSTRUCTION and LLANOS DRYWALL LLC                    -10-

- On March 4, 2015, Step 3 letters were sent to Llanos Drywall and Angelo's Construction Co., Inc., requesting a meeting with representatives of both Companies. (See U-5 and U-6). As the Union asserted, neither Company responded to the Step 3 letter.

- On March 6, 2015, Step 2 letters were sent to Hudson County Building and Construction Trades Council President Patrick Kelleher, requesting the Council to schedule meetings with representatives of Angelo's Construction Co., Inc., Llanos Drywall and AJD Construction Co. (see U-7 and U-8). As the Union asserted, President Kelleher was not successful in scheduling the Step 2 meeting with the companies as required under the PLA.

- On April 23, 2015, in the absence of a Step 2 meeting, the Union filed for arbitration. As the Union asserted, neither Company objected to procedural arbitrability during the processing of the grievance nor through the scheduling of the hearing.

The Union contended that, despite notice of a grievance, Angelo's bypassed every step of the grievance procedure and the time limits within the PLA and the Schedule "A" Carpenters Agreement, and waived any objection to procedural arbitrability, by failing to respond to the Union's requests to meet. While acknowledging that Llanos met once with representatives of the Union on February 25th, the issue of procedural arbitrability was never raised until commencement of the arbitration hearing.

* * * * * * *

NRCC -and- ANGELO'S CONSTRUCTION and LLANOS DRYWALL LLC                    -11-

## DISCUSSION OF THE RECORD

The Union initially presented the testimony of Peter Gowing, Business Manager of Carpenters Local 253 (the local union having territorial jurisdiction of the work site in Jersey City) and Manual Ortega (NRCC Council Representative) to testify as to discovery of non-union workers performing sheet rocking on the 70 Columbus project, the investigation of membership of individuals performing framing and sheet rock work on the project and the steps taken in filing and processing the grievance.

Mr. Ortega testified that, on January 19, 2015, he received a phone call from Bob Satriano (NRCC Team Leader) regarding a report from a member that work was being performed after-hours at the 70 Columbus job by non-union members. (Tr.41). According to his instructions to investigate, Mr. Ortega and Anthony Abrantes (NRCC Council Representative) arrived at the job site at 7 pm to investigate.

According to Mr. Ortega, he and Mr. Abrantes waited to observe any movement in the building and noticed "lights on .. that the hoist was being used ... people walking in and out at various floors." (Tr.1:42). At 8 pm, the two Council Representatives entered the building, started up the stairwell and, while on the third floor, observed an individual looking for sheetrock. As Mr. Ortega testified, when confronted, the individual identified himself as Joe Valdez. (Tr.1:43)

> He did admit that he worked for Llanos ... working in the building ... he was just looking for some heater stuff ... maintaining the heaters in the building. ... He said he worked for Mr. Llanos and that he was a member of the carpenters, he just recently became a member of Local 253. (Tr.1:44).

> ... he didn't show a union card, but he did identify, he said that his union card was being withheld by Mr. Llanos. He didn't have it in his possession. (Tr.1:45).[10]

The witness described how Mr. Valdez lead him to the 8th floor of the building, where two individuals were performing sheet rock in the stairwell between floors.

---

10. When questioned, Mr. Ortega confirmed that Mr. Valdez was not listed on any of the Shop Steward reports.

**NRCC -and- ANGELO'S CONSTRUCTION and LLANOS DRYWALL LLC**                    -12-

Mr. Ortega testified that he identified both the work as being within the carpenters' jurisdiction and that the two individuals were suspended member-carpenters ("Souza" brothers). (Tr.1:46-47, see U-11[11]). According to the witness, the two individuals told him that they were doing sheetrock in the stairwell for Mr. Llanos. (Tr.1:52). To identify the work being performed, Mr. Ortega and Mr. Abrantes took photos of the tools being used, the sheetrock material and the two individuals doing carpentry work.[12] (Tr.1:48)

Mr. Ortega further testified that, when questioned, the two individuals claimed they were being paid $120 or $150 in cash, although they had not been paid for their work. (Tr.1:53) Upon an invitation by the Council Representative, the two brothers reported to the Union hall[13] the following day and were interviewed by Mr. Satriano and Mr. Ortega.  As the Council Representative testified, when questioned about their work history with Llanos, the two brothers confirmed that the were waiting to get paid, not knowing how much, or whether by cash or check, but believing their pay would be $150 without deductions.  According to Mr. Ortega, the two brothers claimed they were only working that night.  (Tr.1:54)

In describing further aspects of the Union's investigation, Mr. Ortega testified that Joe Valdez also reported to the Union hall (within a few days of the Union's discovery) and described his work relationship with Llanos.[14]  According to the witness, Mr. Valdez told him that he had worked for Mr. Llanos on another jobsite and he was brought to the 70 Columbus jobsite with another worker ("Felix Cardosa") and they would be joining the Union.  He noted that Mr. Valdez told him that Felix Cardosa would be joining the Union as "Rosendo Morales".  (Tr.1:57)

---

11. See U-11, an Ultra report on Union membership.  The two individuals were later identified as Carlos Suazo and Ippolito Suazo. (Tr.1:52)

12. The entry of the photos was objected to by Angelo's as "not authenticated" The Union provided digital copies to Angelo's Counsel

13. 36 Bergen Street, Hackensack, NJ

14. Council for Angelo's objected to the continued hearsay testimony. Council for the Union acknowledged the hearsay aspect of the testimony, but represented that the testimony was offered to describe the steps taken by the Union in investigating the incident and not offered for the truth of the matter asserted. (Tr.1:63)

According to Mr. Ortega, Mr. Valdez also described his entry into membership in the Carpenters Union.[15] As the witness testified, Mr. Valdez related that he went to work on the project and performed work under the direction of Anthony Buttino (Carpenters Shop Steward), taking care of the heaters. (Tr.1:60). Mr. Ortega testified that Mr. Valdez told him that he did what he was told to do because he was "afraid for my job." (Tr.1:61)  According to the witness, Mr. Valdez also told him that he was being paid to remain in the building around the clock, working under the direction of Mr. Buttino and was being paid cash. (Tr.1:62)

Mr. Ortega testified that, with information provided by Mr. Valdez, the Union checked the membership information and investigated Rosendo Morales, Rosendo Castellanos[16] and Bartolomo Ramirez[17]. Thereafter, he went to the jobsite with another Council Representative on February 10th, 2015.

According to Mr. Ortega, he summoned the shop steward, Kenny Dukes[18], and approached Mr. Reyes/Llanos. Together they approached Bartolomo , who the shop steward also knew as Rosendo Morales. (Tr.1:74).  When confronted and asked to see his union card, he produced the Union card and his ID.[19] As Mr. Ortega testified, he observed the Union card and the fake ID. He then took possession of the Union card. (Tr.1:76)

---

15. Mr. Valdez explained that, after being discovered by the Union working by himself during the night, Martin drove him to the Carpenters hall to sign up for a union book as a "Sheetrocker". (Tr.1:86).

16. According to Mr. Ortega, Mr. Castellanos told him that he had a long time relationship with Mr. Llanos and Mr. Buttino from the 18 Park (Jersey City) job and, like the Suarez brother, got paid $150 in cash on a daily basis, whether he worked overtime or not. (Tr.1:66) As he added, Mr. Castellanos confirmed that Mr. Llanos sent him to get a union book under the name of "Rosendo Morales." (Tr.1:66).

17. According to Mr. Ortega, he spoke to Bartolomo Ramirez who confirmed that he was not Rosendo Morales. (Tr.1:71) .  As the witness related, "He claims that Mr. Llanos, again, had him go to a Chinese, how should I say, check-cashing place nearly and have this phot taken and produce this fake ID with Mr. Rosendo Morales, and he had given him to hold the union card as Rosendo Morales." (Tr.1:72).

18. By that time, Anthony Buttino had been replaced as shop steward. (Tr.1:73)

19. Photos were taken of Mr. Ortega, Mr. Reyes and Mr. Bartolomo by Mr. Serritelli. (See U-13). In addition to the individuals identified in the photo, background reveals carpentry work being performed, including framing and sheetrocking. (Tr.1:75).

Mr. Ortega also identified Shop Steward Reports submitted by the shop stewards for work performed by Carpenters on the project. (See U-14[20] and U-15[21]). According to the witness, the Shop Steward Reports submitted by Anthony Buttino during the time he served as shop steward on the project did not include Ramirez, Valdez, Castellanos or the Suazo brothers. (Tr.1:78).

On cross-examination, Manuel Ortega described the work jurisdiction of the Carpenters which included sheetrocking, caulking and taping. He was aware that taping was being performed at the 70 Columbus project by the Tapers Union and not by the Carpenters. (Tr.2:59) While he acknowledged that neither he nor the Carpenters were claiming the work under the PLA, he confirmed (through Counsel's legal argument[22]) that the Carpenters were seeking a remedy for the improperly paid tapers on the job under the PLA. (Tr.2:60[23]).

While visiting the job site on a regular basis between November 2014 and April 2015, when a new shop steward was named. He did not acknowledge that sheetrocking began in December 2014, based on what was told him by the workers. (Tr.2:66). By personal knowledge and comments from Lianos, he was aware that the sheetrocking (fire stop) had started at that time. (Tr.2:67 and 68).

Mr. Ortega confirmed that he had personal knowledge of non-Union workers performing sheetrocking on the eighth floor in January 2015 (Tr.2:74); knowledge that ex-members performing sheetrocking on the fifteenth floor in December 2014 (Tr.2:76); and personal observation of non-Union workers doing protection in December 2014 (Tr.2:78).

---

20. Mr. Buttino voluntarily acknowledged his signature on the Shop Steward Reports submitted for the dates he served as shop steward. (Tr.1:80).

21. Peter Gowing identified the Shop Steward Reports as records kept by the Union in its regular course of business. (Tr.1:126) It was acknowledged that some of the SSR were signed by Dukes and some by Steven Dianni, another Shop Steward assigned to the Project. Nevertheless, Mr. Gowing testified that the Shop Steward Reports are to cover the "work of Carpenters" and cover Sheetrock, Caulking, Framing, Taping. (Tr.1:128) He also confirmed that there were no reports nor benefits remitted on behalf of Joseph Valdez, Gieanderson Soares, Roman Garcia, Rosendo Morales or Bartolomo Ramirez. (Tr.1:129)

22. As Mr. Heineman represented, payment "will not go to the Carpenters' Union." He further commented that, it would appear that the taping was done outside the parameters of the PLA and in violation of the PLA and should be a remedy. (Tr.2:61)

23. Through discourse between Counsel, it was agreed that the taping on the 70 Columbus project was work within the jurisdiction of Painters' District 711. (Tr.2:62).

NRCC -and- ANGELO'S CONSTRUCTION and LLANOS DRYWALL LLC                    -15-

In furtherance of its position that Angelo's and Llanos failed to hire Carpenters under the hiring hall procedures and, instead, improperly hired non-union individuals to perform framing, sheetrocking and taping work withing the jurisdiction of the Carpenters, the Carpenters presented the testimony of individuals performing the work.

Joseph Valdez, employed by Angelo's and Llanos in 2013, began work on the 70 Columbus project in October 2014. At the time, he was not a union member. (Tr.1:82) The witness testified that, in January 2015, he was moving sheetrock at the 70 Columbus project. (Tr.1:83) Mr. Valdez further testified that, during that time, his work hours were "Twenty-four hours" a day. As he described:

> I stay for 24 hours. From January , the whole month, I stayed 24 hours. I didn't go home for the whole month. I was taking care of the heaters for the leveling the floors. I was taking care of the heaters. (Tr.1:83-84).

When questioned who supervised his work, Mr. Valdez responded, "... Martin[24] and Tony."[25] (Tr.1:84). "Tony" would tell him to work overnight tending the heaters. (Tr.1:85). According to the witness, they knew he was on the on the job for 24 hours at a time, "just doing able stuff like sweeping ... but basically, I was doing ... caulking, insulation ..." (Tr.1:84).

Mr. Valdez was also questioned about his pay:

> A hundred dollars a day for every eight hours. So since I was staying for 24 hours, I was getting paid $300. Sometimes I don't even get the hundred dollars because Martin never paid me. (Tr.1:85).

Mr. Valdez also described the method of payments made to him. In one instance, he was given a check from "Llanos" in the amounts of $3,000 and $2,500, without deductions,  and instructed to cash the checks. However, the checks were not entirely for him, but to pay the "tapers, to the illegal aliens" working on the job. (Tr.1:91) He described the job after 3 o'clock when union workers left the job and sheetrockers and tapers came on.

---

24. "Martin" (or "Martine") was later identified by Joseph Valdez as "Valerio Martinez". (see U-17).

25. Anthony Buttino, the then-Carpenters shop steward, acknowledged that he was the individual referred to. (Tr.1:84)

NRCC -and- ANGELO'S CONSTRUCTION and LLANOS DRYWALL LLC                    -16-

As Mr. Valez added, "they were supposed to be working for the union, but all the sheetrockers ... they were just using somebody else name." (Tr.1:90). He coud identify approximately twenty workers employed by Llanos as tapers and sheetrockers, under the direction of "Tony, Martin and Jesse." (Tr.1:93).

According to the witness, while he was owed $4,000 by Llanos for work performed, "he never gave me my $1,500." (Tr.1:88-89). As Mr. Valdez commented, "That's why I quit, because he always stealing money out of my pocket. He make me work for free." (Tr.1:89 and U-16).[26] He confirmed that he never got paid union wages on the job, never got overtime pay and was never told that the company was making benefit contributions on his behalf and never completely paid by the company based on the $100 per eight hours of work. (Tr.1:101). As he confirmed, Martin only paid him for six weeks and then only paid him $900. (Tr.1:102). As he added, Mr. Buttino knew. (Tr.1:102).

Mr. Valdez also confirmed that he met Mr. Ortega on the jobsite, when questioned why he was carrying gas tanks and working alone during the night. As the witness admitted, he got 'scared' when he realized that he was there by himself. He also acknowledged leading the union representative to the two men working in the building and confirmed they were doing sheetrocking. He also identified the two men in the photo. (Tr.1:94; see U-11). Finally, Mr. Valdez testified that the two men lied when telling the union that they did not know who sent them to work. (Tr.1:95). As Mr. Valdez confirmed, "But they lie. That was Martin who send." (Tr.1:96).

Mr. Valdez was questioned by the Union as to three other aspects of his employment with Martin. In the first instance, the witness described how he was offered $10,000 by Martin to say that it was him (Mr. Valdez) who brought the two sheetrockers to the job. As he added, "... He want to get me in trouble so he can be clean for everything." (Tr.96).

In the second instance, Mr. Valdez asserted that "... Martin took away my Social Security card and the card from the union was because he wanted to put somebody to work under my name. He never return it. ... He never gave it to me." (Tr.1:96).

---

26. To help Mr. Valdez in recovering his unpaid wages, the Union assisted Mr. Valdez in preparing a claim submitted to the New Jersey Depart of Labor & Workplace Development, Division of Wage and Hour Compliance, dated February 4, 2015. (Tr.1:103; and see U-19).

NRCC -and- ANGELO'S CONSTRUCTION and LLANOS DRYWALL LLC                                   -17-

In the third instance, Mr. Valdez identified and played a voice message left him on his telephone from Mr. Martin. (Tr.1:105-106; and see U-20 and 21).[27] The 28-second recording states:

*"Look sucker you balls we are going to give them to you mother to you bitch ass mother. Son of your bitch ass mother. And go to work and tell them you son you bitch ass mother and go cross me again since you have soo much balls sucker.*

*Look sucker you don't make me cry sucker. I am not a talker like you idiot. Tell me where are such and I will come there. But you don't make me cry son of a bitch. Now stop talking shit sucker."*

Continuing his testimony, Mr. Valdez referred to his record of the number of hours worked on the project, Mr. Valdez confirmed that he kept the record because he was working 24 hours a day through the month of January 2015. (Tr.2:26 and see U-24[28]) According to the witness, he recorded his work time at 7 am after finishing his regular overnight shift. He testified that he remained in the building on a 24-hour a day basis. (Tr.2:28).

On cross-examination, when questioned about working "24 hours straight", the witness was asked if and where he showered, brushed his teeth and whether he left the building for a straight month. In response, Mr. Valdez related that he used water, tooth paste and tooth brush at the building and, on one occasion, left the building for two hours to take a shower. (Tr.2:36)

He acknowledged that was doing the heat watch every day in January where he "set up the heaters on the floor, while the floors are self leveling" but was not aware who was responsible for heat watch. He admitted that he did not ask 'Tony or Martin Valerio'. (Tr.2:37) However, he did acknowledge that he never did sheetrock and confined his work to sweeping and caulking around the pipes and sheet racks. Mr. Valdez did not know Paul Roldan from the Laborers Union and did not recall him giving him an application for a Laborers book. (Tr.2:40). He also used the hoist to get propane tanks up to the floors above and then got the hoist ready for the operating engineer to use at 6:30 am. (Tr.2:41)

---

27. Translated from Spanish to English, this Arbitrator can only conclude that the phone call from Mr. Martin, Valeriano Reyes Martinez, is both threatening and a threat.

28. Counsel for Angelo's objected to the document on its 'lack of consistency' and not reliable.

NRCC -and- ANGELO'S CONSTRUCTION and LLANOS DRYWALL LLC                    -18-

In responding to his claim before the Department of Labor, Mr. Valdez confirmed his statements. In one instance, he was asked about listing sheetrocking as work he performed.  Mr. Valdez confirmed that he performed sheetrocking at the Secaucus job for Llanos in October 2014.  (Tr.2:41 and see U-19).  He also confirmed that he was paid every two weeks, in the beginning by cash and then by check.  (Tr.2:44).  He explained the amount of the checks based on his pay ... "a hundred dollars a day ... I made three hundred dollars a day because I stayed 24 hours. ..." (Tr.2:44).

On further cross-examination, Mr. Valdez confirmed that he cashed the checks and paid "the illegals" performing as "tapers".  When asked for proof, the witness related to a photo of the cash and the check.  When questioned if he took a picture of him handing the money to a taper, he asked:

> And you think they're going to take the money out of my hand if I got a cell phone in my hand recording them?  No.  (Tr.2:45 and 46)

Mr. Valdez admitted that he did not write down the names of the six tapers he gave cash to.  (Tr.2:46).  Likewise, he had no idea whether they were legal or illegal on the 70 Columbus jobsite but asked if they had a green card.  As the witness stated, "... I know these guys.  They don't have no green cards." (Tr.2:50).  And when asked their names, Mr. Valdez added, "... I don't even know what name they got because they got fake I.D." (Tr.2:51).

When further questioned, Mr. Valdez confirmed that Mr. Valerio took his Union book and Social Security card and "never returned it to me."  However, he maintained that Mr. Valerio told him that he took the Union book to use for another work.  (Tr.2:49)

Mr. Valdez further responded to cross-examination by confirming that he met Manny Ortega in January 2015 when he was working heat watch at night on the third floor.  He also recalled that he took Mr. Ortega to see the two workers sheetrocking on the thirtieth floor[29].  (Tr.2:53).

Gieanderson Soares, a Member of the Carpenters Union since 2012, also testified.  Confirming that he was employed by Angelo's Construction, Soares testified that he worked on the 70 Columbus project under foreman "Jesse" between March 2014 and February 18, 2015. (Tr.1:108).  Mr. Soares was not aware of "Llanos". (Tr.1:108).

---

29. Note: The transcript appears to have mis-recorded "thirtieth" floor instead of "eighth" floor, which is cited in referenced by all other witnesses.

NRCC -and- ANGELO'S CONSTRUCTION and LLANOS DRYWALL LLC                    -19-

During that time he worked overtime, Mr. Soares was paid for overtime after eight hours of work and for overtime on Saturdays. (Tr.1:109). However, after January 24, 2015, he was told by Jesse that Angelo's could not pay overtime but could pay overtime in cash. Refusing to be paid in cash ($25 per hour) for working overtime hours, Mr. Soares lost his overtime hours of work. (Tr.1:110) Mr. Soares was aware that other workers employed by Angelo's on the job were union members. (Tr.1:110)

Roman Garcia, employed by Llanos on the Project, was called to testify by the Union. Admittedly a non-union worker until December 2014, Mr. Garcia testified that he was paid by Llanos every 15 days. (Tr.1:111). However, as Mr. Garcia testified, in December 2014, Martin gave him a social security number for identification and he joined the Painters Union. (Tr.1:113; see U-23). Shortly thereafter, Martin took back the social security card and took the union card. (Tr.1:114)

While acknowledging that he is now doing painting and taping[30], Mr. Garcia testified that Martin wanted him in the Painters Union "to avoid a hassle" by the Carpenters.[31] Moreover, Mr. Garcia testified that, while employed and working six days a week ("Monday through Saturday"), Martin informed him that he would be reported as working three days a week to match his pay of three days at the Painters Union rate. (Tr.1:115) As Mr. Garcia confirmed, while a Union Painter, he was paid $100 per day, without union benefits. (Tr.1:116). And when correspondence was sent from the Painters Union, Martin would take it. (Tr.1:117).

The Union also called Rosendo Castellanos as a witness. Employed by Valerio Martin and Llanos in September 2014, Mr. Castellanos performed sheetrock work. (Tr.1:119). He testified that was hired to work at 70 Columbus in September-October 2014 (Tr.1:122); he did not join the Carpenters Union (Tr.1:121); was paid in cash at $150 per day (Tr.1:122); installed sheetrock on

---

30. The objection to the testimony by Angelo's Counsel as irrelevant was countered by the Union's proffer that the work being performed was taping and covered work within the Carpenter's jurisdiction. Mr. Garcia's testimony was admitted for probative and credibility purposes.

31. This Arbitrator acknowledges the jurisdiction of "taping" to be within the jurisdiction of both trades and, as such, there is no decision regarding appropriate jurisdiction.

NRCC -and- ANGELO'S CONSTRUCTION and LLANOS DRYWALL LLC                                    -20-

framing (Tr.1:123); was also paid by check in the name of 'Thomas Ramos' and a couple of other names (Tr.1:123). When paid by check, the names used included "Rosendo Morales" and "Mario Mena", cashed at the instruction of Llanos and Valerio Martin (Tr.1:123).The witness testified that, while employed at 70 Columbus, he was given work orders by Valerio Martinez. (Tr.1:124).

On cross-examination by the Company, Rosendo Castallanos confirmed that he was paid by check in the name of Thomas Ramos. As the witness described:

> He (Martin Valerio) would have me using two different names. I would get paid under Thomas Ramos and use the company name of Rosendo Morales. I would constantly, under his direction, change names. (Tr.2:16)

The witness acknowledged that he began working for Mr. Martinez in October 2014, although at a different job site (Secaucus) but worked at the 70 Columbus project during that time and until February 2015. (Tr.2:17). However, he confirmed that he moved around quite a bit, one different floors, elevator shafts and fire stops. (TR.2:18-19). He reported at 7 am and worked to 4:30 pm, Monday through Friday, and sometimes late at night. As he confirmed:

> At time, I would go to work, not work during yhe day. I would be asked to come and work at night but, at the end of the week, (I) would work from Monday through Friday, whether it was during the day or during the night. (Tr.2:20).

When further questioned, Mr. Castallanos believed he did work Christmas day. (Tr.2:21). And, although he acknowledged the building was closed, he testified that,

> Yes. Well, we always used to make our way through the fence and the security was aware of it.
>
> Q. On Christmas day?
> A. Yes. ...it was very cold - - yes. I believe that day was very cold and we worked that day. ... That day, I remember that we were doing a heavy board, the one-inch and we doing all the areas for the shoot for the garbage. (Tr.2:22)

Mr. Castallanos acknowledged that he never met Angelo Ramos, but remembered that "Tony was also in the hallway telling Mr. Llanos what to do" and giving him direction on where to go and what to do. As the witness confirmed, "Tony would tell Valerio what he wanted" and, in turn, Velerio Martinez would direct Mr. Castellanos. (Tr.2:23).

NRCC -and- ANGELO'S CONSTRUCTION and LLANOS DRYWALL LLC       -21-

Angelo's initiated its defense to the Carpenters's claims by presenting the testimony of William Buttino, the Carpenters' Shop Steward on the 70 Columbus project during the period of the grievance.[32] As Mr. Buttino testified, he appeared at the arbitration hearing, under subpoena, "to clear my name." (Tr.3:104). As a third generation Union Carpenter with 30 years experience, Mr. Buttino served as a shop steward for twenty years and was on the Local Union 6 executive board. He is certified as a union shop steward and holds an OSHA 30 (safety) certificate. (Tr.3:105). Mr. Buttino described his duties as shop steward which he took "seriously":

> I check that all members are union-card carrying members, all dues are paid up-to-date. All work is done in a safe manner, that all workers have their proper safety gear, that all workers report to work on time , stop at the right time, and give the contractor a good day's work for a good day's wage. (Tr.3:106).

He also met with the building inspectors every time they came to the job site and made sure he signed off on the work. (Tr.3:109).

With respect to preparing Shop Steward Reports (SSR), Mr. Buttino related that he included the names of those carpenters working on the jobsite, together with their local union number, hours (worked) and total wages.[33] (Tr.3.108). He was not aware that any non-union workers were employed by Angelo's. As he testified, "I wouldn't allow that. ... It's a Union job. It's a PLA job and that's what I do as a shop steward." (Tr.3.108).

Mr. Buttino described his work day, starting at 7 am, when he took the job hoist to the top of the building and walked down to make sure that no work was done the night before and to make sure that all carpenters were there and wearing personal protective gear. His work day ended at 3:15 pm. (Tr.3:109)  He stated that power in the building was shut off when work stopped at 3:15 pm and he knew the amount of work done during the day and where work was to start the next day.[34]

---

32. Mr. Buttino explained that he was assigned to 70 Columbus after completing his work for Angelo's Construction as shop steward on the '18 Park' (Jersey City) project. (Tr.3:111).  At the 18 Park project, he worked for a panel company (ABS) which ended up going out of business and finished he job for AJD through Innovative Construction.  (Tr.3:139).

33. As Mr. Buttino testified, he kept the shop steward reports for Angelo's Construction.  (Tr.3:128).

34. According to Mr. Buttino, he knew where everybody was working, since he went through the building twice a day and knew how many sheetrock boards were used. (Tr.3:128).

NRCC -and- ANGELO'S CONSTRUCTION and LLANOS DRYWALL LLC                                    -22-

(Tr.3:110)

While at 70 Columbus, Mr. Buttino spoke to a Union representative when an issue needed to be addressed. He recalled that a Union representative (George Schreck) visited the job site three times during the period he served as shop steward. He noted that Manny Ortega and Peter Gowing also visited the job. (Tr.3:107). He acknowledged that he was replaced as shop steward on the 70 Columbus project in late January/early February 2015.[35] (Tr.3:111). Nevertheless, he returned to his duties as a Union Carpenter, meeting with building inspectors and making sure the framing and trim work was in place for Angelo's.[36] (Tr.3:113)  As of May 2015, he is employed by Angelo's as the Foreman on the "Journal Square" project. (Tr.3:140 and 152)

Mr. Buttino acknowledged that the sheetrocking on 70 Columbus was subcontracted to Llanos. (Tr.3:113). He also testified to the sequence of work, beginning in mid-December 2014 with 'prerock'[37], continuing with sheetrocking under the direction of the General Contractor ("AJD") and Angelo's, his employer.[38] Mr. Buttino also identified Llanos Drywall, owned by Valeriano Reyas Martinez[39], as the subcontractor performing "drywall, spackling, taping and painting" on the project. (Tr.3:116). He testified that Mr. Martinez (Llanos) supervised his own workforce and that his workers were Union members. (Tr.3:117). As Mr. Buttino claimed, he checked the workers' Union card(s). (Tr.3:118). He testified that he was not involved in the hiring of Llanos' workers nor was he involved in disciplining, scheduling, firing or paying the workers. (Tr.3:119). Likewise, he did not direct their work. (Tr.3:119 and 152).

---

35. Mr. Buttino described his removal and replacement after being summoned to the Local 253 offices and meeting with Council Representatives.  He also testified that he met with Mike Capelli (the Northeast Regional Executive Secretary-Treasurer at the time).  Mr. Buttino testified that he was never told the reasons for being replaced. (Tr.3:112).

36. He also distinguished the work performed by Painters District 711 as spackling and taping.

37. As he described, "Prerock is two strips on top before they put the full board up in order for the instpector to come and make sure it's all fire-rated, all penetrations, etc .. Fire stop, it's the same." (Tr.3:115).

38. Mr. Buttino initially testified that the sheetrocking began on the 53rd floor, the top of the building, but corrected himself by testifying that the sheetrocking commenced on the 4th floor and worked up. (Tr.3:128-129).

39. Mr. Buttino denied Angelo Ramos' ownership in Llanos and pointed to a different workforce. (Tr.3:116).

Questioned about the 'heat watch' and Joseph Valdez, Mr. Buttino explained that AJD had the responsibility for heating the building but directed Llanos to do the work.[40] According to the witness, Angelo's had nothing to do with the heatwatch.[41] (Tr.3:120). As he explained, the building required 24-hour a day heat beginning in January and needed to be maintained through the day with working shifts. (Tr.3:121)

Mr. Buttino recognized that Jose Valdez performed the heat watch from 10:03 pm to 6-6:30 am.[42] He was aware of Mr. Valdez because he saw him leave in the morning after riding the hoist to the ground level. (Tr.3:122). Through years of experience, he was also aware that the jurisdiction for heat watch belonged to the Laborers. (Tr.3:122). And he was specifically aware of the Laborer's jurisdiction because he was on the job when the Laborers Business Agent (Paul Roldan) visited the job and gave Mr. Valdez an application for Union membership.[43] (Tr.3:123).

Mr. Buttino was also aware that, besides the heat watch, Joseph Valdez patched drafts with insulation (at the direction of AJD), swept up and did caulking for pipe penetrations. (Tr.3:124-125). He did not see Mr. Valdez do any sheetrocking work. (Tr.3:125). Mr. Buttino was not aware that Mr. Valdez was in the building 24-hours straight, since "it's impossible for him to be there. .... And I was there during the day." (Tr.3:126).

Mr. Buttino testified that he did not observe non-union workers performing sheetrocking or taping.[44] (Tr.3:127). According to the witness, he would have known if sheetrocking was done at night by non-union workers because he knew where work was left at 3:20 and where work began the next morning.

---

40. As Mr. Buttino testified, the heaters belonged to AJD. (Tr.3:155).

41. According to Mr. Buttino, John Mack, Superintendent of ADJ, directed Llanos to perform heat watch. (Tr.3:120).

42. Another laborer (Aaron Dawson) worked the heat watch from 3:30 pm to 10:30 pm. (Tr.3:123).

43. On cross-examination, Mr. Buttino confirmed that he saw Mr. Valdez fill out the application given him by Mr. Roldan and return it to the Laborers Business Agent. (Tr.3:164).

44. On cross-examination, Mr. Buttino testified that "I never found non-Union carpenters on the job." According to the witness, if Llanos was using a non-union tapers, "That's not my business. That's the business of the Union." (Tr.3:159).

NRCC -and- ANGELO'S CONSTRUCTION and LLANOS DRYWALL LLC                                              -24-

Mr. Buttino was also aware of how many boards were needed on each floor and where the Union carpenters left their tools.  (Tr.3:130).  In that respect, he denied seeing the two Souzas working on the job. (Tr.3:131)

When questioned about specific individuals, Mr. Buttino denied that Rosendo Castellanos sheetrocked on the project between October 2014 and March 2015[45] and on the 32nd floor on Christmas Day 2014[46] and that Bartelomo Ramirez used a Union book of Rosendo Morales.[47]  On cross-examination, he denied that he was aware that Mr. Reyas (Llano's) arranged for Mr. Valdez to get a Carpenters book (Tr.3:144), but acknowledged that he saw Ramon Garcia[48] and Bartolomo Ramirez[49] on the job.

While denying that he had an interest in Llanos Drywall[50], Mr. Buttino recalled that he was present at a meeting that "George Schreck coming down and talking to Valeriano Reyas Martinez and Valeriano was talking he was interested in become a contractor."[51] (Tr.3:127).   According to Mr. Buttino, further meetings with Mr. Schreck and several other business representatives lead to the conclusion that it would be best being that Angelo's Construction pay the benefits for the carpenters employed by Llanos. (Tr.3:128 and 142).

---

45. "No, I never seen him. And in October we were not sheetrocking. There were no inspections nor permits to Sheetrock." (Tr.3:132)  "No. I never seen nobody named that there." (Tr.3:147).

46. "No, the site was closed, the power was turned off.  There was security and cameras on the building." (Tr.3:131) "No, I knew exactly what men were there, what apartments they did and how many boards they did." (Tr.3:132). On cross-examination, he acknowledged that Council Representative Manny Ortega walked through the locked gate and entered the building 'while the power was off'.  (Tr.3:149).

47. "... Manny (Ortega) basically told me, Anthony, this guy has the wrong, he's using a different card. Make sure he never returns to the job, and I said, Okay, Manny thank you." (Tr.3:133)

48. "A few days a week. You know, it was sporadic.  He was in and out." (Tr.3:147)

49. "I saw him February or so." (Tr.3:148)

50. Mr. Buttino testified that he had no interest or ownership in Llanos, did not get paid by them and never received cash from them. (Tr.3:139).

51. George Schreck later testified that Mr. Buttino informed him that he knew of a non-union contractor that might work well in the commercial industry performing sheetrocking. (Tr.3:236). He confirmed that Mr. Buttino then set up a meeting with Martine about becoming a Union contractor and he and Mr. Buttino attended. (Tr.3:237).

NRCC -and- ANGELO'S CONSTRUCTION and LLANOS DRYWALL LLC                                    -25-

On cross-examination, Mr. Buttino denied that he proposed the idea that Angelo's pay the benefits for Llano's workers. (Tr.3:142).

The issue of carpenters holding "residential" books and being cleared to work on the 70 Columbus (commercial) project was raised through the testimony of Jose Paz, a Union-Carpenter holding a residential membership book.[52] As Mr. Paz testified, after being unemployed for months, he started working on the 70 Columbus project on January 26, 2015.

According to the witness, he first contacted his Union representative (Kevin Brown) and inquired as to seeking a job on the project, he was told that "if they give you the job you can stay there." (Tr.3:167) He testified that, knowing there were many jobs in Jersey City, he got Valeriano Martinez' number, contacted him and started sheetrocking the next day. (Tr.3:168). He worked for Llanos eight hours a day, five days a week between 7 am and 3:30 pm and was paid by check. (Tr.3:170). He could not understand why he got laid off.

Mr. Paz testified that he returned to work with Martinez, performing sheetrocking, and within weeks, was transferred to Angelo's Construction to do trim work. (Tr.3:171). According to the witness, he was laid off and told (by Manny Ortega) that he could not perform commercial work with a residential book. As Mr. Paz testified, he again contacted the Union (Andrew Pacifico) and was told that, if the employer did not lay him off, he could stay on the job. (Tr.3:173) The witness testified that he remained on the job until August, when Manuel Ortega told him he "was residential working in a commercial job."[53] (Tr.3:176).

Mr. Paz testified that, while working on the project, he was not aware that anybody performed work at night. He confirmed his observations, "because I always start working in the same place that I finish working last day." (Tr.3:179).

On cross-examination, Mr. Paz acknowledged that he entered the Union through the Direct Entry Apprentice Program, signed into the program under the residential agreement and received a residential book. (Tr.3:183-184) He also admitted that, once he worked 3,000 hour, he would be admitted into the commercial program.

---

52. Note: Sergio Tahada, Giberto Reyes and Roberto Floraz were other Carpenters holding residential books while working on the 70 Columbus project and will be referred to in various comments.

53. Mr. Paz expressed his belief that his removal from the job and the Union's denial of his request for a commercial union book was "racist". (Tr.3:179 and 181).

**NRCC -and- ANGELO'S CONSTRUCTION and LLANOS DRYWALL LLC**                    -26-

Mr. Paz also acknowledged that, when he started work on the 70 Columbus project, Mr. Buttino saw his book and saw no problem with a residential carpenter working on a 50-story building. He likewise acknowledged that his residential union book contained a written provision that limited his work to "residential and/or blended rate projects." (Tr.3:185).

Valeriano Reyas Martinez testified on behalf of Llanos Drywall, a company he owns and started in December 2014.[54]   According to his testimony, he spoke to the Union representative (George Schreck) and asked for an opportunity and how he would be paying benefits. As the witness confirmed, "Angelo was going to pay the benefits ... because I was new ..." (Tr.3:196) Accordingly, he entered into a contract with Angelo's to do sheetrock and drywall on the 70 Columbus job. (Tr.3:197) He used the same workforce that was used by Angelo's and then Angelo Ramos called the Union for workers. He remained as supervisor. (Tr.3:198).

Mr. Martinez acknowledged that he used Joe Valdez to take care of the heaters between 10 pm and 6 am, which was paid for by AJD (Luis, the Super). According to the witness, Angelo's had nothing to do with the heat watch. (Tr.3:198-199)

Mr. Martinez denied that work was performed on Christmas Day 2014 by Rosendo Morales, although he acknowledged Morales as a carpenter.[55]   (Tr.3:199)   He did not know if Rosendo Morales is the same person as Bartelomo Ramirez, did not know Rosendo Castillanos as a person working on the job and was not aware of men named Souza doing sheetrocking on the job. (Tr.3:200). Mr. Martinez was aware that Feliz Cardoza was his brother-in-law and worked on the job as a cleaner. (Tr.3:203). Subsequently, he acknowledged that he took "Rosendo Morales" to the Union hall to get a Carpenters book, but did not know who the person was while employing him for three or four weeks. (Tr.3:202, 205 and 206).

On cross-examination, the witness also acknowledged that he took Mr. Valdez to the Union hall to get a carpenters book, but did not pay him Union wages or benefits. He admitted paying him $120 a day, because he was doing the heating. (Tr.3:201-202) Likewise, Mr. Martinez testified that he never showed Valdez' Union card to Shop Steward Buttino because "he never worked there" as a carpenter. However, when Mr. Morales started working, Mr. Martinez showed the Union card to Shop Steward Kenny Dukes. (Tr.3:212).

---

54. Mr. Martinez testified through an interpreter (Mr. Chavez).

55. When shown a picture of "Rosendo Morales" on the Union application, he denied that it was Morales. (Tr.3:203 and see U-12).

Mr. Martinez testified that he paid Mr. Valdez and Ramon Garcia by check. (Tr.3:214)

Angelo Ramos, owner of Angelo's Construction[56], testified on his own behalf and described the scope of work performed on the 70 Columbus project as "(d)rywall, taping, spackle, insulation, trim package." (Tr.3:214).  He denied any responsibility or involvement in the heat watch, denied any ownership interest in Llanos Drywall and denied running Llanos Drywall.  (Tr.3:215). Mr. Ramos maintained that the 'taping' on the job was under the jurisdiction of the Painters Union District 711 and he used Painters to perform the work.  (Tr.3:216)

However, Mr. Ramos explained that he remitted the benefit contributions for Llanos' workers because Llanos "was a new company, and we wanted to make sure that all the benefits were paid, and we paid it out of his contract price. Simple as that. I was told to pay it for him because he's a new contractor, and I accepted that."[57]  (Tr.3:216)

On cross-examination, Mr. Ramos also denied knowledge of non-Union workers working on the job site.  As he stated, "No. Why would I allow people to work nonUnion when I'm paying all this goddamn money to the Union?" (Tr.3:220) When further pressed, Mr. Ramos stated, "I never had them.  Maybe somebody else had them.  But I never had them."[58]  (Tr.3:221)

The witness also described the work of Anthony Buttino, starting as a shop steward and then overseeing that the framing material and sheet rock arrived at the site and checking out inspections. (Tr.3:220)  When subsequently questioned about the five carpenters employed in November 2014, Mr. Ramos testified that Mr. Buttino did not know that the men were working. (Tr.3:227)

---

56. Mr. Ramos testified that he is a Union Carpenter and member of Local 253.  His company is a member of DISCA (Drywall & Interior Systems Contractors Association). (Tr.3:215).

57. According to Mr. Ramos, Peter Gowing, George Schreck and Bob Satriano told him to pay Llanos' benefits and "… we didn't want no issues of benefits not getting paid for the guys. …. I was told … (b)ecause I wouldn't do it out of the goodness of my heart. … So I didn't do it out of my own willing." (Tr.3:217)

58. Mr. Ramos corrected his statement through an exchange on cross-examination:
Q. You never had nonUnion workers on this job?
A. NO.
Q. Okay.  In November didn't your have five nonUnion workers on this job?
A. That was a different issue.
Q. What was that issue?
A. That was because the carpenters I had couldn't produce the job, and the GC told me that I got to get it done or we're going to get thrown off the job, and Ihad to do what had to do to get thejob done.  … they were Unio guys, but they were working on the side. …. I paid them.  I didn't pay the benefits. …. " (Tr.3:221-222).

Anthony Abrantes, a Council Representative, testified to his participation in the investigation. As the witness recalled, during the investigation, he became aware that carpenters holding residential books were working on the 70 Columbus job. (Tr.3:260). He testified that the original Carpenters residential Local 119 was dissolved and merged into the commercial locals. The members holding residential books were likewise transferred into commercial locals and became commercial carpenters. (Tr.3:260).

Mr. Abrantes further described how new members were admitted into the Union through a "direct entry program" and limited to work on residential housing and "blended rate projects." (Tr.3:261) To be permitted to work on commercial projects, direct-entry carpenters were required to complete two years, 3,000 hours of work under the Carpenters Agreement and attend (training) school to be evaluated. (Tr.3:261).

According to Mr. Abrantes, both Mr. Paz and Sergio Tahada were direct entry carpenters and were required to meet the qualifications before working on commercial projects. (Tr.3:262) Gilberto Reyes and Roberta Floraz were originally in Local 119 and permitted to work on commercial jobs. (Tr.3:262). However, Mr. Tahada and Mr. Paz should not have been working on the Project. Mr. Abrantes testified that he never received a call from Mr. Buttino reporting the four residential carpenters working on the project. (Tr.3:261).

In response to the testimony, Mr. Buttino was recalled by Angelo's Counsel to explain how Mr. Paz was cleared to work on the project despite having a residential book. As he explained, when Mr. Paz arrived on the job, he called the Union hall and was told that Andy Pacifico (Union President) "let them go to work." (Tr.3:229).

George Schreck, a Council Representative representing the jurisdiction of Hudson County and the 70 Columbus project, responded to Mr. Buttino's statement that he cleared residential carpenters through him (Mr. Schreck) on the project. Disputing the statement, Mr. Schreck testified that Mr. Buttino never told him that he had "residential" carpenters on the job or asked if they could work on the project. (Tr.3:236). When questioned further, he stated that he never had the discussion with Mr. Buttino. (Tr.3:236)

Likewise, Robert Satriano, Team Leader of Carpenters Local 253 (the Local Union having jurisdiction of the 70 Columbus project) was questioned about the Carpenters with "residential" books working on the project and questioned why some residential carpenters were permitted to work on the project while others were removed.  As he explained, there were two different types of "residential" books, the first being held by those carpenters from former "residential" local unions that were merged into the current local unions and the second being those carpenters admitted to the union through "direct-entry residential".  (Tr.3:252).  As he distinguished, the former residential carpenters are permitted to work on commercial projects and the direct-entry carpenters are prohibited from performing on commercial projects.  (Tr.3:255).

Mr. Satriano testified that he did not receive communication from Anthony Buttino to clear the four residential carpenters into the job.  (Tr.3:252).  On cross-examination, he confirmed that he first became aware of the residential carpenters working on the commercial project in March 2015, after pulling shop steward reports for January and February after the investigation began.  (Tr.3:254).

Mr. Gowing confirmed that Mr. Buttino never cleared any residential carpenters to work on the 70 Columbus Project. (Tr.3:274) He testified that he became aware in August 2014 that Paz and Tahada, two residential carpenters, were working on the project. (Tr.3:275).

Finally, the parties stipulated that Andrew Pacifico would testify that he not called by Mr. Buttino to clear carpenters on the 70 Columbus project.

\* \* \* \* \* \* \*

## OPINION

### Procedural Issue

Angelo's correctly argued that the Union's effort to rely on the grievance and arbitration procedure of the Schedule "A" Carpenters Agreement instead of the applicable procedures of the PLA is misplaced and without merit.  Indeed, it is the Grievance Procedure of the PLA which controls the present grievance.

As Article 2, Section 4 (Supremacy Clause) of the PLA clearly states, "[w]here a subject covered by the provisions of this Agreement is also covered by a Schedule A collective bargaining agreement, the provisions of this [PLA]Agreement shall prevail."  Thus, the PLA supersedes the underlying Schedule "A" Carpenters Agreement's grievance procedure.

Next, Angelo's argued that Article 9 of the PLA contains express procedures for the processing of grievances before, and through to, arbitration. According to Angelo's, when considering the evidence and Peter Gowing's testimony, the Union failed to adhere to the PLA in processing the grievance. The requirements cited by Angelo's relates to the Union's untimely filing of the February 20th grievance, the Union's failure to schedule grievance meetings in a timely fashion, the Union's unilateral decision to skip the mandatory Step 2 meeting and the Union's failure to meet the deadline for a timely demand for arbitration. According to Angelo's, these failures cannot be overlooked nor condoned and deprive this Arbitrator of jurisdiction for any other decision than to dismiss the grievance as "untimely."

Indeed, Angelo's arguments could survive, if living in a vacuum or avoiding the duplicity of the underlying facts.  Evidence revealed that, upon discovery of non-union carpenters performing work at night, the Union commenced an investigation and, on February 20, 2015, filed written Step 1 grievances against Angelo's and Llanos pursuant to the PLA and the Schedule "A" Carpenters Agreement.  The grievances requested meetings with representatives of both Angelo's and Llanos. (See U-1 and U-2, sent by certified mail).  While Llanos responded, Angelo's did not respond.

NRCC -and- ANGELO'S CONSTRUCTION and LLANOS DRYWALL LLC                    -31-

Moreover, on February 25th, Valeriano Reyas (Llanos) met with the Local 253 Business Manager (Peter Gowing) and other Union representatives. The matter was not resolved and, on February 26th, the Union filed written Step 2 grievances against Angelo's and Llanos and requested meetings with representatives of both Angelo's and Llanos. (see U-3 and U-4). Neither Angelo's nor Llanos responded to the Step 2 letter request. Thereafter, on March 4, 2015, the Union filed written Step 3 grievances against Angelo's and Llanos, again requesting meetings with the representatives of both entities. (see U-5 and U-6). Again, neither Angelo's nor Llanos responded to the Step 3 request. On March 6, 2015, the Union filed written Step 2 grievances against Angelo's and Llanos under the PLA, requesting Building Trades President (Patrick Kelleher) to schedule meetings with representatives of Angelo's and Llanos. (see U-7 and U-8). Scheduling the Step 2 meeting with Angelo's and Llanos under the PLA was not successful and, on April 23, 2015, the Union filed for arbitration.

In the opinion of this Arbitrator, a party to the PLA cannot be successful in a procedural defense, or raise the enforcement of contract application, when similarly failing to comply with the requirements of the contract. Herein, once Angelo's disregarded the request of Local 253 to attend the Step 1 meeting, it was precluded from raising procedural objection to the steps (or missteps) taken by the Union in pursuing and precluded form enforcing the PLA language regarding timeliness.

Mr. Gowing testified that he filed the grievances against Angelo's and Llanos (Tr.1:32; see U-1 and U-2 on February 20, 2015) and acknowledged that Mr. Ramos did not attend a meeting with the Union. While Mr. Reyas appeared on behalf of Llanos, Mr. Ramos did not respond and did not attend. Thereafter, additional requests by the Union met similar responses by Angelo's and meetings did not occur. Thus, Angelo's cannot be successful in a procedural defense, or raise the enforcement of contract application against the Union, when failing (refusing or refraining) to comply with the meeting requirements of the PLA. By its actions, Angelo's waived its contractual right to enforce its subsequent timeliness issues against the Union and the grievance presented by Carpenters shall proceed on its merits.

NRCC -and- ANGELO'S CONSTRUCTION and LLANOS DRYWALL LLC                    -32-

## Substantive Issue

In the opinion of this Arbitrator, the initial question in this matter rests with a determination of *credibility of witnesses*[59] and whether the adverse testimony presented in this matter was reliable, based on the competence of the witness and likelihood that the statements are true.[60]

As such, and contrary to Angelo's contention that the evidence presented by the Carpenters and the testimony offered by non-union workers claiming to have performed carpentry work on the 70 Columbus project, including sheetrock, were not credible, it is this Arbitrator's initial determination that the testimony presented by, and on behalf of, Angelo's and Llanos, together and separately, strained the bounds of credibility. It is this Arbitrator's further determination that the witnesses presented by the Carpenters, whether on balance or taken separately, were credible and reliable in establishing that non-union and undocumented workers, and workers with false and fraudulent identification performed work on the 70 Columbus project under the employment, direction and supervisor of Angelo's and Llanos. Evidence established that those workers were hired by Angelo's and Llanos to perform work on the project which was within the trade and geographic jurisdiction of the Carpenters Local 253.

The credibility, and reliability, of testimony offered by newly accepted members of the Carpenters Union, together with statement non-union and undocumented workers employed by Angelo's and Llanos far exceeded the credibility of 'sworn' statements offered by Angelo Ramos or Valeriano Reyes-Martinez ... or their surrogate Anthony Buttino.

---

59. As universally accepted, credibility determinations are within the fact finder's exclusive purview, based on considering the totality of the circumstances, and all relevant factors, including the demeanor, candor, or responsiveness of the witnesses, the inherent plausibility of the witness's account and the consistency of statements.

60. "It is within the province of the arbitrator to determine the weight, relevancy, and authenticity of evidence." *How Arbitration Works* at p. 413. It is clear that "material inconsistencies in the testimony of any witness will ordinarily detract much from the witness's credibility." *How Arbitration Works* at p. 415; *see Robins Air Force Base,* 90 LA 701, 704 (Byars, 1988). "Special considerations are involved in weighing testimony in discharge and discipline case." *How Arbitration Works* at p. 417. "Arbitrators have recognized that an accused employee has an incentive for denying a charge, in that the employee stands immediately to gain or lose in the case." *How Arbitration Works* at p. 417; *see Ford Motor Co. , 1* ALAA ¶67,274, at 67,620 (Shulman, 1954).

NRCC -and- ANGELO'S CONSTRUCTION and LLANOS DRYWALL LLC                    -33-

Denying their conduct in paying non-union and undocumented workers in cash conflicted with veracity. Testimony of workers claiming to be underpaid or failing to receive wages after work was performed, was accepted as truth. Testimony regarding the acts of providing false names, social security numbers and identification to workers seeking union membership was accepted as truthful and factual. Denials of the acts revealed fraudulent intent and was not a path to walk if seeking to reach credibility. Falsely testifying about leaving non-union and undocumented names off a shop steward report did not paint a picture of reality, especially coming from the individual assigned to protect the work of union members or the jurisdiction of the Union while on the jobsite.

These acts were repeatedly evidenced by documents submitted by the Carpenters and established through the testimony of unrelated individuals who sought work and income and received less than agreed to by the web of deceit foisted upon them by their respective employers. The initial discovery and subsequent investigation of the use of non-union workers on the jobsite, as testified to by Council Representatives Manual Ortega and Anthony Abrantes, uncovered the conspiracy of Angelo Ramos, Valeriano Reyas Martinez and Anthony Buttino.

Moreover, evidence demonstrated to this Arbitrator that Angelo's and Llanos acted interchangeably and together. Whether considered an alter-ego or double-breasted arrangement by this Arbitrator,[61] there is no question that the combined entities worked as one.

---

61. This Arbitrator found a clear interrelation of operations between Angelo's and Llanos and a straight path of interaction between the two entities. While both entities perform dry-wall installation and are contractors in the New Jersey construction industry, it was the apparent evidence that linked the two entities. Angelo's assisted Llanos in becoming established on the 70 Columbus project. With undetermined assets, Llanos was assisted by Angelo's in establishing its business and subcontracting work of an identical nature. Angelo's agreed to remit the benefits on behalf of Llanos. Llanos performed the work under a subcontract, arranged by Angelo's and its shop steward Buttino. Both entities used the same workers to perform carpentry work on the 70 Columbus Avenue Project and both Angelo's and Llanos shared common supervision on the site. As the evidence revealed, the owners of the companies operated a non-union crew of employees (the extent not fully uncovered) which, in the opinion of this Arbitrator, was intended to insulate Angelo's from liability for any potential breach of the PLA and the Subcontractor Clause of the Schedule "A" Carpenters Agreement.

Moreover, the evidence established that the two companies shared control of labor relations, with Anthony Buttino instrumental in arranging for Llanos to sign the short form agreement with the Carpenters and for Angelo's to pay the benefits on behalf of the companies' crew of carpenters operating under the terns of the PLA and the Schedule "A" Agreement.

Finally, the evidence established a common workplace management, with Anthony Buttino and "Jesse" serving as jobsite supervisors of the work performed on the Project, directing workers in their assignments and handling material movements for both Angelo's and Llanos.

**NRCC -and- ANGELO'S CONSTRUCTION and LLANOS DRYWALL LLC** -34-

Despite Angelo's repeated denials, the overwhelming weight of evidence and the credibility of witnesses uncovered a conspiracy of operation wherein non-union workers, performing framing and sheetrock (and taping) were utilized in a manner to circumvent the jurisdiction of the Carpenters Union and employ individuals under the cover of protection by the Union shop steward.[62] The Union was not forced to testify in a self-serving manner, but accurately reported its findings. Moreover, former employees of Angelo's and Llanos provided reliable testimony and convincing evidence to establish that Angelo's and Llanos perpetuated deceitful and deceptive acts of creating fake names to procure union books and employ workers at-will, withholding accurate wage and hour reports and cheating individuals out of contractual wage payments and benefit contributions.

Glaringly, the two entities fraudulently created fake names and identification to procure union books, commit contractual wage and hour violations and cheat both the Union and its members of work assignments on the 70 Columbus project. Aspersions cast on Ramos, Angelo's, Martinez, Llanos and Anthony Buttino were self-created and the sad result of their joint effort to avoid the obligations of the PLA. Credible evidence demonstrated that work within the Carpenters' jurisdiction was performed by non-union workers on the Project, with knowledge of Ramos (on behalf of himself and Angelo's), Reyas-Martinez (on behalf of himself and Llanos) and Buttino (on behalf of himself and for the benefit of Angelo's and Llanos). The picture painted by the record, and the testimony offered in three hearings and the story told by the individual workers was far from a fiction. Indeed, it was a portrait of a workplace conspiracy 'concocted and advanced' by Angelo's and Llanos, with knowledge of Buttino, to employ non-union crews to perform Carpenters work on the Project and avoid the obligations of the PLA and the Schedule "A" Carpenters Agreement. It was fortunate that the story ended, to the degree discovery is accurate, at a chapter earlier than the epilogue.

---

62. Limited evidence addressed the "trim" work performed during the period of the grievance.

NRCC -and- ANGELO'S CONSTRUCTION and LLANOS DRYWALL LLC                         -35-

Based on the record, this Arbitrator finds that Angelo's and Drywall violated the PLA and the Schedule "A" Carpenters Agreement by failing to hire Carpenters under the "70 Columbus Avenue" PLA procedures and by failing to compensate employees performing work covered on the Project in accordance with the wage and benefits contained within the Schedule "A" Carpenters Agreement. This determination further finds that Angelo's and Llanos, together, employed non-union employees to perform bargaining unit work on the Project and failed to pay those individuals contractual wages and benefits for hours worked.

Clearly, aspersions cast on Angelo's, Llanos and former shop steward Anthony Buttino were self-created but well-earned.[63] However, to whatever extent the acts may have flourished, the discovery of crews working undercover lead to the further discoveries that work within the jurisdiction of the Carpenters was performed by non-union employees, improperly hired and incorrectly paid, on the Project. It was not necessary for the Union to concoct a story in fictional form, for Angelo's and Llanos, at the very least, created the reality of employing non-union crews to perform Carpenters work on the Project, without a shred of conscience.

This Arbitrator can only conclude that, as disgusting, base and threatening is the telephone message sent from "Mr. Martin" (Valeriano Reyas Martinez, see page 18 above) to Joseph Valdez after "Angelo's and Llanos" were exposed for hiring non-union individuals on a project covered by a project labor agreement, more disgusting is the conduct displayed by the two companies through their principals, Angelo Ramos and Valeriano Reyes Martinez.

---

63. Counsel for the Carpenters offered comments relating to Anthony Buttino which were harsh, but accurate. He noted that Buttino, despite being named shop steward on the Project by the Carpenters Union and having responsibility to protect the interests of the Carpenters and the individuals performing bargaining unit work on the Project, testified in support of the two companies. While not disputing Buttino's explanation that he was under subpoena to testify, Union Counsel challenged Buttino's testimony and that he acted consistent with his duties as shop steward. According to Counsel, Buttino's behavior at the hearing indicated his true interest as an advocate for the Companies and his complicity in their attempt to circumvent the PLA and the Carpenters Agreement. As Counsel further noted, Buttino assisted the Companies' counsel, taking notes, interjecting comments and providing assistance ... and revealing his infidelity to his obligations as steward. In the opinion of this Arbitrator, while Buttino's involvement in the actions taking place on the Project was embarrassing to the Union and shameful to himself, his testimony was incredible and unreliable. The record further revealed that , by February 10, 2015, the Union replaced Anthony Buttino (with Kenny Dukes) as shop steward on the job. Buttino remained on the jobsite as an employee of Angelo's and a supervisor of the employees employed by Angelo's and Llanos. (See U-15).

NRCC -and- ANGELO'S CONSTRUCTION and LLANOS DRYWALL LLC                    -36-

In summation, this Arbitrator was presented a scenario of disregard for workers, exploitation of individuals, disregard for common notions of dignity, creating false identities, manipulating hours and wages for earned pay, defrauding the union by alternating coverage under union books, and stealing money from individuals cheated out of wages earned and promised.

Angelo Ramos, in defense of his actions, said it best:

"You can ask all your shop stewards; you can ask Steve, you can ask Rick. You can ask - - how many we have, like 50 of them. Jobs that go nonUnion. You got jobs right now that you got people work nonUnion which you knew and I told you about, and you guys didn't do shit about it. All right. So don't come over here, "Oh, here Angelo's a fucking bad guy." I'm not a bad guy. But if I got to do something, I'm gonna do what I got to do. But don't tell me I am a bad guy." (Tr.3:227)

In the opinion of this Arbitrator, while Mr. Ramos will not be told he is a "bad guy", the record nevertheless revealed he was party to a duo of companies, inter-related by both business operations and absence of ethics, aided by the misdeeds and disloyalty of a shop steward[64], all deserving of each other but exploitive of the workers performing carpentry work on the 70 Columbus project and with disregard for the controlling PLA and individual Schedule "A" Carpenters Collective Bargaining Agreements. For those actions, a remedy is appropriate.

As the grievance filed by the Carpenters shall be sustained, the Carpenters shall also be entitled to a monetary remedy for failure to hire and pay contractual wages and for the lost wages and benefits of its member-Carpenters. While the Carpenters could not identify all workers performing carpentry work for Angelo's and Llanos, a remedy will be ordered for "unidentified workers" and those workers who were identified in this record.

Notwithstanding the above liability for lost wages and benefits, Angelo's argument that Article 9 of the PLA limits the retroactive remedy to "no earlier than 60 days prior February 20, 2015" is sustained (and agreed to by the Union) and the remedy shall be calculated from December 20, 2014.

---

64. Notwithstanding the harsh, although well-deserved, comments of Union Counsel, the record clearly established that non-union and non-identified individuals performed carpentry work of framing and sheetrocking with the knowledge and direction of shop steward Anthony Buttino and not included on the job-site Shop Steward Reports filed for the Project. (See U-14).

NRCC -and- ANGELO'S CONSTRUCTION and LLANOS DRYWALL LLC                    -37-

Based on calculations provided, which were neither opposed nor disputed, Angelo's Construction Co. and Llanos Drywall shall be liable to the Northeast Regional Council of Carpenters the New Jersey Carpenters Funds and named individuals, in the total amount of **$382,899.32** for unpaid wages and for benefit contributions for work performed on the "70 Columbus Avenue", Jersey City, New Jersey project.

Specifically, Angelo's and Llanos shall make payment to the Northeast Regional Council of Carpenters in the amount of $92,378.88 for lost and unpaid wages for unidentified workers and to the following individuals, specifically identified as: Joseph Valdez in the amount of $29,490.56 in lost wages and $46,680.70 for lost overtime wages; Rosendo Castellano in the amount of $8,247.36 for lost wages and $4,673.68 for lost overtime wages; Ramon Garcia in the amount of $17,865.54 for lost wages and $16,348.08 for lost overtime wages; and Gielanderson Soares in the amount of $6,298.56 for lost overtime wages.

In addition, Angelo's Construction Co. and Llanos Drywall shall make payment to the New Jersey Carpenters Funds in the amount of $160,915.96 representing lost benefit contributions on the project, specifically in the amount of $52,631.04 for unidentified carpenters, plus $56,045.08 for benefit contributions on behalf of Joseph Valdez, $9,868.32 for benefit contributions on behalf of Rosendo Castellano, $34,596.48 for benefit contributions on behalf of Roman Garcia and $7,775.04 for benefit contributions on behalf of Gielanderson Soares.

Moreover, in accordance with Article 9 of the PLA, Angelo's Construction Co. and Llanos Drywall shall reimburse the Northeast Regional Council of Carpenters for payment of one-half the Arbitrator's total fee of $23,500.00 (as itemized below[65]). Payment to the NRCC in the amount of $11,750.00 by Angelo's and Llanos shall be deemed an obligation imposed by this Award pursuant to Article 9, Step 3(a) of the PLA, which states: ".. the fees and expenses of such arbitrations shall be borne equally by the involved Contractor and Local Union."

---

65. The Final Statement of Fee, based on a $2,000 per diem fee, is itemized as follows: Hearing of Matter (June 22nd; August 3rd and October 30, 2015) (3.0); Review of hearing record and Transcripts of Proceedings (2.0); Analysis of Post-Hearing Summations (2.25); Writing and Issuance of Award and Order (4.5): Total (11.75 days x $2,000) = $23,500.00, to be borne equally by the parties. It is noted that the Carpenters portion of the Final Statement is credited with a payment of $2,000.00 by the NRCC on the August 9, 2015 Interim Statement.

To insure accuracy of contributions for hours worked, the Trustees of the Funds, in their discretion, may cause an audit to be made of the payrolls and such other records of Angelo's Construction Co. and Llanos Drywall as are considered pertinent by the Trustees and Angelo's Construction Co. and Llanos Drywall shall immediately cooperate in the performance of the audit. The Funds may commence the audit within 30 days from the date of this award.

This Arbitrator shall retain jurisdiction of this matter in the event of any dispute of any issue relating to or arising from the interpretation or application of this Award and Order.

In consonance with the proofs, and upon the foregoing evidence presented, this Arbitrator herey renders the following:

### AWARD and ORDER

1. The grievance presented by the Northeast Regional Council of Carpenters is timely, as Angelo's Construction Co. failed to respond to the initial request of Carpenters Local 253 for a meeting between the parties, as required by Article 9 of the Project Labor Agreement and, thus, precluding and waiving Angelo's Construction right to raise the procedural objection to the grievance filed by Carpenters Local 253.

2. Angelo's Construction and Llanos Drywall violated the PLA and the Schedule "A" Carpenters Agreement by failing to hire Carpenters under the PLA procedures and by failing to compensate Carpenters for lost work opportunities on the "70 Columbus Avenue", Jersey City, New Jersey project.

3. The grievance filed by the Northeast Regional Council of Carpenters shall be sustained and an appropriate remedy shall be issued ordering Angelo's Construction and Llanos Drywall to make the Carpenters whole for lost work opportunities and lost wages and benefits

4. Notwithstanding the above liability for lost wages and benefits, Angelo's Construction Co.'s argument that Article 9 of the PLA limits the retroactive remedy to "no earlier than 60 days prior February 20, 2015" shall be sustained and the remedy shall be calculated from December 20, 2014.

5. Angelo's Construction Co. and Llanos Drywall shall be liable to the Northeast Regional Council of Carpenters and the New Jersey Carpenters Funds, and individuals named below, in the total amount of **$382,899.32** for lost work opportunities and lost wages and for benefit contributions for work performed on the "70 Columbus Avenue", Jersey City, New Jersey project.

NRCC -and- ANGELO'S CONSTRUCTION and LLANOS DRYWALL LLC                    -39-

A. Angelo's Construction Co. and Llanos Drywall shall make payment to the Northeast Regional Council of Carpenters for unidentified Carpenters in the amount of $92,378.88 for lost work opportunities and lost wages of unidentified individuals, plus payments to the following individuals: Joseph Valdez in the amount of $29,490.56 in lost wages and $46,680.70 for lost overtime wages; Rosendo Castellano in the amount of $8,247.36 for lost wages and $4,673.68 for lost overtime wages; Ramon Garcia in the amount of $17,865.54 for lost wages and $16,348.08 for lost overtime wages; and Gielanderson Soares in the amount of $6,298.56 for lost overtime wages.

B. Angelo's Construction Co. and Llanos Drywall shall make payment to the New Jersey Carpenters Funds on behalf of unidentified carpenters in the amount of $52,631.04 for lost benefit contributions, plus $56,045.08 for benefit contributions on behalf of Joseph Valdez, $9,868.32 for benefit contributions on behalf of Rosendo Castellano, $34,596.48 for benefit contributions on behalf of Roman Garcia and $7,775.04 for benefit contributions on behalf of Gielanderson Soares in the total amount of $160,915.96

6.    In accordance with Article 9 of the PLA, Angelo's Construction Co. and Llanos Drywall shall reimburse the Northeast Regional Council of Carpenters for one-half the Arbitrator's total fee of $23,500 (as itemized in the statement of fee and set forth in footnote 65 above). Payment of $11,750.00 by Angelo's Construction Co. and Llanos Drywall to the NRCC shall be deemed an obligation imposed by this Award pursuant to Article 9 Step 3(a) of the PLA, which states: ".. the fees and expenses of such arbitrations shall be borne equally by the involved Contractor and Local Union" and reimbursement of the Arbitrator's fee advanced in full by the NRCC.

7.    Amounts set forth in paragraphs 5 and 6 above shall be made payable in the following manner by checks to: "Northeast Regional Council of Carpenters" in the amount of $104,128.88; "Joseph Valdez" in the amount of $76,171.26; "Rosendo Castellano" in the amount of $12,921.04; "Ramon Garcia" in the amount of $34,213.62; and "Gielanderson Soares" in the amount of $6,298.56; and "New Jersey Carpenters Funds" in the total amount of $160,915.96

All checks shall be forwarded within fifteen (15) business days to the Funds' Counsel: Kroll, Heineman and Carton, LLC, attn: Raymond G. Heineman, Esq., Metro Corporate Campus I, 99 Wood Avenue South – Suit 307, Iselin, New Jersey 08830.

8.  In addition, the Trustees of the Funds, in their discretion, may cause an audit to be made of the payrolls and such other records of Angelo's Construction Co. and Llanos Drywall as are considered pertinent by the Trustees and Angelo's Construction Co. and Llanos Drywall shall immediately cooperate in the performance of the audit. The Funds may commence the audit within 30 days from the date of this award.

9.  The Arbitrator shall retain jurisdiction of this matter in the event of any dispute of any issue relating to or arising from the interpretation or application of this Award and Order.

Dated: May 30, 2016

_____
J. J. Pierson, Arbitrator

STATE OF NEW JERSEY:
        ss.
COUNTY OF ESSEX :

I, J. J. PIERSON, Esq., on my oath, do attest and affirm to being the person who has executed the foregoing instrument and issued the above AWARD and ORDER on May 31, 2016.

_____
J. J. Pierson, Attorney at Law - State of New Jersey

Distribution List:

**John Ballantyne, Exec. Secretary-Treasurer**
**Robert Satriano, Council Representative**
Northeast Regional Council of Carpenters
91 Fieldcrest Avenue - 2nd Floor
Edison, NJ 08837

**Raymond G. Heineman, Esq.**
Kroll Heineman Carton
Metro Corporate Campus I
99 Wood Avenue South - Suite 307
Iselin, NJ 08830

**Patrick Kelleher, President**
Hudson Co. Building & Construction Trades Council
c/o Plumbers Local 24
20 Fairfield Place
Fairfield, NJ 07004

**Alan I. Model, Esq.**
Littler Mendelson, P.C.
One Newark Center
8th Floor
Newark, NJ 07102

**Angelo Ramos**
Angelo's Construction Co.
59 Rose Street
Wood Ridge, NJ 070775

**Valeriano Reyes-Martinez**
Llanos Drywall
315 Madison Avenue
Passaic, NJ 07055

**John Macchiaverna, Sr., Vice President**
**Stephen I. Petrillo, Esq.**
A. J. D. Construction Co., Inc.
948 Highway 36
Leonardo, NJ 07737

NRCC -and- ANGELO'S CONSTRUCTION and LLANOS DRYWALL LLC            -41-

D

STATE OF NEW JERSEY

| | |
|---|---|
| In the Matter of Arbitration | Before: J. J. PIERSON, Esq. |
| | Arbitrator |
| Between | |
| | |
| NORTHEAST REGIONAL COUNCIL | |
| OF CARPENTERS, UBCJA ("Union") | |
| | |
| -and- | <u>AWARD and ORDER</u> |
| | |
| LLANOS DRYWALL LLC | |
| ("Llanos") | "Failure to Hire" |

The undersigned is designated Arbitrator by the parties pursuant to Article 9 (Grievance & Arbitration Procedure") of three (3) "Project Labor Agreements" ("PLAs") Covering Construction of (1) 615 Pavonia Avenue, Jersey City; (2) 65 Bay Street (Trump Building), Jersey City; and (3) 80 Columbus (Marriott Hotel),Jersey City, New Jersey Projects, to address the grievances submitted by the Northeast Regional Council of Carpenters ("Carpenters" or "Union"), alleging that Llanos Drywal! LLC, as a subcontractor to AJD Construction Co., failed to hire Member-Carpenters to perform bargaining unit work on the three Projects pursuant to the terms and conditions of the PLA and Schedule "A" and the NRCC Agreement. A hearing was conducted on February 24, 2017 at the Union Offices, Edison, New Jersey, after due notice was given to the parties by the Arbitrator, to address the following:                    **ISSUES:**

> 1. Whether Llanos Drywall LLC violated the Project Labor Agreements and the Schedule "A" NRCC Agreement by failing to hire Carpenters under the PLA procedures on the 615 Pavonia Avenue, Jersey City; 65 Bay Street (Trump Building), Jersey City; and 80 Columbus (Marriott Hotel), Jersey City, New Jersey Project jobsites and by failing to compensate Carpenters for work performed? If so, what shall be the remedy?

> 2. Whether Llanos Drywall LLC violated the "Agreement between Northeast Regional Council of Carpenters and Building Contractors Association of New Jersey and their affiliates and Associated Construction Contractors of New Jersey" ("NRCC ∴greement") by failing to hire Carpenters under the PLA procedures on the 615 Pavonia Avenue, Jersey City; 65 Bay Street (Trump Building), Jersey City; and 80 Columbus (Marriott Hotel), Jersey City, New Jersey Project jobsites and by failing to compensate Carpenters for work performed? If so, what shall be the remedy?

Hearing Appearances - February 24, 2017[1]

Appearing for the Union:
Raymond G. Heineman, Esq.
Peter Gowling, Council Representative
Thomas Hurley, Council Representative
Pedro Navedo, Council Representative
Simon Santiago, Shop Steward

Also Appearing:
Bernabe Garcia
Jose M. Gomez
Erson Murillo
Oscar Rodriguez
Fernando Tellez

Appearing for Llanos Drywall LLC:
None

Appearing for AJD Construction Co., Inc.
None

Appearing for the Hudson County Building
and Construction Trades:
Patrick Kelleher, President (By Phone)

## BACKGROUND

The present matter arises on three construction projects in Jersey City, New Jersey: 615

Pavonia Avenue; 65 Bay Street (Trump Building); and 80 Columbus (Marriott Hotel) which are

covered by Project Labor Agreements ("PLAs") between AJD Construction Co. ("AJD"), as General

Contractor ("GC"), reflecting the objectives of the Owners, and the Hudson County Building and

Construction Trades Council, AFL-CIO, on behalf of itself and its affiliated local union members.

The Northeast Regional Council of Carpenters is a signatory union to the PLA. (See U-1[2]).

The PLA at Article 1 - Preamble, Section 1, Parties to the Agreement, states:

This an Agreement entered into by and between the GC, the Hudson County Building and
Construction Trades Council, AFL-CIO, on behalf of itself and its affiliated local union
members, and the signatory Local Unions on behalf of themselves and their members,
regardless of their affiliation with the County Council or lack thereof, provided that every
Local Union must qualify as a Labor Organization as that term is defined in the Ordinance.

---

1. Notice of Hearing was sent to: Valerino Reyes (aka "Valeriano Martinez" or "Martine"), Llanos Drywall -
315 Madison Avenue, Passaic, NJ 07055 (By Priority Express Mail EL213106646 and Certified Mail: 7014
0150 0001 9300 0128) and to: Raymond Heineman, Esq. - Kroll Heineman Carton - 99 Wood Avenue South
- Suite 307 - Iselin, NJ 08830; John Ballantyne, Executive Secretary-Treasurer; William Sproule, NRCC
Manager; John Macchiaverna, Sr., Vice President - A.J.D. Construction Co., Inc. - 948 Highway 36 -
Leonardo, NJ 07737; and Pat Kelleher, President - Hudson County Building and Construction Trades
Council (By Email to each person).

2. References to Exhibits are (U- ) for Union Exhibits.

NRCC -and- LLANOS DRYWALL LLC                                                        -2-

<u>Article 2, Section 3 - Entities Bound and Administration of Agreement</u> of the PLA states:

*This Agreement shall be binding on all signatory Unions and the GC and all signatory contractors performing on site work, including staging areas related to the Project. The Contractors shall include in any subcontract which they let for performance during the term of this Agreement, a requirement that their subcontractors, of whatever tier, become signatory and bound by this Agreement with respect to subcontracted work performed within the scope of Article 3. (emphasis added by this Arbitrator)*

<u>Article 2, Section 4 - Supremacy Clause</u> of the PLA states:

This Agreement, together with the Ordinance[3] and the local Collective Bargaining Agreements appended hereto as Schedule A, represent the complete understanding of all signatories and supersedes any national agreement, local agreement or other collective bargaining agreement of any type which would otherwise apply to this Project, in whole or in part. The sole exception to the preceding sentence is for work performed under the national agreement of the International Union of Elevator Constructors.  As to such work, the only provisions of this Agreement which shall be deemed to supersede the Elevator constructor's national agreement shall be Articles 7 (Work Stoppages and Lockouts), 9 Grievance and Arbitration Procedures) and 10 (Jurisdictional Disputes).  Where a subject covered by the provisions of this Agreement is also covered by a Schedule A collective bargaining agreement, the provisions of this Agreement shall prevail. It is further understood that no Contractor shall be required to sign any other agreement as a condition of performing work on this Project. Finally, it is understood that: (a) this Agreement shall have no application to any activity of any party hereto except as such activity directly relates to the performance of covered work on the Project; and (b) the execution of this Agreement shall not make any person or entity executing this Agreement a party to any of the Collective Bargaining Agreements and/or addenda attached to this Agreement, except to the extent that they perform work on the Project that is covered by a Schedule A collective bargaining agreement.

<u>Article 4, Section 2 - Union Referral</u> of the PLA states:

*A. The Contractors agree to hire Project craft employees covered by this Agreement through the job referral systems and hiring halls and procedures established in the Local Unions' area collective bargaining agreements (Schedule A). (emphasis added)*

<u>Article 11 - Wages and Benefits, Section 1 - Classification And Base Hourly Rate</u>, states:

*All employees covered by this Agreement shall be classified in accordance with the work performed and paid the base hourly wages rates for those classifications as specified in the attached Schedules, as amended during this Agreement. ....*

---

3. See PLA, "WHEREAS Jersey City Ordinance 07-123" which requires the execution of a Project Labor Agreement for tax abated projects;"

<u>Article 9, Section 1. Procedure For Resolution of Grievances</u>, states:

Any question, dispute or claim arising out of, or involving the interpretation or application of this Agreement, other than jurisdictional disputes or alleged violations of Article 7, Section 1) shall be considered a grievance and shall be resolved pursuant to the exclusive procedure of the steps described below; provided, in all cases, that the question, dispute or claim arose during the term of this Agreement.

STEP 1:

(a) When any employee covered by this Agreement feels aggrieved by a claimed violation of this Agreement, the employee shall, through the Local Union business representative or job steward, give notice of the claimed violation to the work site representatives of the involved Contractor. To be timely, such notice of the grievance must be given within 14 calendar days after the act, occurrence, or event giving rise to the grievance. The business representative of the Local Union or the job steward and the work site representative of the involved Contractor shall meet and endeavor to adjust the matter within 14 calendar days after timely notice has been given. If they fail to resolve the matter within the prescribed period, the grieving party, may, within 14 calendar days thereafter, pursue Step 2 of the grievance procedure by serving the involved Contractor and the GC with written copies of the grievance setting forth a description of the claimed violation, the date of which the grievance occurred, and the provisions of the Agreement alleged to have been violated. Grievances and disputes settled at Step 1 are nonprecedential except as to the specific Local Union, employee and Contractor directly involved unless the settlement is accepted in writing by the GC as creating precedent.

(b) Should any signatory to this Agreement have a dispute (excepting jurisdictional disputes or alleged violations of Article 7, Section 1) with any other signatory to this Agreement and, if after conferring, a settlement is not reached within 14 calendar days, the dispute shall be reduced to writing and proceed to Step 2 in the same manner as outlined in subparagraph (a) for the adjustment of employee grievances.

STEP 2.

The Business Manager or designee of the involved Local Union and, if desired, a representative from the International, together with representatives of the Council (if the Local Union is a member or affiliate), the involved Contractor, and the GC <u>shall</u> meet in Step 2 within 14 calendar days of service of the written grievance to arrive at a satisfactory settlement.

STEP 3.

(a) If the grievance shall have been submitted but not resolved in Step 2, any of the participating Step 2 entities may, within 21 calendar days after the initial Step 2 meeting, submit the grievance in writing (copies to other participants) to J. J. Pierson, Jr., Esq. who shall act as the Arbitrator under this procedure. The Labor Arbitration Rules of the American Arbitration Association shall govern the conduct of the arbitration hearing, at which all Step 2 participants shall be parties. The decision of the Arbitrator shall be final

and binding on the involved Contractor, Local Union and employees and the fees and expenses of such arbitrations shall be borne equally by the involved Contractor and Local Union.

(b) Failure of the grieving party to adhere to the time limits set forth in this Article shall render the grievance null and void. These time limits may be extended only by written consent of the GC, involved Contractor and involved Local Union at the particular step where the extension is agreed upon. The Arbitrator shall have authority to make decisions only on the issues presented to him and shall not have the authority to change, add to, delete or modify any provision of this Agreement.

* * * * * * *

Llanos Drywall is also signatory to the NRCC "Short Form Agreement" ("SFA") which states:

## SHORT FORM AGREEMENT
## NORTHEAST REGIONAL COUNCIL OF CARPENTERS
## UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA

WHEREAS the Contractor desires to employ employees represented by the Northeast Regional Council of Carpenters ("NRCC")/ the Eastern Millwright Regional Council ("EMRC") and their affiliated Local Unions of the United Brotherhood of Carpenters and Joiners of America ("UBC") hereinafter the "Union" in their respective territorial jurisdictions which employment will require payments to the NJ Benefit Funds and/or Empire State Benefit Funds ("Funds") and check-off dues deductions to the NRCC/EMRC; **ALL FRINGE BENEFITS ARE TO BE PAID WEEKLY.**

WITNESSETH, the undersigned agree to be bound by every applicable current collective bargaining agreement between the NRCC, or other Local Unions affiliated with the UBC and the members of the contractors associations, governing wages, working conditions and payments to fringe benefit funds applicable to the construction, site location where the work is being performed, which agreements are incorporated herein by reference. The Contractor acknowledges that the Union has demonstrated that the Union has majority support and represents a majority of the Contractor's employees in an appropriate unit for the purposes of collective bargaining. Accordingly, the Union demands and the Contractor recognizes the Union as the exclusive bargaining agent under Section 9 of the NLRA for all of its employees with the contractual bargaining unit. The permanent arbitrator appointed by the Trustees of the Funds shall herein decide all matters concerning wages and benefits and all matters concerning procedural or substantive arbitrability. Notwithstanding any contrary provisions in the above described agreements, the permanent arbitrator is also authorized to hear and decide any and all contractual disputes arising under the grievance and arbitration provisions of those agreements. The Agreements and Declarations of Trust, as amended, governing the above mentioned fringe benefit Funds are agreed to by the parties and incorporated herein by reference. This Agreement shall continue in effect for the duration of the above referenced applicable collective bargaining agreements, whether renewed by renegotiations or otherwise, including any amendments and/or modifications thereto, and shall continue in full force and effect from year to year unless at least 90 days before expiration of the then current collective bargaining agreement, either party notifies the other in writing by certified mail, return receipt requested, of cancellation of this Agreement. This agreement shall also govern any corporation, partnership, sole proprietorship which is deemed to be a controlled entity under the Internal Revenue Code or which is a successor to, joint employer with, or alter ego of the undersigned Contractor. To the extent the undersigned Contractor subcontracts any work covered by this Agreement to any subcontractor or other person, the Contractor shall be liable for all contributions owing to the above mentioned Funds in the event the subcontractor or person fails to pay contributions to said Funds for employees covered by this or the above referred to Agreement who are employed by the said subcontractor as person.

**NRCC -and- LLANOS DRYWALL LLC**                                                        **-5-**

Article XIX - Subcontractor Clause of the Carpenters Agreement, states, in relevant part:

1.The Employer will not subcontract any work within the jurisdiction of the Union which is to be performed at the job site except to a contractor who holds an agreement with the United Brotherhood of Carpenters and Joiners of America or one of its subordinate bodies having jurisdiction at the job site, or who agrees in writing, prior to or at the time of the execution of his subcontract, to be bound by the terms of this Agreement.
....

4. The Employer represents that its members, officers, and supervisory personnel will not attempt to form or participate in the creation of or operation of new or double-breasted corporations for the purposes of avoiding the obligations of this Agreement.

\* \* \* \* \* \* \*

## EXHIBITS

U-1: Project Labor Agreements (PLAs) covering Construction of (1) 615 Pavonia Avenue, Jersey City; (2) 65 Bay Street (Trump Building), Jersey City; and (3) 80 Columbus (Marriott Hotel),Jersey City (New Jersey) Projects. [Note: the three (3) PLAs contain identical contract language].

U-2: "Agreement between Northeast Regional Council of Carpenters and Eastern Millwright Regional Council of the United Brotherhood of Carpenters and Joiners of America and Associated Construction Contractors of New Jersey and their affiliates and Drywall & Interior Systems Contractors Association, inc. of New Jersey and Construction Contractors Labor Employers" ("NRCC Agreement", effective May 2016 - April 30, 2019)

U-3: Short Form Agreement ("SFA") between Northeast Regional Council of Carpenters and Llanos Drywall, executed by Valeriano Reyes - authorized as Principal of the Company and Michael Capelli, Executive Secretary-Treasurer, on behalf of the Northeast Regional Council of Carpenters on August 21, 2014 and witnessed by Anthony Abrantes and Manny Ortega, NRCC Council Representatives.

U-4A: (NRCC) NJ Wage Rates effective 11/1/2016 thru 4/30/2017.
U-4B: (NRCC) NJ Wage Rates effective 5/1/2016 thru 10/31/2016.

U-5: Award and Order - In the Matter of Arbitration between Northeast Regional Council of Carpenters, OBCJA -and- Angelo's Construction and Llanos Drywall, J. J. Pierson, Esq., Arbitrator, dated May 31, 2016

U-6: Grievance, by Carpenters Local 253 against Llanos Drywall under the provisions Article 9 of the PLAs covering (1) 615 Pavonia Avenue, Jersey City; (2) 65 Bay Street (Trump Building), Jersey City; and (3) 80 Columbus (Marriott Hotel),Jersey City Projects and maintaining that Llanos failed to apply the agreement. [Note: Step I filed December 14, 2016 (to Valeriano Reyes, Principal, Llanos Drywall); Step II filed December 29, 2016 (to Patrick Kelleher, President HCBT); Memo from Peter Gowing, President of Local 253, advising Counsel (Ray Heineman, Esq.) that he met with Mr. Reyes in compliance with Step II to resolve the grievances and, pursuant to Step III, requesting that he file for arbitration; Request for Arbitration filed January 24, 2017 to J. J. Pierson, Esq].

NRCC -and- LLANOS DRYWALL LLC                                                                                    -6-

U-7: <u>Grievance</u>, by Carpenters Local 253 against Llanos Drywall under the provisions Article XVIII of the NRCC Agreement covering (1) 615 Pavonia Avenue, Jersey City; (2) 65 Bay Street (Trump Building), Jersey City; and (3) 80 Columbus (Marriott Hotel),Jersey City Projects and maintaining that Llanos failed to apply the agreement. [Note: Step I filed December 14, 2016 (to Valeriano Reyes, Principal, Llanos Drywall); Step II filed December 20, 2016 (to Valeriano Reyes), Step III filed December 27, 2016 (to Valeriano Reyes); Step III - Abeyance re 80 Columbus Drive (to Valeriano Reyes); Memo from Peter Gowing, President of Local 253, advising Counsel (Ray Heineman, Esq.) that he met with Mr. Reyes in compliance with Step II to resolve the grievances and, pursuant to Step III, requesting that he file for arbitration; Request for Arbitration filed January 24, 2017 to J. I. Pierson, Esq.].

U-8A: <u>Statement</u> (in English) of Pedro Navedo (Counsel Representative - NRCC) and Tom Hurley (Counsel Representative - NRCC) regarding Fernando Tellez and Jose Gomez, re: Llanos Drywall Violation:

> On Tuesday 11/22/16, we received a phone call from Fernando Tellez stating that he had been a non-union carpenter and was given one of our business cards in hopes to get help from us. On Monday 11/28/16, Council reps Tom Hurley and Pedro Navedo met with Fernando Tellez and Jose Gomez, also a non-union carpenter at our office to address this issue. Both which have 12+ years experience in carpentry. These men stated they work for a union contractor named Martin, who's real name is Valeriano Martinez, the owner of Llanos Drywall. They both worked at three different job sites for Llanos Drywall at <u>80 Columbus</u> Drive, 1 Journal Square and Trump <u>2 on Greene Street in Jersey City</u>.

U-8B: <u>Statement</u> (in Spanish) of Pedro Navedo (Counsel Representative - NRCC) and Tom Hurley (Counsel Representative - NRCC) regarding Fernando Tellez and Jose Gomez, re: Llanos Drywall Violation:

U-9: <u>Steward's Weekly Report</u>, Llanos Dry Wall LLC for "Journal Square Phase I" Pavonia Avenue Jersey City, for periods between 11/2015 through 10/2016.

U-10: <u>Steward's Weekly Report</u>, Llanos Dry Wall LLC for "Trump" Job, Jersey City, for periods between 12/2015 through 9/2016.

U-11: <u>Steward's Weekly Report</u>, Llanos Dry Wall LLC for "Marriott" Job, Jersey City, for periods between 9/2016 through 12/2016

U-12: <u>Membership Record</u> for Jesus A. Rodriguez - Craft Carpenter - "In Good Standing" as of 2/28/2017.

U-13A: <u>History Inquiry</u> for Jesus Rodriquez, as of 12/1/2016
U-13B: <u>History Inquiry</u> and <u>Gross Wages Inquiry</u> for Jesus Rodriquez, as of 2/22/2017
[Note: Based on Shop Steward Reports to confirm hours paid, specific as to job site and confirmed benefit payments of 468 hours]

U-14: <u>Membership Record</u> for Mario Mena - Craft Carpenter - "In Arrears - Not in Good Standing" as of 10/31/2016.

U-15: <u>History Inquiry</u> for Mario Mena, as of 12/1/2016

U-16: <u>Membership Record</u> for Benigno Modesto - Craft Carpenter - "In Good Standing" as of 12/1/2016.

U-17: <u>History Inquiry</u> for Benigno Modesto for periods between 1/1/2016 through 12/30/2016.

U-18: <u>Photo</u> of Fernando Tellez; <u>Union Card</u>of Jesus Rodriguez, Carpenters Local 253 Member; and <u>Safety Orientation Card</u> for Fernando Tellez.

U-19: <u>Payroll Pay Check #1778</u>, issued by "Llanos Dry Wall LLC" to Jesus Rodriguez in the amount of $1,095.66 for 40 hours work for the Pay Period 08/08/2016 to 08/14/2016.

U-20: <u>Photo</u> of Jose Gomez; <u>Union Card</u> Mario Mena, Carpenters Local 253 Member.

U-21:<u>Corporate Check #1511</u> issued by "Llanos Maintenance Services, Limited Liability Company" to Benabe Garcia in the amount of $2,200.00, dated 02/09/17.

U-22: <u>Work Card</u> for Benigno Modesto, Carpenters Local 253 Member.

U-23: <u>Corporate Check #1814</u> issued by "Llanos Maintenance Services, Limited Liability Company" to Erson Murillo in the amount of $2,200.00, dated 02/09/17.

U:24: <u>Corporate Check #1510</u> issued by "Llanos Maintenance Services, Limited Liability Company" to Oscar Rodriguez in the amount of $2,200.00, dated 02/09/17.

U:25: <u>Damage Calculation</u>, dated February 24, 2016, submitted by Northeast Regional Council of Carpenters.

## DISCUSSION OF THE RECORD

The NRCC contended that, pursuant to Llano's contractual obligations under (a) the PLAs and the Schedule "A" Carpenters Agreement attributed to each PLA Project and, simultaneously, (b) the individual NRCC Short Form Agreement and incorporated NRCC Agreement, Llanos Drywall LLC ("Llanos") was specifically required <u>to hire</u> and <u>to pay</u> Member-Carpenters on the three construction Projects for work within the jurisdiction of the Carpenters. (see U-1A,B,C; U-2 and U-3, respectively). Thus, the Carpenters asserted that Llanos violated the PLA and Schedule "A" Carpenters Agreement by failing to apply the "hiring hall" procedure (Article VI, Referral Procedure) in hiring Member-Carpenters to perform carpenters' work on the Projects and to Article XXIV (Payment of Wages & Fringes) by failing to pay contractual wages and benefits to employees performing bargaining unit work on the Projects. A similar violation was asserted under the SFA and Carpenters Agreement.

NRCC -and- LLANOS DRYWALL LLC                                                                          -8-

To meet its burden of proving the allegations set forth, the Union initially presented the testimony of Pedro Navedo, a Carpenter Union member for 16 years and presently a Council Representative for one year. Mr. Navedo testified that he became aware of a job site incident when he received an anonymous call reporting that "guys were on the 615 job ... with no union cards." As a result, he went to the jobsite with another carpenter representative (Justin Ballantyne) and "carded every guy." He recalled that "some fled the scene" while he was getting cards from other workers and taking pictures of the carpenters on the job site. As Mr. Navedo described, "The photos were guys holding cards ... like a mug shot."[4]  As he added, "many of the guys I never saw before."

Mr. Navedo testified that, during his visit, he gathered information about the workers and instructed the shop steward (Jorge Arevallo) to further investigate. The shop steward related that the shop steward had some difficulty in getting information, as "he would go to one floor .... and Llanos would sneak a crew into the building on another floor." Mr. Navedo testified that, he directed the shop steward to walk the floors and take pictures of the work being performed and then replaced the shop steward with Simon Santiago.

Mr. Navedo further testified that, on November 22, 2016, he received a call from Francisco Tellez, an Llanos employee working in Jersey City. Mr. Tellez was Invited to the Union hall and appeared in Hackensack on November 28th.  According to Mr. Navedo, Mr. Tellez and another employee (Jose Gomez) sought help from the Union and gave a written statement regarding their job-site. Mr. Navedo confirmed, the statements were written in Spanish and English, signed in his presence and resulted in a grievance being filed.  (See U-8A Statement in English and U-8B Statement in Spanish; and U-6 Grievance filed under the PLA and U-7 Grievance under the CBA).

Thomas Hurley, a Council Representative, attended the meeting with Mr. Tellez and Mr. Gomez and supported Mr. Navedo's description of the events. He testified that the two statements were "true and accurate" and signed by the two individuals who appeared "nervous ... and expressed being nervous."

---

4. The photo revealed a Carpenter's union card, held in front of the individual.

NRCC -and- LLANOS DRYWALL LLC                                                    -9-

The Union also presented the testimony of Peter Gowing, Vice President of Carpenters Local 253, who confirmed that he began an investigation after learning that non-union sheet-rockers were performing work on the three projects under the names of Member-Carpenters. The investigation began by seeking the Shop Steward Reports, Membership Records and Work History Reports of the involved Carpenters. (See U-9 through U-17). He confirmed that, while Llanos contributed benefit funds for identified Member-Carpenters, no benefits were being contributed for the non-union workers (Oscar Rodriguez) or who were using a Member's Union card. (Erson Murillo and Barnabe Garcia).

In addition, the Union presented the testimony of Simon Santiago, a Member-Carpenter for ten years and the Shop Steward on the Pavonia Avenue project between July and October 2016. He also worked the night shift on the Trump project between April and June 2016. Mr. Santiago testified that he was named Shop Steward on the Journal Square ("Pavonia") job after the first shop steward was taken off the job in June 2016. As Shop Steward, he was responsible for recording attendance each day in his time book, gathering time and hours at the end of the week and checking paychecks for correctness.

Mr. Santiago confirmed that he knows Fernando Tellez, as they worked together on the Journal Square job. The witness testified that Mr. Tellez worked under the Union Card issued to "Jesus A. Rodriguez". He also confirmed that he knows Jose Gomez, as they also worked together on the Journal Square job. The witness testified that Mr. Gomez worked under the Union Card issued to "Mario Mena". Mr. Santiago corroborate that employees showed him their paychecks, to insure that they were receiving the correct "hours". He was not aware of what employees did with their paychecks after being issued. As he stated, "they did what they did after that."

Fernando Tellez worked "sheetrock" for Llanos on three projects in Jersey City, using an another person's Union card (Jesus Rodriguez). Mr. Tellez testified that Velariano Martinez gave it to him and "told me to show it to the shop steward, if asked." The witness identified the photo taken of him with the Union card. (U-18).

NRCC -and- LLANOS DRYWALL LLC                                                                    -10-

Mr. Tellez also identified a paycheck (and paystub), given him on the jobsite. (U-19). The witness testified that he was instructed to return the check to 'Martinez' who, in exchange, gave me a personal check ... "Sometime $1,200 for six days ... $200 per day."

The witness testified that he worked eight months total on the day shift and also worked the night shift for about four weeks. During that time he always used the name and Union card of Jesus Rodriguez. He confirmed that he gave a written statement to the Union. (See U-8A and U-8B).

Jose Gomez also appeared to testify. Employed by Llanos in 2016, he began at the 80 (Marriott job) in January, then went to the Trump in March and Journal Square in April. Mr. Gomez testified that, when hired by Llanos, Veleriano Martinez gave him a union card issued in the name of "Mario Mena" and told, "Work with this card ... there wouldn't be a problem." (See U-20)

The witness testified that he was paid $200 a day, for five or six days of work each week. According to Mr. Gomez, when given a payroll check it was in the name of Mario Mena. Upon receipt, he returned it to Velariano and was given a company check. The check was issued with "no taxes taken out." Mr. Gomez testified that he stopped working for Llanos at the end of November 2016.

Barnabe Garcia testified that he has worked for Llanos for 8 months and, as with other workers performing sheet rock, paid $200 per day by personal check without deductions. He received the check every two weeks. (See U-21). The witness also identified the Carpenters Union card of "Benigno Modesto", given him by Valeriano Martinez. According to Mr. Garcia, Mr. Martinez told him "that if anyone from the Union comes by ... that's what you show him." He then described a instance when the Union representative came to the Journal Square jobsite and asked to see his Union card.

Mr. Garcia also testified that he worked at night at the Columbus job, from 6 pm to 10 or 11 pm, with 5-6 other non-union workers. As he confirmed, "We worked about a month ... sheet rock and framing." He is presently working at the Harborside project and still being paid $200 per day.

The Union also presented Erson Murillo, employed by Llanos to work on the Trump and Journal Square jobs. The witness testified that he was given the Union card of "Mario Mena" by Valeriano Martinez and told to "show the card if anybody from the Union came by".

Questioned about the method of his pay, Mr. Murillo testified that, when he started his employment, he was paid $160 per day, and was then raised to $200 per day. He confirmed that he was paid by a Llanos Drywall check, with no deductions. (See U-22) Mr. Murillo also related that he worked both the day and night shifts with a crew of "at least 8" other workers for three months. He was aware that three of the eight workers had union cards and five were non-union workers.

Finally, the Union presented the testimony of Oscar Rodriguez, who worked for Llanos as a non-Union sheet rocker beginning in June 2016. Mr. Rodriguez testified that he worked 5-6 days a week and was paid $200 per day by a personal check. (See U-23).

## OPINION

In the opinion of this Arbitrator, the Union has presented clear and convincing evidence that: (a) pursuant to Article 2, Section 3 of the PLA, Llanos Drywall, a contractor performing sheet-rocking and framing on the three project job sites, was required to sign, and be bound by the terms and condition of the three PLAs and Schedule A.; (b) pursuant to Article 4, Section 2, Llanos was obligated to hire Project craft employees through the job referral systems and hiring hall procedures under the NRCC Schedule "A" Agreement; and ( c) pursuant to Article 11 of the PLA, Llanos was responsible to pay wages and benefits in accordance with the work performed and classifications as specified in the attached Schedule.

Based on the record presented by the Union, this Arbitrator finds that Llanos Drywall violated the PLA and Schedule "A" and the NRCC Agreement by failing to hire Member-Carpenters under the established hiring hall procedures and to pay wages and benefits to employees performing sheet-rock installation and framing work, as recognized to be work within the jurisdiction of the Carpenter's Agreement.

NRCC -and- LLANOS DRYWALL LLC                                                                    -12-

The testimony offered at hearing revealed that, of five (5) individuals employed by Llanos and performing sheet-rocking on the three projects during periods in 2016, four (4) of the workers were given union cards belonging to a Member-Carpenters in order to perform work on the (1) 615 Pavonia Avenue, Jersey City; (2) 65 Bay Street (Trump Building), Jersey City; and (3) 80 Columbus (Marriott Hotel), Jersey City Projects.  Testimony credibly established that the non-union workers were given the Union cards by their employer, Valeriano Martinez (Reyes), with the instruction to show the Union cards to the Union shop steward, if asked.  Further testimony established that two of the five individuals employed (Francisco Tellez and Jose Gomez) were issued "regular" paychecks (including actual hours of work, contractual hourly wage rate, deductions and withholdings of taxes) in the name matching the Union card.  Both employees testified that, once the pay stubs were shown to the shop steward, Valeriano Martinez (Reyes) required them to return the "payroll" paychecks in exchange for "corporate" checks issued by "Llanos Maintenance Services, Limited Liability Company" at the rate of $200 per day, without deductions or benefits.  While given Union cards, two of the five individuals (Barnabe Garcia and Erson Murillo) worked on a non-union crew, performed sheet rocking at night and were paid $200 per day by "corporate" checks, without benefits.  The fifth individual (Oscar Rodriguez) testified that he was a non-union worker who worked on the 80 Columbus project and was paid $200 per day by "corporate" check, without benefits.

From the evidence detailed in the record, this Arbitrator concluded that, between January 2016 and November 2016, Llanos Drywall operated through the control and direction of Valeriano Martinez (Reyes) to avoid and eliminate (a) the obligation of hiring employees through the Carpenter's hiring hall procedures, (b) the requirement to perform the sheet rock subcontract with union workers with properly issued Union cards and ( c) the liability to pay contractual wages and benefits in accordance with the work performed and classifications as specified in the schedule of rates.  Moreover, it is determined that Mr. Martinez' conduct was a deliberate act to avoid Llanos' contractual obligations to the Carpenter's Union and to misrepresent wage payments and benefits contributions to the Carpenter's Union and the Funds.

NRCC -and- LLANOS DRYWALL LLC                                                           -13-

The Union introduced a previous arbitration Award issued by this Arbitrator under an identical PLA which, in significant context, mirrored the conduct and findings in the present matter. (See U-5). Therein, the two employers were found to have disregarded the rights of workers, exploited individuals in the workplace, disrespected common notions of dignity, created false identities, manipulated hours and wages for earned pay, defrauded the Union by alternating coverage under union books and stealing wages from the workers. Llanos was one the named employers.

Herein, Valeraino Reyes Martinez has evidently chose to continue his misconduct and act in a deliberate manner to deceive the Union and the Funds and gain an economic advantage over the employees performing the work of sheet rocking and framing on the (1) 615 Pavonia Avenue, Jersey City; (2) 65 Bay Street (Trump Building), Jersey City; and (3) 80 Columbus (Marriott Hotel), Jersey City Projects. This Arbitrator finds that Llanos economically exploited the individuals he hired to perform sheet rock, exhibited a disregard for workers by jeopardizing their union membership, dismissed common notions of dignity by requiring workers to exchange payroll checks for corporate checks in lesser amounts than earned, created false identities for workers on the job site by handing out Union cards issued to another individual, reduced wages for hours worked and pay earned on the project, deceived Union representatives and fraudulently misrepresentrf contributions to an established benefit funds for employees not working the hours reported. A representative of Llanos or Martinez-Reyes did not appear at the hearing to deny, challenge or contest evidence presented.[5]

The Union, on its behalf and on behalf of the Funds, sought a remedy in the form of monetary damages for Llanos' contract violations. In line with the proofs offered, the Union prepared and submitted a calculation of damages. (See U-25) As these figures are supported by the evidence produced during the hearing and neither opposed nor disputed Llanos, this Arbitrator accepted the calculations as reliable in the form and amounts set forth in the document.

---

5. The Return Receipt of the Certified Letter sent Mr. Valeriano (Martinez) Reyes confirmed his receipt of Notice.

Based on the record and the finding that: Llanos, as a contractor performing on the Projects, failed to hire Project craft employees covered by the PLAs through the job referral systems and hiring halls procedures established in the Local Carpenter Unions' collective bargaining agreement and violated Article 4, Section 2 of the the PLA; and failed to pay base hourly wages rates for job classifications in compliance with Schedule A applicable to employees performing work covered by the Carpenter Agreement and to contribute benefits in compliance with Article 11 of the PLA, a remedy shall be awarded and ordered.

And, with these findings, the grievances filed by the Carpenters under either and both the PLAs and the NRCC Agreement shall be sustained and Member-Carpenters, individuals and the Funds shall be awarded a monetary remedy for damages caused by Llanos' failure to hire and pay contractual wages and benefits to employees performing work covered within the jurisdiction of the Carpenters.

Therefore, Llanos Drywall shall be liable to the Northeast Regional Council of Carpenters, the Northeast Carpenters Funds and named individuals, for damages of lost work opportunity ($251,291.80), lost benefits ($392,938.87) and lost wages ($240,996.05), respectively, in the total amount of $885,226.72. (See U-25, Damage Calculations). Likewise, in accordance with Article 9 of the PLA, Llanos Drywall shall reimburse the Northeast Regional Council of Carpenters for payment of one-half the Arbitrator's total fee of $7,000.00 (as itemized below[6]).

This Arbitrator shall retain jurisdiction of this matter in the event of any dispute of any issue relating to or arising from the interpretation or application of this Award and Order.

---

6. The Statement of Fee, based on a $2,000 per diem fee, is itemized as follows: Hearing of Matter (February 24, 2017) (1.0); Review of hearing record (1.0); Writing and Issuance of Award and Order (1.5): Total (3.5 days x $2,000) = $7,000.00. See Article 9, Step 3(a) of the PLA, which states: ".. the fees and expenses of such arbitrations shall be borne equally by the involved Contractor and Local Union."

NRCC -and- LLANOS DRYWALL LLC                                                    -15-

In consonance with the proofs, and upon the foregoing evidence presented, this Arbitrator hereby renders the following:

## AWARD and ORDER

1. **Llanos Drywall LLC** violated the Project Labor Agreements and the Schedule "A" Carpenters Agreement on the 615 Pavonia Avenue, Jersey City Project; 65 Bay Street (Trump Building), Jersey City Project; and 80 Columbus (Marriott Hotel),Jersey City Project by failing to hire Carpenters under the PLA hiring procedures and by failing to properly compensate Carpenters for wages and benefits for work performed on the three Projects.

2. **Llanos Drywall LLC** violated the Carpenters Agreement on the 615 Pavonia Avenue, Jersey City Project; 65 Bay Street (Trump Building), Jersey City Project; and 80 Columbus (Marriott Hotel),Jersey City Project by failing to hire Carpenters pursuant to the hiring procedures of the Carpenters Agreement and by failing to properly compensate Carpenters for wages and benefits for work performed on the three Projects.

3. The two (2) grievances filed by the Northeast Regional Council of Carpenters shall be sustained and an appropriate remedy shall be issued, ordering **Llanos Drywall LLC** to make the Northeast Regional Council of Carpenters, Northeast Carpenters Funds and individual performing work on the three Project whole for lost work opportunities, lost wages and lost benefits as calculated under Union Exhibit U-25.

4. **Llanos Drywall LLC** shall be liable to the Northeast Regional Council of Carpenters, the Northeast Carpenters Funds and individuals named below, in the total amount of **$885,226.72**, for lost work opportunity and for lost wages and benefit contributions for work performed on the 615 Pavonia Avenue, Jersey City Project; 65 Bay Street (Trump Building), Jersey City Project; and 80 Columbus (Marriott Hotel),Jersey City Project within the jurisdiction of the Northeast Regional Council of Carpenters.

    A. **Llanos Drywall LLC** shall make payment to the Northeast Regional Council of Carpenters in the amount of **$251,291.80** for lost work opportunity on the 615 Pavonia Avenue, Jersey City Project; 65 Bay Street (Trump Building), Jersey City Project; and 80 Columbus (Marriott Hotel),Jersey City Project, for lost work within the jurisdiction of the Northeast Regional Council of Carpenters.

B. **Llanos Drywall LLC** shall make payment to the following individuals, identified in Exhibit U-25: Francisco Tellez in the amount of $**49,702.24**; Jose Gomez in the amount of $**49,702.24**; Barnabe Garcia in the amount of $**45,267.71**; Erson Murillo in the amount of $**49,953.59** and Oscar Rodriguez in the amount of $**46,370.27**.

C. **Llanos Drywall LLC** shall make payment to the New Jersey Carpenters Funds in the amount of $**392,938.87** for lost benefit contributions for work performed on the 615 Pavonia Avenue, Jersey City Project; 65 Bay Street (Trump Building), Jersey City Project; and 80 Columbus (Marriott Hotel),Jersey City Project within the jurisdiction of the Northeast Regional Council of Carpenters.

5.    In accordance with Article 9 of the PLA, **Llanos Drywall LLC** shall reimburse the Northeast Regional Council of Carpenters for one-half the Arbitrator's total fee of $**7,000** (as itemized in the statement of fee and set forth in footnote 6 above). Payment of $**3,500.00** by Llanos Drywall LLC to the NRCC shall be deemed an obligation imposed by this Award pursuant to Article 9 Step 3(a) of the PLA, which states: ".. the fees and expenses of such arbitrations shall be borne equally by the involved Contractor and Local Union."

6.    All payments set forth in paragraphs 4 and 5 above shall be forwarded within fifteen (15) business days to the Union's Counsel: Kroll, Heineman and Carton, LLC, attn: Raymond G. Heineman, Esq., Metro Corporate Campus I, 99 Wood Avenue South – Suit 307, Iselin, New Jersey 08830.

7.    The Arbitrator shall retain jurisdiction of this matter in the event of any dispute or any issue relating to or arising from the interpretation or application of this Award and Order.

Dated: March 5, 2017

_J. J. Pierson, Arbitrator_

STATE OF NEW JERSEY:
       ss.
COUNTY OF ESSEX :

I, J. J. PIERSON, Esq., on my oath, do attest and affirm to being the person who has executed the foregoing instrument and issued the above AWARD and ORDER on March 5, 2017

_J. J. Pierson, Attorney at Law - State of New Jersey_

Distribution List:

**NRCC -and- LLANOS DRYWALL LLC**

-17-

Raymond G. Heineman, Esq.
Kroll Heineman Carton
Metro Corporate Campus I
99 Wood Avenue South - Suite 307
Iselin, NJ 08830

John Ballantyne, Exec. Secretary-Treasurer
William Sproule, New Jersey Regional Manager
Northeast Regional Council of Carpenters
91 Fieldcrest Avenue - 2nd Floor
Edison, NJ 08837

Peter Gowling, Vice President
Local 253, Northeast Regional Council of Carpenters
36 Bergen Street
Hackensack, NJ 07603

Valeriano Reyes-Martinez
Llanos Drywall
315 Madison Avenue
Passaic, NJ 07055
By Certified Mail: 7014 3490 0001 7510 5595

John Macchiaverna, Sr., Vice President
A. J. D. Construction Co., Inc.
948 Highway 36
Leonardo, NJ 07737

Patrick Kelleher, President
Hudson Co. Building & Construction Trades
Council
c/o Plumbers Local 24
20 Fairfield Place
Fairfield, NJ 07004

NRCC -and- LLANOS DRYWALL LLC                                    -18-

| Name | Total Period Worked Weeks | Hours in Period | Day Shift Hours | Straight Time Night Shift Hours | Weekend and Night Overtime Hours | Wages Day Shift Hours | Wages Night Shift Hours 15% | Overtime Hours | Gross Wages | Interim Earnings | Wages Owed | Benefits Owed |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Teller, Francisco | 34.00 | 1,680.00 | 1,248.00 | 0.00 | 432.00 | $57,333.12 | $0.00 | $29,769.12 | $87,102.24 | $37,400.00 | $49,702.24 | $50,370.68 |
| Gomez, Jose | 34.00 | 1,680.00 | 1,248.00 | 0.00 | 432.00 | $57,333.12 | $0.00 | $29,769.12 | $87,102.24 | $37,400.00 | $49,702.24 | $50,370.68 |
| Garcia, Barnabe | 34.00 | 1,680.00 | 1,248.00 | 160.00 | 272.00 | $55,393.20 | $8,452.96 | $18,821.55 | $82,667.71 | $37,400.00 | $45,267.71 | $47,842.99 |
| Murillo, Erson | 34.00 | 1,680.00 | 888.00 | 520.00 | 272.00 | $41,059.92 | $27,472.12 | $18,821.55 | $87,353.59 | $37,400.00 | $49,953.59 | $50,513.95 |
| Rodriguez, Oscar | 34.00 | 1,680.00 | 1,408.00 | 0.00 | 272.00 | $64,948.72 | $0.00 | $18,821.55 | $83,770.27 | $37,400.00 | $46,370.27 | $48,471.45 |
| Lost Work Opportunities | | | | | | | | | | | | |
| Columbus (Garcia) | 5 men, 4 weeks | 800.00 | 0.00 | 800.00 | 0.00 | $0.00 | $42,264.80 | $0.00 | $42,264.80 | $0.00 | $42,264.80 | $24,434.94 |
| Trump (Murillo) | 5 men, 13 weeks | 2,600.00 | 0.00 | 2,600.00 | 0.00 | $0.00 | $137,360.60 | $0.00 | $137,360.60 | $0.00 | $137,360.60 | $79,413.54 |
| Columbus (Rodriguez) | 3 men 13 weeks | 1,560.00 | 1,560.00 | 0.00 | 0.00 | $71,666.40 | $0.00 | $0.00 | $71,666.40 | $0.00 | $71,666.40 | $41,520.65 |
| Total - Funds | | | | | | | | | | | | |
| Total - Union | | | | | | | | | | | | |

*Handwritten annotations:*

LOST WAGES $240,996.05

$392,598.87 → BENEFITS

$251,291.80 LOST WORK OPPORTUNITE

**Damage Calculation**
Union Exhibit U-025

E

New Jersey Business Gateway
Business Entity Information and Records Service
Business Id : 0400561739

```
Status Report For:      LLANOS DRY WALL   LIMITED LIABILITY COMPANY
Report Date:            6/11/2018
Confirmation Number:    81621430387
```

IDENTIFICATION NUMBER, ENTITY TYPE AND STATUS INFORMATION

```
Business ID Number:     0400561739
Business Type:          DOMESTIC LIMITED LIABILITY COMPANY
Status:                 REVOKED FOR NOT FILING ANNUAL REPORT FOR 2
                        CONSECUTIVE YEARS
Original Filing Date:   04/01/2013
Stock Amount:           N/A
Home Jurisdiction:      NJ
Status Change Date:     NOT APPLICABLE
```

REVOCATION/SUSPENSION INFORMATION

```
DOR Suspension Start    11-16-2017
Date:
DOR Suspension End      N/A
Date:
Tax Suspension Start    N/A
Date:
Tax Suspension End      N/A
Date:
```

ANNUAL REPORT INFORMATION

```
Annual Report Month:    APRIL
Last Annual Report      02/23/2015
Filed:
Year:                   2015
```

AGENT/SERVICE OF PROCESS (SOP) INFORMATION

```
Agent:                  DENNI COTERA
Agent/SOP Address:      265 PARKER AVENUE ,CLIFTON,NJ,07011
Address Status:         DELIVERABLE
Main Business Address:  377 MADISON STREET APT 2, PASSAIC, NJ, 07055
Principal Business      N/A
Address:
```

ASSOCIATED NAMES

```
Associated Name:        N/A
Type:                   N/A
```

New Jersey Business Gateway
Business Entity Information and Records Service
Business Id : 0400561739

**PRINCIPALS**

Following are the most recently reported officers/directors (corporations),
managers/members/managing members (LLCs), general partners (LPs), trustees/officers
(non-profits).

       Title:         OTHER
       Name:         VALERIAO MARTINEZ REYES,
       Address:      377 MADISON STREET APT 2, PASSAIC, NJ, 07055

**FILING HISTORY -- CORPORATIONS, LIMITED LIABILITY COMPANIES, LIMITED PARTNERSHIPS AND
LIMITED LIABILITY PARTNERSHIPS**

To order copies of any of the filings below, return to the service page,
https://www.njportal.com/DOR/businessrecords/Default.aspx and follow the instructions
for obtaining copies. Please note that trade names are filed initially with the County
Clerk(s) and are not available through this service. Contact the Division for
instructions on how to order Trade Mark documents.

Charter Documents for Corporations, LLCs, LPs and LLPs

       Original Filing     2013
       (Certificate) Date:

Changes and Amendments to the Original Certificate:

       Filing Type       Year Filed
       REVOKED FOR FAILURE TO 2017
       PAY ANNUAL REPORTS

Note:
Copies of some of the charter documents above, particularly those filed before June
1988 and recently filed documents (filed less than 20 work days from the current date),
may not be available for online download.

   • For older filings, contact the Division for instructions on how to order.

F

New Jersey Business Gateway
Business Entity Information and Records Service
Business Id : 0450191120

Status Report For:      MJO DRY WALL CONSTRUCTION LLC
Report Date:            6/11/2018
Confirmation Number:    81621430387

## IDENTIFICATION NUMBER, ENTITY TYPE AND STATUS INFORMATION

    Business ID Number:     0450191120
    Business Type:          DOMESTIC LIMITED LIABILITY COMPANY
    Status:                 ACTIVE
    Original Filing Date:   08/09/2017
    Stock Amount:           N/A
    Home Jurisdiction:      NJ
    Status Change Date:     NOT APPLICABLE

## REVOCATION/SUSPENSION INFORMATION

    DOR Suspension Start    N/A
    Date:
    DOR Suspension End      N/A
    Date:
    Tax Suspension Start    N/A
    Date:
    Tax Suspension End      N/A
    Date:

## ANNUAL REPORT INFORMATION

    Annual Report Month:    AUGUST
    Last Annual Report      N/A
    Filed:
    Year:                   N/A

## AGENT/SERVICE OF PROCESS (SOP) INFORMATION

    Agent:                  DENNI COTERA
    Agent/SOP Address:      265 PARKER AVE ,CLIFOTON,NJ,07011
    Address Status:         DELIVERABLE
    Main Business Address:  315 MADISON STREET, PASSAIC, NJ, 07055 0705
    Principal Business      N/A
    Address:

## ASSOCIATED NAMES

    Associated Name:        N/A
    Type:                   N/A

New Jersey Business Gateway
Business Entity Information and Records Service
Business Id : 0450191120


**PRINCIPALS**


Following are the most recently reported officers/directors (corporations),
managers/members/managing members (LLCs), general partners (LPs), trustees/officers
(non-profits).

           Title:               OTHER
           Name:                VALERIANO MARTINEZ,
           Address:             315 MADISON STREET, PASSAIC, NJ, 07055

**FILING HISTORY -- CORPORATIONS, LIMITED LIABILITY COMPANIES, LIMITED PARTNERSHIPS AND
LIMITED LIABILITY PARTNERSHIPS**


To order copies of any of the filings below, return to the service page,
https://www.njportal.com/DOR/businessrecords/Default.aspx and follow the instructions
for obtaining copies. Please note that trade names are filed initially with the County
Clerk(s) and are not available through this service. Contact the Division for
instructions on how to order Trade Mark documents.



Charter Documents for Corporations, LLCs, LPs and LLPs

           Original Filing        2017
           (Certificate)Date:

Changes and Amendments to the Original Certificate:

           Filing Type          Year Filed
           N/A                   N/A


Note:
Copies of some of the charter documents above, particularly those filed before June
1988 and recently filed documents (filed less than 20 work days from the current date),
may not be available for online download.

  • For older filings, contact the Division for instructions on how to order.
  • For recent filings, allow 20 work days from the estimated filing date, revisit the
    service center at https://www.njportal.com/DOR/businessrecords/Default.aspx

New Jersey Business Gateway
Business Entity Information and Records Service
Business Id : 0450191120

periodically, search for the business again and build a current list of its
filings. Repeat this procedure until the document shows on the list of documents
available for download.


The Division cannot provide information on filing requests that are in process. Only
officially filed documents are available for download.